# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Lyman Holding Company, | Case No. 11-45190 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber Company, | Case No. 11-45191 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Automated Building Components, Inc., | Case No. 11-45192 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Building Materials Wholesalers, Inc., | Case No. 11-45193 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Carpentry Contractors Corp., | Case No. 11-45194 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Construction Mortgage Investors Co., | Case No. 11-45196 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Development Co., | Case No. 11-45199 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc., | Case No. 11-45201 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Properties, L.L.C., | Case No. 11-45202 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Mid-America Cedar, Inc., | Case No. 11-45203 |
| Debtor. | Chapter 11 Case |

---

| Woodinville Lumber, Inc., | Case No. 11-45204 |
|---|---|
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
|---|---|
| Debtor. | Chapter 11 Case |

### NOTICE OF HEARING AND MOTION FOR (I) EXPEDITED RELIEF AND (II) INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL

TO:     The parties-in-interest as specified in Local Rule 9013-3(a)(2).

    1.     The debtors named above (collectively, the "Debtors") move the Court for the relief requested below and give notice of hearing.

    2.     The Court will hold a hearing on the Motion for expedited hearing and on the portion of this Motion seeking an **interim order** at 9:30 a.m. on August 9, 2011 in Courtroom No. 2B, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota. A hearing on the portion of this Motion seeking a **final order** will be held at 10:00 a.m. on August 25, 2011 at the same location.

    3.     Local Rule 9006-1(b) provides deadlines for responses to this Motion. However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking an **interim order**, the Debtors do not object to written responses being served and filed immediately prior to the hearing. Any response to the Motion for a **final order** must be filed and served not later than August 20, 2011, which is five days before the time set for the hearing (including Saturdays, Sundays, and holidays). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.  The petitions commencing these Chapter 11 cases were filed on August 4, 2011 (the "Filing Date").  The cases are now pending before this Court.

5.     This motion arises under 11 U.S.C. §§ 105, 363, and 364 and Fed. R. Bankr. P. 4001.  This motion is filed under Fed. R. Bankr. P. 9014 and 4001 and Local Rules 4001-2 and 9013-1 to 9013-3.  The Debtors request that this Court (I) grant the request for expedited relief and (II) enter interim and final orders authorizing the use of cash collateral.  The grounds for this motion are set out below.

## RULE 4001(b)(1)(B) STATEMENT

6.     Pursuant to Fed. R. Bank. P. 4001(b), the Debtors request an order authorizing use of cash collateral in which the Prepetition Lenders (as defined below) hold a security interest. Debtors will use the cash collateral to continue their operations while pursuing a sale of all or substantially all of their assets.  The Debtors request interim authorization to use cash collateral through the end of the week beginning August 22, 2011, and final authorization to use cash collateral through October 31, 2011.  As adequate protection, the Debtors propose to grant the Prepetition Lenders a replacement lien in the Prepetition Lenders' collateral, make interest payments, maintain the equity cushion, and operate and sell their businesses so as to retain the highest possible value of the assets.  With respect to the putative lien of BlueLinx Corporation, the Debtors will provide adequate protection during the interim period by segregating and retaining proceeds from sales of consignment stock, subject to whatever interests BlueLinx may hold, until such time as the Debtors can determine the validity and priority of such interests.

## BACKGROUND

7.     On the Filing Date, the Debtors filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  There is presently no pending request or motion for appointment of a trustee or examiner, and no official committee of unsecured creditors has yet been appointed in these chapter 11 cases.

8.     Further general background information about the Debtors and these cases is set forth in the Declaration of James E. Hurd in Support of Debtors' First Day Motions and the Declaration of James H. Cullen in Support of Debtors' Sale Motion and Financing Motion.

## PREPETITION LIENS

**A.     Prepetition Lenders.**

9.     All the Debtors except Lyman Holding Company (collectively, the "Borrowers") are borrowers from a group of lenders consisting of U.S. Bank National Association (the "Prepetition Agent"), TCF National Bank, BMO Harris Bank, N.A., Bank of America, N.A., Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A., and Prudential Insurance Company of America (collectively, the "Prepetition Lenders").   Lyman Holding Company guarantied the Borrowers' obligations.   The indebtedness to the Prepetition Lenders is memorialized under the terms of the following loan documents:

a.     Tenth Amended and Restated Credit Agreement dated as of  January 27, 2011 (the "Prepetition Credit Agreement");

b.     Seven promissory notes dated January 27, 2011, each executed by the all Borrowers in favor of an individual Lender and totaling, collectively, $21,000,000;

c.     Security Agreements dated February 12, 2009 and reaffirmed on January 27, 2011 executed by the Borrowers;

d.        Guaranty of Lyman Holding Company dated February 12, 2009 and reaffirmed on January 27, 2011;

e.        Pledge Agreement by Lyman Holding Company dated February 12, 2009 and reaffirmed on January 27, 2011; and

f.        Other related documents including but not limited to certain mortgages and negative pledge agreements

(collectively, the "Prepetition Financing Documents").

10.     In the Prepetition Financing Documents, each of the Borrowers granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, security interests (the "Prepetition Agent's Liens") in inventory, equipment, accounts, pledged loans, rights related to pledged loans, general intangibles, pledged subsidiary stock, insurance, letter-of-credit rights, chattel paper, instruments, documents, investment property, deposit accounts, records relating to all of the foregoing, all proceeds of the foregoing, and all supporting obligations of the foregoing (collectively together with the Pledged Collateral described in paragraph 12 and certain real property, the "Prepetition Collateral"), as all of those assets are defined and more completely described in the Prepetition Financing Documents and the representative UCC financing statement attached as <u>Exhibit A</u>.

11.     With respect to the Prepetition Collateral, the Prepetition Lenders filed original financing statements, amendments, and continuation statements with the Minnesota Secretary of State. A chart setting forth the original filing date, date of latest continuation statement, where applicable, and filing numbers is attached as <u>Exhibit B</u>.

12.     In addition, Lyman Holding Company granted to the Prepetition Lenders a security interest in certain "Pledged Collateral" including its equity interests in the Borrowers and rights to payments, proceed, dividends, distributions, splits, warrants, subscription, instruments, compensation, property, assets, interests and rights, and all monies due and payable

on account of those equity interests. The Prepetition Lenders filed UCC financing statement no. 200914971859 with the Minnesota Secretary of State on February 13, 2009 with reference to this collateral.

13. On July 31, 2011, and in accordance with the Prepetition Financing Documents and with the knowledge of the Prepetition Agent, the Debtors draw down the maximum amount available under the loan, approximately $3 million. As of the Filing Date, the outstanding amount of the Debtors' obligations to the Prepetition Lenders totaled $19,027,000 million (the "Prepetition Indebtedness"), plus accrued and unpaid interest, fees, expenses, and other Obligations, if any (as defined in the Prepetition Credit Agreement). The termination date under the Prepetition Financing Documents was August 1, 2011.

**C. Consignment.**

14. Debtor Lyman Lumber Company and BlueLinx Corporation are parties to that certain Consignment Agreement dated March 1, 2009, Amendment No. One to Consignment Agreement dated February 2, 2010, and Material Storage Agreement dated March 1, 2009 (collectively, the "Consignment Agreement") with BlueLinx Corporation ("BlueLinx"). A copy of the Consignment Agreement is attached as <u>Exhibit C</u>. The Consignment Agreement sets forth the terms under which (a) vinyl siding and vinyl siding accessories and (b) metal soffit and installation accessories (together, the "Consignment Stock") are to be delivered, stored, reported, sold, and paid for.

15. On July 2, 2009, BlueLinx caused to be filed with the Minnesota Secretary of State UCC Financing Statement No. 200916616994 covering "Consignment Stock: Vinyl Siding and accessories." Lyman Lumber Company has not determined whether the financing statement applies to the metal soffit and installation accessories in the Debtor's possession. Lyman

Lumber Company has also not determined whether BlueLinx provided to the Prepetition Lenders an authenticated notification of the consignment as required by Uniform Commercial Code § 9-324(b)(2).

16. The Debtors have historically excluded the Consignment Stock from the inventory on the borrowing base certificates provided to the Prepetition Lenders, so that none of the prepetition funding was advanced in reliance on the Consignment Stock.

17. As of June 30, 2011, Lyman Lumber Company had in its possession Consignment Stock with an approximate value of $6,000 that was delivered prior to July 1, 2009, and approximately $444,000 worth of Consignment Stock delivered after that date. As of the Filing Date, Lyman Lumber Company estimates that the outstanding amount due to BlueLinx on account of prepetition sales of Consignment Stock is approximately $128,000.

18. Lyman Lumber Company cannot determine whether BlueLinx has properly perfected its security interest in the Consignment Stock. Furthermore, BlueLinx may contend that Lyman Lumber Company possesses the Consignment Stock under a bailment and that the Consignment Stock is neither property of the estate nor subject to the Lenders' liens. To protect BlueLinx's interests, whatever they may be, prior to the entry of a final order on use of cash collateral, Lyman Lumber Company will segregate and retain any proceeds of sales of Consignment Stock, subject to the liens and interests that BlueLinx had in the Consignment Stock, if any, to attach to the proceeds.

**D.      Real Property Mortgages.**

19. Certain of the Debtors' properties are subject to Mortgages with certain parties. These parties are TCF National Bank, Union Central Mortgage Funding, Inc., U.S. Bank National Association, and U.S. Bank Trust Company. The properties to which these Mortgages

and related documentation cover are located in: Chanhassen, Minnesota; Eau Claire, Wisconsin; Woodinville, Washington; Cottage Grove, Minnesota; Montrose, Minnesota; Longview, Washington; Chetek, Wisconsin; and Matthews, North Carolina. A full description of the Mortgages and related documentation is attached as Exhibit D.

**E. Other UCC Filings.**

20. Certain other parties have filed financing statements covering certain equipment, goods, and improvements and fixtures to real property of the Debtors. Those parties include Les Schwab Tire Center of WA, Inc.; US Bank, N.A.; TCF National Bank; and Stiles Machinery, Inc. The collateral these parties list on their financing statements do not constitute cash collateral subject to this motion.

## CASH NEEDS

21. The Debtors seek authorization to use the cash collateral existing as of the Filing Date, and in which the Prepetition Lenders claim an interest, in order to pay expenses in accordance with the cash flow projections and budget attached as Exhibit E (the "Budget"). The Debtors have an immediate need to use approximately $9,216,213 of cash collateral between the Filing Date and the end of the week beginning August 22, 2011, in accordance with the Budget. The Debtors have reviewed the Budget and delayed all payments that are not critical during the interim period. Payment of the remaining amounts is necessary to avoid immediate and irreparable harm to the estate pending a final hearing on this Motion.

22. The Debtors will use cash collateral to pay essential business expenses, which include: pre- and post-petition wages and benefits to employees, payroll taxes, and sales taxes, as well as payments to utilities, trade vendors for postpetition purchases, and other parties that supply essential goods and services to the Debtors.

23.     The Debtors need the interim use of cash collateral to pay the costs and expenses of operating their businesses and to avoid immediate and irreparable harm. The Debtors are already at risk of trade vendors refusing to extend credit postpetition, and if the Debtors cannot use cash collateral, they will not be able to fund their operations.

24.     With significant business in the pipeline, the Debtors' businesses are approaching a crucial point in their selling season. The Debtors have a multitude of customers and other constituents that rely on them to provide products and services to homebuilders, and it is essential that these customers, as well as the broader market, be given a degree of certainty as to the future of the Debtors' operations. Approval of the use of cash collateral is critical to minimize disruption of the Debtors' businesses and operations, and would permit them to meet payroll for their approximately 775 employees. It would also allow the Debtors to pay their operating expenses so as to obtain needed supplies and retain customer and supplier confidence by demonstrating an ability to maintain normal operations. On the other hand, if the use of cash collateral is not approved, the Debtors' estates would suffer the immediate and irreparable harm of being forced to scale down or entirely halt operations.

25.     After the interim period and through October 31, 2011, the Debtors must have access to cash collateral to pay the other expenses set forth on the Budget in addition to the essential business expenses to be paid in the interim period. The Debtors must also meet administrative expense obligations such as professional fees and United States Trustee fees.

26.     The Debtors will generate cash from continuing operations. As set forth in the Budget, the Debtors project that such cash will be sufficient to pay their Chapter 11 administrative expenses, including postpetition operating expenses, while maintaining a comparable level of collateral to provide adequate protection to the Prepetition Lenders.

## ADEQUATE PROTECTION FOR USE OF CASH COLLATERAL

27.     To adequately protect the Prepetition Lenders' interests, the Debtors propose to grant the Prepetition Lenders a postpetition replacement security interest of the same priority, dignity, and effect as their prepetition interest in the Debtors' cash collateral, to the extent of such cash collateral use.  As shown on the collateral balance projections attached as <u>Exhibit F</u>, the value of the Prepetition Collateral will exceed the Debtors' indebtedness to the Prepetition Lenders by at least 74% during the period in which Debtors seek to use cash collateral.  The projected cash proceeds from the Stalking Horse Bid (as that term is defined in the motion to approve sale and sale procedures to be filed in these cases) will also be sufficient to provide an equity cushion of 25%.  That does not take into account the possibility that asset sales will yield higher prices.  Accordingly, the Prepetition Lenders are also adequately protected by an equity cushion.

28.     The use of cash collateral itself also protects the Prepetition Lenders' interest, allowing the Debtors to retain key employees and to operate the businesses.  As described on Exhibit F, the Debtors estimate that the going-concern value of the Prepetition Collateral will decrease modestly over the period for which the Debtors request use of cash collateral, but significantly exceed the amount of the indebtedness.  In contrast, if operations cease and employees leave, the value of the Debtors' assets will be reduced to their liquidation value, which is much lower.  Thus, the Debtors' use of cash collateral presents a much lower risk of loss to the Prepetition Lenders than the loss they face if the Debtors do not use cash collateral.

29.     Prior to the interim or final hearings on this Motion, and in settlement of any and all matters raised in this Motion, the Debtors may enter into a stipulation or agreed order with the Prepetition Lenders concerning the use of cash collateral, adequate protection, and other related

matters.  In the event the Debtors enter into any such stipulation, they will seek approval of the stipulation without further notice or hearing pursuant to Bankruptcy Rule 4001(d)(4), and **THE DEBTORS HEREBY GIVE NOTICE OF INTENT TO SEEK APPROVAL OF ANY SUCH STIPULATION OR AGREED ORDER.**

30.     The Budget shows that the Debtors will be able to operate through the end of October with use of cash collateral.  Prior to the Filing Date, the Debtors requested from the Prepetition Lenders a DIP loan to ensure their operations during the case.  Although such borrowing does not seem likely, in the event that additional funds are required, the Debtors may seek authority on an expedited basis to obtain postpetition credit that would propose to grant a "priming" lien on Prepetition Collateral.  Based on the Debtor's prepetition efforts to negotiate DIP financing with the Prepetition Lenders and potential bidders, the Debtors believe that no DIP financing will be available without such a lien.  **THE DEBTORS HEREBY GIVE NOTICE  THAT THEY MAY SEEK APPROVAL OF POSTPETITION CREDIT SECURED BY A FIRST POSITION LIEN IN THEIR ASSETS, INCLUDING PREPETITION COLLATERAL.**

## EXPEDITED RELIEF

31.     The Debtors seek the interim relief herein on an expedited basis, and cause exists to reduce notice of the Motion.  The Debtors have given approximately _____ days' notice of hearing.  Furthermore, the Prepetition Lenders are well aware of the Debtors' cash needs.

32.     Moreover, the Debtors must be authorized to use cash collateral in the interim period.  Among other things, the Debtors are scheduled to fund payroll obligations.  If the Debtors fail to make such payments, the Debtors may lose their employees and be unable to hire new employees.  As described above, without the interim use of cash collateral as proposed, the Debtors may be unable to continue operations, and the interest of creditors and others in these

cases will be irreparably harmed. Therefore, cause exists to reduce notice of the hearing with respect to an interim order authorizing the use of cash collateral.

33. Pursuant to Local Rule 9013-2(a), this motion is accompanied by a memorandum of law, proposed order, and proof of service and is supported by the declarations of James E. Hurd and James H. Cullen.

34. Pursuant to Local Rule 9013-2(c), the Movants give notice that they may, if necessary, call James E. Hurd, the President and Chief Executive Officer, and/or Dale Carlson, Senior Vice President, whose business addresses are 300 Morse Avenue, Excelsior, Minnesota or James Hajek, Brock Kline or James Cullen, Alliance Management, Inc., whose business address is 601 Carlson Parkway, Suite 110, Minnetonka, MN 55305 to testify regarding the facts set out in this motion.

WHEREFORE, the Debtors move the Court for an order granting:

A. An expedited hearing on this motion;

B. Interim and final approval of the use of cash collateral in which the Prepetition Lenders hold a security interest; and

C. Such other and further relief as the Court deems just and equitable.

Dated: August 4, 2011

 _/e/ Douglas W. Kassebaum_
James L. Baillie (#3980)
Thomas F. Steichen (#279511)
Cynthia A. Moyer (#211229)
Douglas Kassebaum (#386802)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis MN 55402
(612) 492-7000
(612) 492-7077  fax
jbaillie@fredlaw.com
cmoyer@fredlaw.com
dkassebaum@fredlaw.com

PROPOSED ATTORNEYS FOR DEBTORS

4967353

## VERIFICATION

I, James E. Hurd, am the President and CEO of the Debtors, and declare under penalty of perjury that the facts set forth in the preceding motion, including exhibits, are true and correct, according to the best of my knowledge, information and belief.

Dated:  August 4, 2011          Signed:_____

                                      James E. Hurd

## EXHIBIT A

## REPRESENTATIVE FINANCING STATEMENT

**Filing NO: 20091497186**
**Filing Date: 2009/02/13**
**Filing Time: 4:42 PM**
**State of Minnesota**
**Processing Office: Jackson**
**Filed by: mccber32**

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

PLEASE RETURN ACKNOWLEDGEMENT TO:

Capitol Lien Records & Research, Inc.
1010 N Dale St
St. Paul, MN 55117
www.capitollien.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| **20011498448; FILED SEPTEMBER 10, 2001** | |

| 2. | TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|
| 3. | CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
| 4. | ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9. |

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

**THE COLLATERAL DESCRIPTION ATTACHED TO THE INITIAL FINANCING STATEMENT REFERENCED ABOVE IS HEREBY AMENDED AND RESTATED IN ITS ENTIRETY TO READ AS SET FORTH ON EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF.**

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **U.S. BANK NATIONAL ASSOCIATION, AS AGENT** | | | |
| OR | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**
For filing with the Minnesota Secretary of State          Current Debtor: Lyman Lumber Company

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

2289071v1

EXHIBIT A TO UCC FINANCING STATEMENT AMENDMENT NAMING
LYMAN LUMBER COMPANY, AS DEBTOR AND
U.S. BANK NATIONAL ASSOCIATION, AS AGENT, AS SECURED PARTY

This FINANCING STATEMENT covers the following described property of Debtor, whether
now existing or hereafter arising, and whether now owned or hereafter acquired (the "Collateral"):

(a)     Inventory.  All "inventory," as such term is defined in the UCC, of the Debtor
wherever located and of every class, kind and description and, in any event, shall include, without
limitation, (a) all goods, merchandise, raw materials, work-in-process, returned goods, finished
goods, samples and consigned goods (to the extent of the consignee's interest therein), materials
and supplies of any kind or nature which are or might be used in connection with the
manufacture, printing, publication, packing, shipping, advertising, selling or finishing of any such
goods and all other products, goods, materials and supplies, (b) all inventory as is temporarily out
of the Debtor's custody or possession, items in transit and any returns and repossessions upon any
accounts of the Debtor (c) all goods that are stopped in transit or which otherwise come into the
possession of the Debtor and (d) all substitutions therefor or replacements thereof, and all
additions and accessions thereto;

(b)     Equipment.  All "equipment," as such term is defined in the UCC, of Debtor,
whether now owned or hereafter acquired, including, but not limited to, all present and future
machinery, vehicles, tractors, trailers, trucks, furniture, fixtures, manufacturing equipment, shop
equipment, office and recordkeeping equipment, parts, tools and supplies, excluding only the
Specific Montrose Equipment;

(c)     Accounts.  All "accounts," as such term is defined in the UCC, of the Debtor,
including, without limitation, (a) all margin accounts, futures positions, book debts and other
forms of obligations and receivables now or hereafter owned or held by or payable to the Debtor
relating to or arising from the sale or lease of goods or the rendering of services by the Debtor or
any other party, including the right to payment of any interest or finance charge with respect
thereto, together with all merchandise represented by any of the accounts, (b) all of such
merchandise that may be reclaimed or repossessed or returned to the Debtor, (c) all of the
Debtor's rights as an unpaid vendor, including stoppage in transit, reclamation, replevin and
sequestration, (d) all assets pledged, assigned, hypothecated or granted to, and all letters of credit,
guarantee claims, liens and security interests held by, the Debtor to secure payment of any
accounts and which are delivered for or on behalf of any account debtor, (e) all accessions to all
of the foregoing described properties and interests in properties, (f) all powers of attorney for the
execution of any evidence of indebtedness or security or other writing in connection with the
foregoing and (g) all evidence of the filing of financing statements and other statements and the
registration of other instruments in connection therewith and amendments thereto, notices to other
creditors or secured parties and certificates from filing or other registration offices;

(d)     Pledged Loans.  All right, title and interest of the Debtor in and to all present and
future indebtedness or obligations owed to the Debtor by any Person, and all promissory notes,
contracts for deed, real estate mortgages, deeds of trust, security agreements, chattel mortgages,
assignments of rent and other documents, instruments or agreements which evidence or secure (or
constitute collateral for any note, instrument or agreement evidencing or securing) such
indebtedness or obligations (the "Pledged Loans");

(e)     Rights Related to Pledged Loans.  All right, title and interest of the Debtor under
all agreements between the Debtor and Persons other than the Debtor pursuant to which the

2289097v1

Debtor undertakes to service any Pledged Loan, including without limitation the rights of the Debtor to income and reimbursement thereunder; all right, title and interest of the Debtor in and to all financing statements perfecting the security interest of any Pledged Loan or property securing any Pledged Loan; all right, title and interest of the Debtor in and to all guaranties and other instruments by which the Persons executing the same guarantee, among other things, the payment or performance of any Pledged Loan; all right, title and interest of the Debtor in and to all title insurance policies, title insurance binders, commitment or reports insuring or relating to any Pledged Loan or property securing any Pledged Loan; all right, title and interest of the Debtor in and to all surveys, bonds, hazard and liability insurance policies, participation agreements and any other agreement, instrument or document pertaining to, affecting, obtained by the Debtor in connection with, or arising out of, any Pledged Loan; all right, title and interest of the Debtor in and to all collections on, and proceeds of or from, any and all of the foregoing including, without limitation, all rights of the Debtor (i) under a sheriff's certificate of sale (or other similar instrument of conveyance) issued to Debtor following a foreclosure sale of any mortgage, deed of trust or other security document securing any Pledged Loan, (ii) under any deed in lieu of foreclosure or (iii) following the cancellation of any contract for deed associated with any Pledged Loan; all files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records, and other records, information, and data of the Debtor relating to the Pledged Loans (including all information, data, programs, tapes, discs and cards necessary to administer and service the Pledged Loans; and any and all balances, credits, deposits, accounts or moneys of, or in the name of, the Debtor representing or evidencing the foregoing or any proceeds thereof, and any and all proceeds of the foregoing;

(f)      General Intangibles.  All "general intangibles," as such term is defined in the UCC, of the Debtor, including, without limitation, (i) all "payment intangibles," as such term is defined in the UCC, (ii) all "software," as such term is defined in the UCC, and all discs, related documentation and other related assets relating to the Collateral, (iii) all trade secrets, registered and unregistered copyrights in computer programs and rights under licenses to use computer programs and all other rights with respect to computer programs, and (iv) all inventions, designs, patents, patent applications, design patents, design patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, tax refund claims, rights to indemnification and rights under warranties, in each case whether now owned or hereafter acquired and wherever located;

(g)      Pledged Subsidiary Stock.  All Pledged Subsidiary Stock;

(h)      Insurance.  All insurance policies of any kind maintained in effect by Debtor, now existing or hereafter acquired, under which any of the Collateral is insured, claims under such policies and any proceeds payable to Debtor under such policies, whether or not such policies are issued to or owned by the Debtor and whether or not the Agent is named as loss payee or additional insured, including any credit insurance;

(i)      Letter of Credit Rights.  All "letter-of-credit rights," as such term is defined in the UCC;

(j)      Chattel Paper, Instruments and Documents.  All "chattel paper", "instruments" and "documents", as such terms are defined in the UCC;

(k)      Investment Property.  All "investment property," as such term is defined in the UCC;

(l)    <u>Deposit Accounts</u>. All "deposit accounts," as such term is defined in the UCC;

(m)    <u>Other</u>. All books, correspondence, credit files, records, invoices, manuals, service records and programs, other papers and documents, computer records, runs, software, systems, procedures, disks, tapes and other storage media relating to any of the Collateral, including any of the foregoing in the possession or control of any service, consultant, or outside vendor;

(n)    <u>Proceeds</u>. All "proceeds" of the foregoing property, as such term is defined in the UCC; and

(o)    <u>Supporting Obligations</u>. All "supporting obligations," as such term is defined in the UCC relating to the foregoing

Defined Terms.

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement. The following terms used herein shall have the following meanings:

"<u>Borrowers</u>" means collectively, Debtor, Construction Mortgage Investors Co., a Minnesota corporation, Mid-America Cedar, Inc., a Minnesota corporation, Lyman Development Co., a Minnesota corporation, Woodinville Lumber, Inc., a Minnesota corporation, Woodinville Construction Services, L.L.C., a Minnesota limited liability company, Carpentry Contractors Corp. (formerly known as Carpentry Contractors Acquisition, Inc.), a Minnesota corporation, Lyman Properties, L.L.C., a Minnesota limited liability company, Building Material Wholesalers, Inc., a Minnesota corporation, Automated Building Components, Inc., a Minnesota corporation, and Lyman Lumber of Wisconsin, Inc., a Minnesota corporation.

"<u>Credit Agreement</u>" means that certain Ninth Amended and Restated Credit Agreement by and among Borrowers and Secured Party, as one of the Lenders and as administrative agent for the Lenders and the other Lenders party thereto (as the same may be hereafter amended, restated, modified or supplemented from time to time).

"<u>Development Pledged Subsidiary Stock</u>" means the Pledged Subsidiary Stock of Lyman Development.

"<u>Properties Pledged Subsidiary Stock</u>" means the Pledged Subsidiary Stock of Lyman Properties.

"<u>Pledged Subsidiary Stock</u>" means all of the membership units of Lyman Properties, L.L.C. ("Lyman Properties"), and all of the capital stock of Lyman Development Co. ("Lyman Development"), now or hereafter owned by the Debtor, together with the certificates or other agreements or instruments, if any, representing or evidencing such membership units or capital stock, and all options and other rights, contractual or otherwise, with respect thereto. The term Pledged Subsidiary Stock shall specifically include, but shall not be limited to:

(i)    all membership units, capital stock, shares or securities representing a dividend on any of the Pledged Subsidiary Stock, or representing a distribution or return of capital upon or in respect of the Pledged Subsidiary Stock, or resulting from a split, revision, reclassification or other exchange therefor, and any subscriptions, warrants,

rights or options issued to the holder of, or otherwise in respect of, the Pledged Subsidiary Stock; and

(ii)      without affecting the obligations of Debtor under any provision prohibiting such action hereunder or under the Credit Agreement, in the event of any consolidation or merger involving the issuer of any Pledged Subsidiary Stock and in which such issuer is not the surviving entity, all shares of each class of membership unit, capital stock or other equity interest of the successor entity formed by or resulting from such consolidation or merger.

"Secured Obligations" means, collectively, all of the Borrowers' respective obligations and liabilities under the Credit Agreement, the Notes and all of the other Loan Documents, and any and all further renewals, extensions, and amendments thereto, whether such obligations and liabilities may be direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, including without limitation any such obligation that arise after the filing of a petition by or against the Debtor under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 or otherwise.

"Specific Montrose Equipment" means the equipment listed on Exhibit B attached hereto.

"UCC" means the Uniform Commercial Code in effect on the date hereof in the State of Minnesota; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection on the security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Minnesota, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of provisions hereof relating to such perfection or effect of perfection or non-perfection.

EXHIBIT B TO UCC FINANCING STATEMENT NAMING
LYMAN LUMBER COMPANY, AS DEBTOR AND
U.S. BANK NATIONAL ASSOCIATION, AS AGENT, AS SECURED PARTY

1.    <u>Specific Montrose Equipment</u>.  Means the following items of equipment owned by the Debtor:

(a) Item #487 Alpine RS CNC Controlled Auto Mill Saw

(b) Item #689 Flat Stacker for Trusses

and all substitutions and replacements thereof and all proceeds thereof.

# EXHIBIT B

## CHART OF FILINGS

| Debtor Entity | Creditor | Original Filing Date | File No. | Latest Continuation Date | File No. | Collateral |
|---|---|---|---|---|---|---|
| Mid-America Cedar, Inc. | US Bank | 10/05/90 | 1363016 | 04/14/10 | 20101987697 | All assets |
| Lyman Lumber Company | US Bank | 09/10/01 | 20011498448 | 03/30/11 | 20112366211 | All assets |
| Construction Mortgage Investors Co. | US Bank | 09/10/01 | 20011498552 | 03/30/11 | 20112366193 | All assets |
| Mid-America Cedar, Inc. | US Bank | 09/10/01 | 20011498622 | 03/30/10 | 20112366204 | All assets |
| Lyman Development Co. | US Bank | 09/10/01 | 20011498725 | 03/30/11 | 20112366218 | All assets |
| Woodinville Lumber, Inc. | US Bank | 09/10/01 | 20011498840 | 03/30/11 | 20112366224 | All assets |
| Woodinville Construction Services, LLC | US Bank | 09/10/01 | 20011499048 | 03/30/11 | 20112366233 | All assets |
| Carpentry Contractors Corp. | US Bank | 09/10/01 | 20011499174 | 03/30/11 | 20112366187 | All assets |
| Mid-America Cedar, Inc. | US Bank | 09/02/03 | 20038611035 | 03/18/08 | 20081100850 | All assets |
| Lyman Properties LLC | US Bank | 12/22/03 | 20039922372 | 07/09/08 | 20081243971 | All assets |
| Mid-America Cedar, Inc. | US Bank | 07/08/04 | 200412458533 | 01/23/09 | 20091468704 | All assets |
| Mid-America Cedar, Inc. | US Bank | 07/08/04 | 200412458634 | 01/23/09 | 20091468694 | All assets |
| Lyman Lumber of Wisconsin, Inc. | US Bank | 02/04/09 | 200914827046 | n/a | n/a | All assets |
| Automated Building Components, Inc. | US Bank | 02/04/09 | 200914827185 | n/a | n/a | All assets |
| Building Material Wholesalers, Inc. | US Bank | 02/04/09 | 200914827197 | n/a | n/a | All assets |
| Lyman Holding Company | US Bank | 02/13/09 | 200914971859 | n/a | n/a | All assets |
| Woodinville Lumber, Inc. | Les Schwab Tire Center of WA, Inc. | 05/02/02 | 20023930756 | 03/26/07 | 20071605412 | Any and all products purchased from creditor |
| Lyman Lumber Company | Bluelinx Corporation | 07/02/09 | 200916616994 | n/a | n/a | Consignment Stock: Vinyl siding and accessories |

# EXHIBIT C

## CONSIGNMENT AGREEMENT

# CONSIGNMENT AGREEMENT

**THIS CONSIGNMENT AGREEMENT** (this "Agreement") is entered into as of 3/25/2009___, 2009, by and between **BlueLinx Corporation**, a Georgia corporation with offices located at 4300 Wildwood Parkway, Atlanta, Georgia 30339 (hereafter known as "Seller" or "Consignor"), and **Lyman Lumber**, a __Minnesota_____ corporation with offices located at 18900 W. 78th Street, Chanhassen, Minnesota 55317 (hereafter known as "Buyer" or "Consignee").

### 1. Supply of Consignment Stock

a.      Seller produces and/or distributes building products, including, without limitation, vinyl siding, roofing products, plywood, lumber, insulation, engineered lumber products, paneling, and other goods.  Subject to the terms of this Agreement, Seller shall maintain in Buyer's or its designee's warehouse (hereafter known as the "Warehouse") located at 18900 &18930 West 78th St. Chanhassen, MN 55317_____ _____, a supply of certain types of the foregoing goods, as agreed to with Buyer from time to time in accordance with this Agreement.  Upon receipt by Buyer of any supply thereof, such products shall be deemed the "Consignment Stock".  Buyer shall not change the address or the location of the Consignment Stock from the address and location stated in this section.

b.      Buyer shall inspect Consignment Stock for damage at the time of delivery and inform Seller in writing within two (2) business days after delivery of any shortage, overage, or defective Consignment Stock.  If Buyer does not so notify Seller, such Consignment Stock shall be deemed to have been received in good and usable condition, and in the quantities indicated in the bill of lading that accompanied the product shipment. Buyer shall notify Seller in writing by the tenth (10th) day of each calendar month of its needs for Consignment Stock for the next calendar month.  Buyer shall furnish to Seller the assistance of Buyer's employees for the purpose of unpacking, handling, storing and placing any of Seller's Consignment Stock in the Warehouse.

### 2. Reporting and Payment for Consignment Stock; Prices and Price Changes

a.      Buyer shall purchase Consignment Stock by withdrawing products from the Consignment Stock.  Buyer shall purchase its requirements for the types of products contained in the Consignment Stock from the Consignment Stock, as long as adequate supplies of such products are maintained in the Consignment Stock. Buyer shall withdraw products from the Consignment Stock on a "first in, first out" basis.  If Consignment Stock is packaged in units or bundles, Buyer shall be deemed to have purchased all pieces or items contained in the unit or bundle when the unit or bundle is opened, broken or withdrawn from the Consignment Stock.

b.      Buyer shall report to Seller, in writing, every two weeks a list of the products withdrawn by Buyer from the Consignment Stock ..  Buyer's report shall include (i) an accounting of the Consignment Stock in the possession of Buyer or its agents at the beginning and end of such period, and (ii) an accounting of all Consignment Stock removed by Buyer during the period; in each case describing the Consignment Stock by location and product type.

c.      Buyer will pay Seller for Consignment Stock in accordance with the prices set forth in Schedule I attached hereto.  Seller shall invoice Buyer for product withdrawn from the Consignment Stock upon receipt of Buyer's written report. Buyer shall pay Seller's invoices based upon the terms of payment set forth in Schedule I.  Seller reserves the right to apply any

payments received by Seller for Consignment Stock to the oldest of Seller's invoices then outstanding. Seller may impose a late payment charge equal to 1 ½% per month, or the maximum rate permitted by law, whichever is less, on past due amounts.

      d.     Seller shall notify Buyer of any change in the price of Consignment Stock. Such price change shall become effective on the date specified in Seller's notice of price change. The parties shall amend Schedule I hereto (and such Schedule shall hereby be deemed amended) to comport with such price change.

### 3. Levels of Consignment Stock

Buyer and Seller shall mutually determine the level of Consignment Stock to be delivered to or maintained with Buyer. Seller, in its sole discretion at any time during this Agreement and without notice to Buyer, may reduce the quantity of Consignment Stock it delivers to or maintains with Buyer (including reducing such quantity to zero) and take physical possession of the Consignment Stock or demand the prompt return of Consignment Stock from Buyer. Buyer shall have the right at any time to return Consignment Stock, that has not been purchased by Buyer in accordance with Section 2, to Seller, if there has been no deterioration in the condition of such Consignment Stock from the date of its delivery to Buyer. Buyer shall cooperate fully with Seller to monitor the Consignment Stock levels.

### 4. Risk of Loss; Title and Separate Inventory

      a.     Consignment Stock shall remain the property of Seller until it is withdrawn by Buyer and Seller has received payment in full in cash from Buyer for such Consignment Stock, at which time title to and ownership of such purchased Consignment Stock shall pass to Buyer. So long as Seller retains title to Consignment Stock, Buyer shall take all appropriate or necessary steps to protect and maintain Seller's title, to keep Consignment Stock separate and apart from similar stock owned by persons other than Seller, and to conspicuously mark and identify Consignment Stock as Seller's. Full legal and beneficial ownership and title to Consignment Stock shall remain with Seller and not merely a retained security interest, notwithstanding the provisions of Article 2-401 of the Uniform Commercial Code or any similar provision of applicable law. Further, Consignment Stock shall not be deemed to be held by Buyer "on sale or return", notwithstanding the provisions of Article 2-326 of the Uniform Commercial Code or any similar provision of applicable law. Seller's interest in and to the Consignment Stock and all Proceeds thereof (as defined in Section 6b) shall at all times be superior to all other liens, claims and interests therein.

      b.     Although title to and ownership of Consignment Stock remain with Seller as provided in the preceding section, risk of loss shall nevertheless pass to Buyer when Seller physically tenders delivery to Buyer at the Warehouse. Buyer shall provide clean, dry and secure storage for Consignment Stock at no cost to Seller, and shall be responsible for damage to or loss of Consignment Stock from any cause, including, but not limited to, the destruction, damage, disappearance, seizure, condemnation, confiscation or theft of Consignment Stock or the failure to properly account for it. Buyer shall keep at all times a detailed and complete inventory list of Consignment Stock, copies of which shall be furnished to Seller promptly upon Seller's request.

### 5. Warranties and Liability of Seller

a. Buyer must give Seller written notice of any claim under this warranty within the earlier of one (1) year after delivery of the product in question to Buyer, or any shorter period specified in the applicable industry standard or grading rule. Seller shall not be liable for any claims not made within the foregoing time period.

b. SELLER WILL ASSIGN, DELIVER AND CONVEY TO BUYER UPON PAYMENT FOR SUCH CONSIGNMENT STOCK ANY AND ALL TRANSFERABLE MANUFACTURER'S WARRANTIES APPLICABLE TO SUCH CONSIGNMENT STOCK. THE CONSIGNMENT STOCK WILL BE IN COMPLIANCE WITH AND SUBJECT TO THE APPROPRIATE GUIDELINES AND STANDARDS APPRROVED BY THE AMERICAN LUMBER STANDARD BOARD OF REVIEW.

c. EXCEPT FOR THE WARRANTY THAT SELLER HAS GOOD TITLE TO THE CONSIGNMENT STOCK, THE WARRANTIES STATED ABOVE ARE EXCLUSIVE. SELLER SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE CONSIGNMENT STOCK.

d. UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF ANY DEFECT, DELAY, NON-DELIVERY, SHORTAGE, BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT OR ANY OTHER LEGAL THEORY. SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, DAMAGE TO OTHER PROPERTY OR LOSS OF USE OF THE PRODUCT OR OTHER PROPERTY.

e. Any action or suit relating to defective products must be commenced within one (1) year after delivery of the product to Buyer.

f. Buyer must give Seller a reasonable opportunity to inspect the nonconforming product. Where Seller finds the product nonconforming, Seller will replace the nonconforming product with conforming product, or, at its option, refund the price paid by Buyer for such nonconforming product. Seller also shall have 60 days from the date of such finding to dispose of the nonconforming product. Under no circumstances are products to be returned to Seller unless Buyer has written permission of Seller to do so. A claim that products are nonconforming shall not entitle Buyer to deduct any sum from any invoice unless such claim has been allowed in writing.

### 6. Intent of Agreement; Grant of Security Interest

a. It is the intent of Buyer and Seller that this Agreement constitutes a "true consignment", whereby title to the Consignment Stock remains in Seller until sold to Buyer and Seller has been paid in full, in cash, the price of such Consignment Stock as provided in Schedule I hereof.

b. Buyer shall execute all documents reasonably necessary to evidence and protect Seller's security interest in the Consignment Stock.

### 7. Notice of Consignment; Liens

a.     Until title and ownership is transferred to Buyer, Buyer, at its expense, shall perform all steps requested by Seller at any time to perfect, maintain, protect, and enforce Seller's title and lien in and to the Consignment Stock.

b.     Buyer shall maintain the Consignment Stock and Proceeds thereof free from any security interest, mortgage, pledge, lien or other encumbrance (except those attributable to Seller) and shall not permit the use of the Consignment Stock or Proceeds thereof as collateral or security for any debt or other liability of Buyer. Buyer shall defend Seller's title to the Consignment Stock against the claims of Buyer's creditors and notify Seller promptly of any claim made or asserted against any of the Consignment Stock. Buyer shall indemnify and save harmless Seller and its officers, directors and employees from and against all losses, damages and expenses arising out of the existence of any lien in the Consignment Stock and Proceeds thereof other than liens in favor of Seller.

## 8.   Insurance

a.     During the performance of this Agreement, Buyer shall maintain and keep in force, at its own expense, All-Risk Property Insurance in amounts and with insurers reasonably acceptable to Seller, providing coverage for all risks of physical loss or damage to the Consignment Stock at all times. On an annual basis, or more often if requested by Seller, Buyer shall provide Seller with a current certificate of insurance evidencing that such property insurance is in place and naming Seller as a loss payee.

b.     Buyer shall pay all deductibles from insured claims under its policies.   The coverage afforded under any insurance policy obtained by Buyer pursuant to this Section 8 shall be primary coverage regardless of whether or not Seller has similar coverage. Buyer shall give Seller written notice of the occurrence of any event of loss with respect to Consignment Stock within five (5) days of the discovery of such loss. Upon receipt of any insurance proceeds for any loss, Buyer shall promptly pay, or shall cause the insurer to pay, to Seller the amount of such proceeds that corresponds to the Consignment Stock affected by such loss. However, the maintenance of the insurance required under this Section 8 shall not in any way operate to limit the liability of Buyer to Seller under this Agreement.

## 9.   Indemnification

Buyer shall defend, indemnify and hold Seller and its employees and agents harmless against losses, damages, claims, suits, liabilities, expenses and reasonable attorneys' fees arising out of or in any manner related to (a) the breach of any representation, warranty or covenant made by Buyer under this Agreement, or (b) the storage, location and maintenance of Consignment Stock in the Warehouse, including without limitation claims made or lawsuits brought by Buyer's employees or invitees to the Warehouse; provided, however, that the foregoing indemnity shall not extend to claims that are caused from Seller's negligence or willful misconduct.

## 10. Taxes

Seller at its own cost shall pay all ad valorem and similar taxes assessed or levied on the Consignment Stock until such time as title thereto passes to Buyer.  Buyer at its own cost shall pay all sales or other taxes resulting from any transfer of title of the Consignment Stock to Buyer.

## 11. Inspection and Audit

Buyer shall permit Seller or its representatives to inspect the Consignment Stock and Buyer's records relating to its use and/or resale of products withdrawn from the Consignment Stock at reasonable times. Upon the request of Seller, Buyer and Seller shall make a joint audit of Consignment Stock at the Warehouse from time to time and at the termination of this Agreement. Buyer shall cooperate with and assist Seller at all times in the conduct of such audits. Jointly conducted and executed physical counts of the Consignment Stock resulting from a joint audit shall be binding on Buyer and Seller. Payment to Buyer or to Seller, as the case may be, for discrepancies in the results of joint audits shall be made within thirty (30) days after the completion thereof on a net basis.

## 12. Force Majeure

Neither party hereto shall be liable to the other for default (except as to Buyer's payment and insurance obligations, which obligations will not be forgiven in any event) or delay in delivering or accepting Consignment Stock or performing services hereunder to the extent that such default or delay is caused by fire, strike, riot, acts of God, delay in carriers, governmental order or regulation, labor disputes, complete or partial shut down of plant by reason of inability to obtain sufficient raw materials or power or of any other contingency beyond the reasonable control of either party, whether or not of the same type or character described herein.

## 13. Termination of Agreement

This Agreement may be terminated at any time by Buyer or Seller. Termination shall be effective on the date specified in the notice of termination (which in no event shall be less than three (3) business days after such party's receipt of such notice). On the date such termination is effective, Buyer shall (a) pay Seller for all Consignment Stock delivered to Buyer or Buyer's warehouse, or (b) return all Consignment Stock to Seller. Any sum not paid in full in cash on such date shall thereafter bear interest at the lower of 18% per annum or the highest lawful rate, until such sums are paid in full. Termination of this Agreement shall not prejudice any claim or right either party may have under this Agreement that arises prior to the effective date of such termination, or affect the rights, obligations or liabilities of the parties under the provisions of this Agreement which by their nature extend beyond termination, including, but not limited to, the provisions of Sections 5 and 9 hereof, which shall survive termination as independent obligations.

## 14. Independent Parties

Nothing in this Agreement shall be construed to constitute Buyer as an agent, partner, joint venturer or employee of Seller. Seller shall not assert any control over the sales price of Consignment Stock later used or sold by Buyer nor over the operations of Buyer. Neither party shall have any authority to bind the other in any respect and each shall remain an independent party, responsible for its own actions.

## 15. Default; Remedies

a.       Any default by Buyer in the payment of any amount when due, or failure to obtain and maintain in full force and effect any insurance required under Section 8 of this Agreement, or breach of any representation or covenant made in this Agreement, or Buyer's failure for a period of ten (10) days after written notice to fulfill any other obligation under this Agreement (each, a "Default"), shall entitle Seller, at its option, without demand to take one or more of the following actions: (i) demand that Buyer assemble and deliver to Seller the Consignment Stock, (ii) enter the Buyer's premises and remove all Consignment Stock from Buyer's possession or

control, (iii) make shipments subject to payment on presentation of sight draft attached to a document of title, (iv) declare Buyer liable for all amounts not previously paid to Seller for Consignment Stock sold to Buyer hereunder, as well as Seller's costs of collection, including interest and reasonable attorneys' fees and expenses, and (v) exercise all rights and remedies available to Seller under applicable law. Notwithstanding any other provisions of this Agreement, in the event Seller shall have reason to feel insecure at any time as to Buyer's financial responsibility or its ability to perform this Agreement, Seller may, in its sole discretion, decline to make further deliveries except upon receipt of cash in advance or satisfactory security.

b.      No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to herein or otherwise available to Seller at law or in equity; and the exercise or beginning of exercise by Seller of any one or more such remedies shall not preclude the simultaneous or later exercise by Seller or any or all such other remedies. No express or implied waiver by Seller of any Default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default. Each and every right, power, remedy, and privilege hereby given to, or retained by, Seller pursuant to this Agreement shall be in addition to and not in limitation of every other right, power, remedy, and privilege given under the Agreement or now or hereafter existing at law or in equity. Each and every right, power, remedy, and privilege of Seller under this Agreement may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Seller. Buyer hereby waives to the extent permitted by applicable law any right which it may have to require Seller to choose or elect remedies.

c.      Seller shall have the right to proceed by any action at law or in equity to obtain possession of any or all Consignment Stock, or to recover the payment of any amount due hereunder, all without the necessity of posting any bond. BUYER HEREBY ACKNOWLEDGES THAT ITS OBLIGATIONS UNDER THIS AGREEMENT ARISE OUT OF A "COMMERCIAL TRANSACTION" AS SUCH TERM IS DEFINED IN O.C.G.A. § 44-14-260(1), AND AGREES THAT IN THE EVENT OF ANY DEFAULT, SELLER SHALL HAVE THE RIGHT TO AN IMMEDIATE WRIT OF POSSESSION WITHOUT NOTICE OR HEARING. BUYER KNOWINGLY AND INTELLIGENTLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO ANY NOTICE, HEARING AND POSTING OF A BOND BY SELLER PRIOR TO SEIZURE BY SELLER, ITS TRANSFEREES, ASSIGNS OR SUCCESSORS IN INTEREST, OF THE CONSIGNMENT STOCK OR ANY PORTION THEREOF. THIS IS INTENDED BY BUYER AS A "WAIVER" AS THIS TERM IS DEFINED IN O.C.G.A. § 44-14-260(3). BUYER ALSO KNOWINGLY AND INTELLIGENTLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO ANY NOTICE, HEARING AND POSTING OF A BOND BY SELLER UNDER ANY SIMILAR STATUTE OF ANY JURISDICTION WHERE THE CONSIGNMENT STOCK IS LOCATED.

**16. Notice of Events**

Buyer will deliver to Seller, promptly upon (and in any event within five (5) business days after) any officer of Buyer obtaining knowledge thereof, written notice of the occurrence of any of the following events, together with a written statement of an officer of Buyer specifying the nature of such event, the period of existence thereof, and the action that Buyer has taken and proposes to take with respect thereto: (a) a Default; (b) the filing of a petition by or against Buyer for voluntary or involuntary bankruptcy; (c) the institution of insolvency proceedings of any other nature against Buyer; (d) the appointment of a receiver for Buyer or any of its property; (e) the attachment or seizure of any property of Buyer under any legal process; or (f) the making by Buyer of a general assignment for the benefit of creditors. If any of the events described in

clauses (b) through (f) of this Section 16 occur, Buyer immediately shall cease removing Consignment Stock from the Warehouse and cease all use or resale of the Consignment Stock; shall segregate the Consignment Stock from other items located at the Warehouse; shall hold the Consignment Stock in trust for Seller; shall grant Seller permission to remove the Consignment Stock from the Warehouse; and, if requested by Seller, shall consent to an emergency motion for relief from the automatic stay in bankruptcy to allow Seller to remove the Consignment Stock.

### 17. Representations and Covenants

a.      Buyer represents and warrants to Seller that Schedule II hereto identifies Buyer's name as of the date of this Agreement as it appears in official filings in the state of its incorporation or other organization, the type of entity of Buyer (including corporation, partnership, limited partnership or limited liability company), organizational identification number issued by Buyer's state of incorporation or organization or a statement that no such number has been issued, the jurisdiction in which Buyer is incorporated or organized, and Buyer's Federal Taxpayer Identification Number. Buyer has only one state of incorporation or organization.

b.      Seller's lien in the Consignment Stock shall at all times, until title and ownership is transferred to Buyer, constitute a first-priority security interest in the Consignment Stock, which is and shall at all times, until title and ownership is transferred to Buyer, remain superior to all other liens, claims and interests therein.

c.      Each representation of Buyer in this Agreement is deemed to be repeated each time Consignment Stock is delivered to and accepted by Buyer.

d.      Buyer shall not merge or consolidate with or into any other person or entity, or convey, transfer, lease or otherwise dispose of (whether in one transaction or a series of transactions) all or any substantial part of its assets.

### 18. Governing Law; Uniform Commercial Code

This Agreement shall be construed and interpreted under, and all respective rights and duties of the parties shall be governed by, the laws of the State of Georgia without regard to its conflict of law principles. All references herein to the Uniform Commercial Code or UCC shall mean the Uniform Commercial Code as adopted and in effect from time to time in the State of Georgia, unless otherwise provided herein. If and to the extent any Consignment Stock is located in a jurisdiction other than Georgia, then as to all matters relating to perfection and enforcement of Seller's security interest references herein to the Uniform Commercial Code or UCC shall mean the Uniform Commercial Code as adopted and in force in the applicable states that govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral.

### 19. Attorneys' Fees

If either party institutes any suit or action to enforce its rights hereunder, the prevailing party in such suit or action shall be entitled to recover from the other whatever sum the court may award as reasonable attorneys' fees in such suit or action and in any appeals therefrom, to the extent actually incurred by such party.

### 20. Notices

Unless otherwise specified in this Agreement, any notice required or permitted under this

Agreement shall be given in writing and shall be deemed to have been delivered only upon actual receipt, or upon refusal of addressee to receive or acknowledge receipt. Notices shall be sent by certified mail, return receipt requested, by express or expedited mail service such as Federal Express, by courier service, or by confirmed facsimile transmission, with all applicable charges prepaid, addressed as set forth below. Either party may change its notice address by giving written notice of the change to the other party pursuant to this Section 20. If notice is required by applicable law, Buyer and Seller agree that ten (10) days notice shall constitute reasonable notice.

### 21. Miscellaneous

a.    This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns. Buyer may not assign its rights under this Agreement without the prior written consent of Seller (which consent Seller may withhold in its sole and absolute discretion), and any such attempted assignment shall be void.

b.    This Agreement may be executed in multiple counterparts by the parties hereto, and each of which when so executed shall be considered an original and all of which taken together shall constitute one and the same agreement. Delivery of a signature page hereto by facsimile transmission shall be effective as delivery of an original of such signature.

c.    None of the provisions of this Agreement shall inure to the benefit of any person or entity other than Seller and Buyer.

### 22. Entire Agreement

The Agreement consists of this Agreement and the Schedules attached hereto and made a part hereof. This Agreement constitutes the entire agreement between the parties and supersedes all previous communications, negotiations, proposals, representations, conditions, or agreements, either oral or written, between the parties with respect to the subject matter hereof. This Agreement may not be enlarged, modified, or altered except in writing, signed by the duly authorized officer or representative of each party.

WITNESS our signatures hereunto affixed this 25 day of *March*, 2009.


SELLER:                                              BUYER:

BLUELINX CORPORATION                 LYMAN LUMBER

By:_____            By:_____
Title: Regional Vice President              Title: *Manager*


Notice Address:                                   Notice Address:
4300 Wildwood Parkway                     _____
Atlanta, Georgia 30339                       _____
Attn.: Law Department                         Attn:_____
Fax: 770-953-7008                              Fax:_____

## SCHEDULE I

### Prices and Terms of Payment

Product Type                                          Price

Terms of Payment    Net 10 days

※ See  UMI  price List  Dated  Jan 9th 2009



# Georgia-Pacific
## VINYL SIDING AND ACCESSORIES

# Lyman Lumber
## Chanhassen, MN

Distribution Exclusively by Bluelinx

January 5th, 2006

## SIDING

| Item | | Item Number | 1 SQUARE | WHITE | STANDARD COLORS | DARK COLORS | PREMIUM COLORS |
|------|--|-------------|----------|-------|-----------------|-------------|----------------|
| Vision Pro .040 Traditional D4 & D5 | | 125/135 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 40.77 | 40.77 | 43.83 | |
| Vision Pro .040 Dutch Lap D4 & D5 | | 129/139 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 40.77 | 40.77 | 43.83 | |
| Traditional .044 Dutch Lap D4 & D5 | | 105/116 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 43.37 | 43.37 | 46.94 | 48.93 |
| Shadow Ridge .042 D4 & D5 (Dutch Lap) | | 109/119 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 43.37 | 43.37 | 46.94 | 48.93 |
| 1/2" Traditional D4 1/2" & D5 | | 147/148 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 47.45 | 48.47 | 55.55 | 55.51 |
| Heritage Hill .044 Dutch Lap D4 1/2" | | 149 | 12 pcs/Sq. D4 1/2" | 47.45 | 48.47 | 55.55 | 55.51 |
| Cedar Lane Select .046 D4 & D5 Traditional | | 161/162 | 12 pcs/Sq. (D4) 10 pcs/Sq. (D5) | 96.94 | 96.94 | | |
| Cedar Lane Select .046 D4-1/2" Dutch Lap | | 163 | 12 pcs per Square D4.5 | 69.64 | 69.64 | 73.92 | |
| Board and Batten .048 | | 160 | 17 pcs/Square | 69.64 | 69.64 | | |
| Sonoma .044 - 6 1/2" Beaded | | 120 | 14 pcs per Square | 69.64 | 69.64 | | |
| Chatham Ridge .044 Triple 3" | | 171 | 11 pcs/ Square | | | $73.92 | |
| 8" Castle Ridge .044 White only | | 130 | 16 pcs/Sheet | $89.61 | | $118 | |

## Seasons Insulated Siding

| Item | | Item Number | UNIT SIZE | White | Colors | Dark Colors | |
|------|--|-------------|-----------|-------|--------|-------------|---|
| Seasons .044 D5 Traditional | | 108 | Box/Sq. 1 square per carton 12'6" Long | 117.355/Sq. | 117.355/Sq. | N/A | |
| Window & Door Surround - Insulated | | 300 | 10 per Carton 12' 8" Long | 18.449/Pc | 18.449/Pc | | |
| 4" Outside Corner Post- Insulated | | 332 | 10 per Carton 12' 8" Long | 14.01/Pc | 14.01/Pc | | |
| 1" Trimable Insulated Starter | | 308 | 20 pcs/Carton 12' 8" Long | 6.69/Pc | 6.69/Pc | | |
| Inside Corner Post | | 359 | 25 pcs/Carton 12' Long | 6.69/Pc | 6.69/Pc | | |
| 1 1/4" J Channel | | 350 | 40 pcs/Carton 12' 8" Long | 5.71/Pc | 5.71/Pc | | |
| 1 1/2" J Channel | | 469 | 40 pcs/Carton 12' 8" Long | Feb-09 | Feb-09 | | |
| Cross Backplate- New | | 365 | 25 pcs/Carton 12' 8" Long | 6.69/Pc | 6.69/Pc | | |
| Wide Crown Molding | | 366 | 10 pcs/Box 3/4x3/8 | 6.69/Pc | 6.69/Pc | | |
| Starter Strip | | 306 | 10 pcs/Box 3/4x3/8 | | | | |

## Cedar Spectrum

| Item | | Item Number | UNIT SIZE | White | Standard Colors | Dark Colors | Shaken | |
|------|--|-------------|-----------|-------|-----------------|-------------|--------|---|
| Cedar Spectrum Shingle Siding | | 356 | 5x12"-15/16" D7 10 pcs/box 50 sq.ft | 133.837/Sq. | 133.837/Sq. | 148.817/Sq. | 148.817/Sq. | |
| Cedar Spectrum Half Round | | 557 | 5x12"-15/16" 10 Pcs/box | 133.837/Sq. | 133.837/Sq. | 148.817/Sq. | 148.817/Sq. | |
| Cedar Spectrum Starter Strip | | 531 | 12' Long Galvanized Steel | | | | | |
| Cedar Spectrum Board Cut | | 559 | 16 pcs/box 50 sq.ft. | 214.295/sq | 214.295/sq | | | |

## Vinyl Soffit

| Item | | Item Number | UNIT SIZE | WHITE | STANDARD COLORS | DARK COLORS | BROWN | |
|------|--|-------------|-----------|-------|-----------------|-------------|-------|---|
| D4 Solid Solid Cedar Lane Select | | 164 | 10 pcs per square | 92.19 | 92.19 | 96.94 | | |
| Triple 4" Solid Cedar Lane Select | | 165 | 10 pcs per square | 92.19 | 92.19 | 96.94 | | |
| Solid Double 5 Solid White only | | 166 | 14 pcs per square | | | | | |
| Hidden Vent Beaded Soffit- White only | | 159 | 14 pcs per square | 92.19 | 92.19 | | | |

PREMIUM COLORS:
Forest Ridge, Shake: Ridge .042 Finish
Heritage Elite
Standard Colors:

Cedar Lane Series Colors:
Cherry, Chestnut, Ironwood
Maize Masonite Oak Rushmore

Behrwood, exfoliation, Forest, Sagewood, Wedgewood
Behrwood, exfoliation, Forest, Sagewood, Wedgewood, Hampton Red
Almond, Beige, Blue, Clay, Cream, Flint Gray, Milk, Pearl, Tan, Olive, White

DARK COLORS: Thistle

*(handwritten notes: "White Color 191.76 12.76", "per", "8:16", "5/14/05 $191.76 /...")*

## SCHEDULE II

### Organizational Information

A. Buyer's legal name

LYMAN LUMBER COMPANY

B. Type of entity (i.e. corporation, partnership, limited partnership, limited liability company)

CORPORATION

C. Organizational identification number issued by Buyer's state of incorporation or organization or a statement that no such number has been issued

STATE TAX ID# = 816193

D. State of Incorporation or Organization

MINNESOTA, 1924

E. Buyer's Federal Taxpayer Identification Number

41-0386245

F. Mailing address

12900 W. 78th St. P.O. Box 130, CHANHASSEN MN 55317

G. Principal Place(s) of Business

MPLS/ST. PAUL

H. Chief Executive Officer

JIM HURD

PRIMARY CONTACT — COLLIN OWENS





# MATERIAL STORAGE AGREEMENT

This is a Material Storage Agreement (the "Agreement") with an effective date of _____March 1, 2009_____ between BLUELINX (as defined below) and CUSTODIAN (as defined below), pursuant to which the parties, in consideration of the mutual convenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows.

| BLUELINX | CUSTODIAN |
|---|---|
| NAME<br>**BlueLinx Corporation** | NAME<br>Lyman Lumber |
| STATE OF INCORPORATION<br>**Georgia** | STATE OF INCORPORATION |
| BUSINESS ADDRESS<br>4300 Wildwood Parkway | BUSINESS ADDRESS<br>18900 W. 78th Street |
| CITY / STATE / ZIP CODE<br>Atlanta, GA 30339 | CITY / STATE / ZIP CODE<br>Chanhassen, MN 55317 |

1.   **Purpose.** BLUELINX shall store certain materials at CUSTODIAN's warehouse, and CUSTODIAN shall store such materials for BLUELINX and provide other services to BLUELINX, in accordance with the terms and conditions set forth below, in the attached Material Storage General Terms and Conditions, and in any Exhibits or Schedules attached to this Agreement.

2.   **Materials.** The materials to be stored (the "Materials") are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable].** The Materials include all materials provided by BLUELINX to CUSTODIAN under this Agreement, whether or not BLUELINX actually owns such materials. BLUELINX may add or delete Materials from this list at any time by giving written notice to CUSTODIAN.

    Vinyl siding and vinyl siding accessories.

3.   **Fees.** The fees and charges to be paid by BLUELINX for storage of the Materials and the other services to be provided by CUSTODIAN (the "Fees") are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable].** Such Fees shall be firm through _____12/31/09_____ ; thereafter, CUSTODIAN may modify such Fees once during each calendar year by giving BLUELINX at least sixty (60) days advance written notice.

    No fees

4.   **Warehouse Locations.** The Materials shall be stored at the warehouse facility or facilities owned by CUSTODIAN that are ☒ listed below **or** ☐ listed on the attached Exhibit _____ (the "Warehouse" or "Warehouses") **[Mark the appropriate box and attach Exhibit if applicable].**

    Lyman Lumber<br>    18900 West 78th St.<br>    Chanhassen, MN 55317

5.   **Special Storage, Loading or Delivery Requirements.** Custodian shall follow the special storage, loading or delivery requirements that are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable; if none apply, write NONE below].**

    Clean dry indoor storage in racks stacked per manaufacturers recommendations.

12486.DOC

6. **Term.** This Agreement shall continue in effect until terminated in accordance with Section 6 of the attached Material Storage General Terms and Conditions.

7. **Addresses for Notices.** Notices given pursuant to Section 12 of the attached Material Storage General Terms and Conditions shall be sent to the following addresses:

| FOR BLUELINX | | | FOR CUSTODIAN | | |
|---|---|---|---|---|---|
| NAME | | | NAME | | |
| BlueLinx Corporation | | | | | |
| ADDRESS | | | ADDRESS | | |
| 4300 Wildwood Parkway | | | | | |
| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
| Atlanta | GA | 30339 | | | |
| ATTENTION | | | ATTENTION | | |
| Legal Department | | | | | |
| FAX NUMBER | | | FAX NUMBER | | |
| (770) 953-7008 | | | ( ) | | |

In witness whereof, the parties hereto have executed this Agreement effective on the date first hereinabove written.

| BLUELINX | CUSTODIAN |
|---|---|
| NAME | NAME |
| BlueLinx Corporation | |
| SIGNATURE | SIGNATURE |
| PRINT NAME | PRINT NAME |
| TITLE | TITLE |

# MATERIAL STORAGE GENERAL TERMS AND CONDITIONS

1. **CUSTODIAN's Services.**

a.      BLUELINX shall have the Materials delivered to the Warehouse.  CUSTODIAN shall provide all facilities, equipment, utilities and other items needed for proper storage of the Materials and proper performance of its services.  CUSTODIAN shall unload, store, inspect, reload for outbound shipment, and arrange for outbound shipment of the Materials according to BLUELINX's instructions and the requirements of this Agreement.  CUSTODIAN shall perform the services and other obligations described in this Agreement at all Warehouses where the Materials are stored.

b.      BLUELINX shall notify CUSTODIAN before shipping the Materials to the Warehouse.  At the time of receipt, CUSTODIAN shall count the Materials and inspect the Materials for shortages, overages, losses and damages.  Within twenty-four (24) hours after receipt of the Materials, CUSTODIAN shall fax or mail, as directed by BLUELINX, a receiving report indicating the types and quantities of Materials received, the date of receipt, the name or number of the delivering carrier, and any other information required by law or BLUELINX.  CUSTODIAN's receiving report shall include a description of any physical damage to the Materials and a copy of the bill of lading or delivery receipt issued by the delivering carrier.  CUSTODIAN shall ensure that the bill of lading or delivery receipt is marked to indicate any shortages, overages, losses and damages to the Materials.  CUSTODIAN shall cooperate with BLUELINX in the investigation of and in BLUELINX's attempts to recover from the carrier for any such shortage, loss or damage.

c.      CUSTODIAN shall unload and store the Materials in accordance with current industry practices and any specific requirements set forth in this Agreement.  Unless otherwise specified by BLUELINX in writing, all Materials shall be stored inside a covered, secured Warehouse, with appropriate fire protection and protection from exposure to the elements.

d.      BLUELINX shall provide CUSTODIAN with timely notice of the Materials to be released from the Warehouse, and the shipping instructions for such Materials.  BLUELINX shall indicate in writing the names and telephone numbers of the BLUELINX personnel who are authorized to release the Materials.

e.      Before shipping the Materials from the Warehouse, CUSTODIAN shall ensure that the Materials are properly and securely palleted for shipment. CUSTODIAN shall be responsible for loading, stacking and palleting the Materials in a safe and secure manner.  When feasible, CUSTODIAN shall reuse any pallets supplied by BLUELINX with the Materials.

f.      After shipping the Materials from the Warehouse, CUSTODIAN shall promptly mail or fax, as directed by BLUELINX, the bill of lading or similar document, which shall indicate BLUELINX's release number, the name or number of the carrier, the types and quantities of Materials shipped, the date of shipment, and any other information required by law or BLUELINX.  CUSTODIAN shall ship Materials using only those carriers which are approved by BLUELINX. CUSTODIAN shall ensure that Materials are shipped in accordance with the deadlines specified by BLUELINX.

g.      In performing this Agreement, CUSTODIAN shall operate as an independent contractor, and not as an agent, employee, servant or representative of BLUELINX.  CUSTODIAN shall have sole control of the performance of its obligations under this Agreement.

2. **Ownership and Risk of Loss.**

a.      At all times, as between BLUELINX and CUSTODIAN, BLUELINX shall be deemed to be the owner of all Materials delivered by or for BLUELINX and held by or under the control of CUSTODIAN.

b.      CUSTODIAN shall not remove any Materials from the Warehouse or move Materials from one Warehouse to another, without BLUELINX's prior written consent, which may be withheld in BLUELINX's sole discretion.  CUSTODIAN shall physically segregate all Materials delivered to the Warehouse and shall properly mark the Materials to indicate that such Materials are owned by BLUELINX and not by CUSTODIAN or any other person or entity.

c.      CUSTODIAN shall ensure that the Materials do not become subject to any lien or any other security interest in favor of CUSTODIAN or securing any obligation owed or alleged to be owed by CUSTODIAN to any person or entity.  If requested by BLUELINX, CUSTODIAN shall notify its lenders and other creditors of BLUELINX's ownership of the Materials, shall execute UCC financing statements for filing by BLUELINX, and shall take any other action which in BLUELINX's opinion is reasonably necessary or suitable to protect BLUELINX against present or future creditors of CUSTODIAN or to give notice to potential lien creditors that the Materials are the property of BLUELINX.  CUSTODIAN hereby appoints BLUELINX as its attorney-in-fact with full authority to execute UCC financing statements and similar documents on CUSTODIAN's behalf.

d.      Each calendar month, or more often if requested by BLUELINX, CUSTODIAN shall provide BLUELINX with a written inventory report of all Materials located in each Warehouse.  Each calendar month, BLUELINX and CUSTODIAN shall conduct a reconciliation of their respective book inventories of Materials located in each Warehouse.  Once per calendar year, or more often if requested by BLUELINX, BLUELINX and CUSTODIAN shall conduct a physical inventory of the Materials located in each Warehouse.  In addition, BLUELINX and its authorized employees and agents shall have the right to enter and inspect the Warehouse at any time during normal business hours for the purpose of inspecting and inventorying the Materials.  BLUELINX and CUSTODIAN shall cooperate to reconcile any differences between the physical inventory and each party's inventory records.

e.      **BLUELINX RETAINS THE RIGHT, AT ANY TIME AND WITHOUT NOTICE, TO ENTER THE WAREHOUSE AND TAKE POSSESSION OF THE MATERIALS WITHOUT NOTICE OR COURT PROCEEDINGS.  CUSTODIAN WAIVES ANY NOTICE, COURT PROCEEDINGS AND LIENS OR CLAIMS OF LIEN (INCLUDING, BUT NOT LIMITED TO, MECHANIC'S LIENS, BAILEE'S LIENS, AND WAREHOUSEMAN'S LIENS) IN THE EVENT THAT BLUELINX ELECTS TO TAKE POSSESSION OF THE MATERIALS.**

f.      CUSTODIAN shall be responsible for any loss, damage, theft, shrinkage or shortage in the Materials which occurs after the Materials are delivered to the Warehouse, regardless of cause.  The bills of lading or delivery receipts for Materials delivered to the Warehouse which are issued by the delivering carriers and signed by CUSTODIAN shall be deemed to be conclusive evidence of the quantity of Materials delivered to the Warehouse.  CUSTODIAN shall reimburse BLUELINX or BLUELINX's designee on demand for lost, damaged, stolen or missing Materials at the greater of the original cost or the replacement cost for such Materials at the time that the loss or damage is discovered.

g.      BLUELINX shall pay promptly any and all federal, state, or local personal property, ad valorem and similar taxes which are assessed against or with respect to the Materials stored at the Warehouse.

3.      **Billing.**  CUSTODIAN shall invoice BLUELINX on a monthly basis.  BLUELINX shall pay CUSTODIAN's undisputed invoices within thirty (30) days of receipt of invoice.  BLUELINX reserves the right to deduct or offset claims which BLUELINX may have against CUSTODIAN from payments made to CUSTODIAN.

4. **Warranties.**

a. CUSTODIAN warrants to BLUELINX that its services shall be of good quality and free from any faults and defects, and shall be performed in accordance with good industry practices, in full compliance with the requirements of this Agreement, and in full compliance with all applicable federal, state and local laws, statutes, codes, rules, regulations, permits, orders and other requirements. CUSTODIAN warrants to BLUELINX that it owns each Warehouse; that each Warehouse has appropriate fire and burglar alarms, sprinkler systems and other fire protection devices, and has in place suitable security measures, including, but not limited to, locked doors and gates; that each Warehouse is currently zoned for the purposes contemplated in this Agreement; and that no Warehouse has been designated as a "Superfund Site" under federal laws and regulations or received any similar designation under other applicable laws and regulations.

b. CUSTODIAN further warrants that its services shall not infringe any patent, trade secret or other intellectual property right of a third party, and CUSTODIAN, at its expense, shall defend any and all actions or suits charging infringement of any such patent, trade secret or other intellectual property right, and shall indemnify and save harmless BLUELINX and its customers from all expenses incurred in defending and all liability for any such claim.

c. CUSTODIAN shall be responsible for railroad demurrage and/or truck detention charges incurred with respect to the shipments of Materials to or from the Warehouse, if BLUELINX gives CUSTODIAN at least forty-eight (48) hours advance notice of such shipments and CUSTODIAN fails to immediately notify BLUELINX that CUSTODIAN cannot comply with BLUELINX's deadlines.

5. **Indemnification and Insurance.**

a. CUSTODIAN shall indemnify, defend and hold BLUELINX and its agents, officers, employees and related companies (the "Indemnified Parties") harmless from any losses, costs, claims (including, but not limited to, claims of CUSTODIAN's employees), expenses (including, but not limited to, attorneys' fees, fees of accountants and other experts, and court costs and other litigation expenses), suits, actions, judgments, fines, penalties or damages of every nature and description (collectively, "Losses") arising out of or resulting from or in connection with: (i) CUSTODIAN's or its agents', employees' or contractors' negligence; (ii) CUSTODIAN's performance of this Agreement; (iii) CUSTODIAN's failure to perform or breach of any representation, warranty, covenant or obligation contained in this Agreement; (iv) CUSTODIAN's release, storage, generation, handling, treatment, transportation, disposal, or arrangement for transportation or disposal of any hazardous or toxic substance, material, chemical, pollutant, contaminant or waste, as those terms are defined by any federal, state or local laws, rules, regulations, permits, orders or other requirements, or any solid wastes, polychlorinated biphenyls, urea formaldehydes, asbestos, radio-active materials, radon, explosives, petroleum products and oil; or (v) failure of CUSTODIAN or its agents, employees or contractors to comply with any federal, state or local laws, rules, statutes, codes, regulations, permits, orders or other requirements. This indemnification obligation and CUSTODIAN's defense obligation in Section 5b shall survive any expiration or termination of this Agreement. As to any claim made by BLUELINX hereunder, CUSTODIAN waives any insulation from liability or immunity from suit with respect to injuries to CUSTODIAN's employees which may be extended to CUSTODIAN as a result of any payments made by CUSTODIAN to such employees or under any applicable Workers' Compensation statute or similar law or judicial decision.

b. CUSTODIAN shall, at CUSTODIAN's sole cost and expense, defend the Indemnified Parties against all actions, suits or other proceedings for which CUSTODIAN may have an indemnification obligation under this Agreement and shall pay or satisfy any judgment or decree that is rendered against the Indemnified Parties in any such action, suit or proceeding. BLUELINX shall reimburse CUSTODIAN for any Losses incurred by CUSTODIAN in connection with any such action, suit or proceeding to the extent that the final judgment or decree is based upon the negligence of BLUELINX.

c. CUSTODIAN shall procure and maintain in full force and effect during the term of this Agreement, with insurance companies reasonably acceptable to BLUELINX, the following insurance coverages and limits.

(i) Commercial General Liability Insurance covering claims for bodily injury, death or property damage, including coverage for Premises and Operations; Products and Completed Operations; Independent Contractors; Personal Injury; Blanket Contractual Liability and Broadform Property Damage Liability, in the amount of $2,000,000 Combined Single Limit per occurrence.

(ii) Workers' Compensation Insurance as required by the state in which each Warehouse is located, with statutory limits.

(iii) Employers' Liability Insurance in the amount of $1,000,000 per occurrence.

(iv) All Risk Property Insurance, covering the Materials.

(v) Warehouseman's Legal Liability Insurance, with a minimum limit of $2,000,000 per occurrence.

d. CUSTODIAN's insurance policies shall provide for thirty (30) days' prior written notice to BLUELINX of cancellation, change or non-renewal. Any such change, non-renewal or cancellation shall not affect CUSTODIAN's obligations to maintain the required insurance coverage. CUSTODIAN shall pay any and all deductibles from insured claims under its insurance policies. Liability insurance policies shall be written on an "occurrence" policy form. CUSTODIAN's insurance shall be primary coverage in all instances regardless of similar coverage, if any, carried by BLUELINX. Except for Workers' Compensation Insurance, BLUELINX shall be named as an "additional insured" or "loss payee", as appropriate, on CUSTODIAN's insurance policies. The maintenance of this insurance shall not in any way operate to limit the liability of CUSTODIAN to BLUELINX under this Agreement.

e. CUSTODIAN shall promptly provide BLUELINX with Certificates of Insurance acceptable to BLUELINX indicating insurance coverage complying with the requirements of this Agreement. During the term of this Agreement, CUSTODIAN shall provide to BLUELINX in a prompt and timely manner, Certificates of Insurance acceptable to BLUELINX indicating renewal of the insurance policies required.

f. CUSTODIAN agrees to release, and will require its insurers by policy endorsement to waive, any rights of subrogation against BLUELINX for loss under the policies of insurance required herein, damages to CUSTODIAN's properties and/or any other losses sustained by CUSTODIAN.

6. **Term of Agreement and Termination.**

a. This Agreement may be terminated as follows:

(i) Either party may terminate this Agreement at any time by giving the other party at least sixty (60) days advance written notice.

(ii) Either party may terminate this Agreement effective immediately by giving written notice to the other party if the other party: (A) becomes unable to pay its debts as they mature; (B) becomes insolvent; (C) becomes the subject of any voluntary or involuntary bankruptcy, receivership, reorganization or other insolvency proceeding; or (D) makes an assignment or similar arrangement for the benefit of its creditors.

(iii)    BLUELINX may terminate this Agreement, effective immediately by giving written notice to CUSTODIAN, if:  (A) CUSTODIAN breaches any representation, warranty, covenant or obligation set forth in this Agreement; (B) any of the Materials are attached or levied upon; (C) CUSTODIAN fails to safely and properly store, handle and protect the Materials; or (D) CUSTODIAN sells or transfers or attempts to sell or transfer any of the Materials except as directed by BLUELINX.

(iv)    CUSTODIAN may terminate this Agreement if BLUELINX fails to pay CUSTODIAN's undisputed invoices when due, by giving BLUELINX written notice of such breach and thirty (30) days to cure the breach.  If BLUELINX has not cured its breach at the end of said period, CUSTODIAN may terminate the Agreement, effective immediately upon written notice to BLUELINX.

b.    Within sixty (60) days of the effective date of termination, BLUELINX shall remove all Materials from the Warehouse.  CUSTODIAN shall cooperate and not interfere with BLUELINX's removal of the Materials and shall make the Materials ready for shipment and load them onto the carrier.  Upon the termination of this Agreement, neither party shall have any further obligation to the other, except (i) no termination of this Agreement under any provision of this Section 6 shall prejudice any claim either party may have under this Agreement that arises prior to the effective date of such termination; and (ii) termination of this Agreement shall not terminate or otherwise affect the rights and obligations set forth in Sections 2 through 8 of these Material Storage General Terms and Conditions, which shall survive termination as independent obligations.

7.    **Attorneys' Fees.**  If either party institutes any suit or action to enforce its rights hereunder, the prevailing party in such suit or action shall be entitled to recover from the other its reasonable attorneys' fees, fees of accountants and other experts, and court costs and other litigation expenses incurred in such suit or action and in any appeals there from.

8.    **Confidentiality.**  During the term of this Agreement, and for a period of one (1) year following termination of this Agreement, CUSTODIAN and its employees, parents, subsidiaries, and affiliates shall not disclose the amount of the Fees to any other person or entity who is not a party to this Agreement.

9.    **EDI.**  If CUSTODIAN and BLUELINX elect to use EDI for the transmission of invoices and other documents which they shall exchange pursuant to this Agreement, then CUSTODIAN and BLUELINX shall execute a mutually acceptable EDI agreement and make appropriate arrangements for sending and receiving EDI transmissions.

10.    **Limitation on Liability.**  UNDER NO CIRCUMSTANCES SHALL BLUELINX BE LIABLE TO CUSTODIAN FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS AND LOSS OF SALES OR BUSINESS BY CUSTODIAN, WHETHER ARISING AS A RESULT OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, OR STRICT PRODUCTS LIABILITY.

11.    **Force Majeure.**  If a party is unable to perform its obligations under this Agreement due to flood, fire or other casualty or act of God; labor dispute or strike; war or other act of governmental authorities; or any other cause beyond such party's reasonable control, such party shall provide prompt notice to the other of the force majeure event and shall be excused from performing its obligations (other than payment obligations) for the duration of such event.  The party claiming a force majeure event shall take commercially reasonable steps to eliminate or minimize the effects of such event.  BLUELINX shall have the right to terminate this Agreement effective immediately upon written notice if CUSTODIAN suffers a force majeure event which in BLUELINX's judgment interferes with CUSTODIAN's performance of the services and lasts or is expected to last more than thirty (30) days.

12.    **Notices.**  Unless otherwise specified in this Agreement, any notice required or permitted under this Agreement shall be given in writing and shall be deemed to have been delivered only upon actual receipt.  Notices shall be sent by certified mail, return receipt requested, by express mail service, by hand delivery, or by confirmed facsimile transmission, with all applicable charges prepaid, addressed as set forth above.  Either party may change its notice address by giving written notice of the change to the other party pursuant to this Section 12.  All documents exchanged by BLUELINX and CUSTODIAN in the performance of this Agreement, including, but not limited to, e-mail messages, facsimiles and notices given pursuant to this Section 12, shall be written in the English language.

13.    **Assignment.**  CUSTODIAN shall not assign or transfer this Agreement or delegate any of its responsibilities under this Agreement to any person or entity, whether verbally, in writing, by operation of law, execution sale, in bankruptcy or otherwise, without the prior written consent of BLUELINX, which may be withheld by BLUELINX for any or no reason in BLUELINX's sole discretion.  Except as provided in this Section 13, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

14.    **Severability.**  Each and every provision of this Agreement is completely severable, and the invalidity of any one or more of such provisions shall not in any way affect the validity of this Agreement or any of the other provisions of this Agreement.

15.    **Remedies and Waiver.**  Except as specifically set forth in this Agreement, the remedies provided in this Agreement are cumulative and shall not exclude any other remedies to which any party to this Agreement may be lawfully entitled, whether under this Agreement or applicable law.  Waiver of a breach of any provision of this Agreement shall not constitute a waiver of any other breach of the same provision, any other provision, or of the entire Agreement.

16.    **Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Georgia, except the laws of that state which would render such choice of laws ineffective.

17.    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or its terms to produce or account for more than one of such counterparts.

18.    **Entire Agreement.**  This Agreement, together with these Material Storage General Terms and Conditions, and any Exhibits or Schedules attached hereto, is the entire agreement between the parties with respect to the matters set forth herein, and supersedes any and all prior agreements, communications or understandings between the parties with respect to such matters.  This Agreement shall not be amended or modified except by a written document executed by BLUELINX and CUSTODIAN.  The terms of this Agreement shall control over any conflicting or inconsistent provision set forth or referred to in any bill of lading, freight receipt, warehouse receipt, invoice or similar document exchanged or executed by the parties in connection with the performance of this Agreement.

# EXHIBIT A TO MATERIAL STORAGE AGREEMENT
## TRANSPORTATION SERVICES TO BE PROVIDED BY CUSTODIAN

CUSTODIAN shall provide transportation services for BLUELINX with respect to the Materials in accordance with the following terms and conditions.

1.    CUSTODIAN shall provide interstate and intrastate motor freight transportation services as reasonably required by BLUELINX at the times and between the points agreed upon by CUSTODIAN and BLUELINX, under the rates and terms set forth in this Exhibit. Such service shall satisfy the distinct needs of BLUELINX for prompt and efficient motor carrier service with the kind of equipment utilized by CUSTODIAN. To the extent that regulated interstate transportation service is provided by CUSTODIAN under this Agreement, this Agreement is entered pursuant to 49 U.S.C. § 14101(b) and BLUELINX does not waive any of its rights provided in Subtitle IV, Part B of 49 U.S.C., except as expressly provided in this Agreement.

2.    CUSTODIAN shall obtain all federal and state licenses, permits and authority required by virtue of the transportation activities carried on by it. CUSTODIAN warrants that it holds all authorization that may be required by the U.S. Department of Transportation ("DOT") and/or the Federal Motor Carrier Safety Administration ("FMCSA") to provide interstate transportation services and that it has complied with any relevant state requirements with respect to transportation provided hereunder. CUSTODIAN shall provide copies of said licenses and permits or other proof of its authority to provide interstate and intrastate transportation services upon request of BLUELINX. CUSTODIAN shall comply with all applicable federal, state and local laws and ordinances and all applicable rules and regulations of any federal, state or other regulatory body having jurisdiction, including, but not limited to, those relating to wages, hours and conditions of labor, vehicle maintenance and operation, and safety, and with any and all applicable amendments to such laws, rules and regulations, now or hereafter enacted or promulgated. Compliance, or failure to comply, with all such laws, rules and regulations shall not, however, relieve CUSTODIAN of any of its obligations to BLUELINX under the terms of this Agreement. CUSTODIAN shall pay the cost of maintaining and repairing its vehicles, fuel, tolls, taxes and all other operating expenses.

3.    Each driver utilized by CUSTODIAN to transport BLUELINX Materials shall hold a valid Commercial Drivers License, be fully qualified to drive a commercial motor vehicle and be familiar with all applicable federal and state safety regulations. CUSTODIAN shall maintain a drug and alcohol testing program to the extent it is required to do so by federal law. CUSTODIAN warrants that it does not hold either a "conditional" or an "unsatisfactory" safety rating from the FMCSA and that, if CUSTODIAN is ever so rated by the FMCSA or any successor agency, it will immediately notify BLUELINX and provide a copy of such rating.

4.    BLUELINX shall provide instructions to CUSTODIAN for each shipment of Materials. These instructions shall include the full name of the consignee to whom the Materials are to be delivered and the exact street address to where the Materials are to be delivered. CUSTODIAN covenants and agrees to transport safely and deliver undamaged all Materials tendered to it by BLUELINX without unreasonable delay and in a safe and workmanlike manner. CUSTODIAN agrees: (a) to maintain and have available in good working order a sufficient amount of acceptable equipment on short notice and capable, well trained and fully qualified crews for the purpose of fulfilling CUSTODIAN's obligations under this Agreement; and (b) to immediately notify BLUELINX by telephone or facsimile machine of the occurrence of an accident or other delay in delivery to the consignee.

5.    CUSTODIAN shall provide and prepare all documentation associated with the transportation services provided by CUSTODIAN under this Agreement, including an appropriate bill of lading or freight receipt.

6.    CUSTODIAN shall charge and BLUELINX shall pay for the transportation services provided hereunder in accordance with the rates and charges set forth in the Agreement or in an Exhibit to the Agreement. CUSTODIAN shall invoice BLUELINX for transportation services, and BLUELINX shall pay said invoices, in accordance with Section 3 of the Agreement. CUSTODIAN shall not retain the Materials as a lien to secure payment of freight charges.

7.    CUSTODIAN agrees to assume all risks arising out of or predicated upon the operation of trucks or by CUSTODIAN, its agents or employees, or the transportation and handling of goods by CUSTODIAN, its agents or employees, and CUSTODIAN shall indemnify and defend BLUELINX against Losses arising out of or resulting from or in connection with such risks in accordance with Sections 5a, 5b and 5c of the Agreement. Claims by BLUELINX for loss, damage or delay in connection with CUSTODIAN's transportation of the Materials shall be handled in accordance with Section 8 of this Exhibit.

8.    Regardless of whether the Materials were transported in interstate or intrastate commerce, CUSTODIAN shall be liable to BLUELINX for any loss, damage or delay in connection with transportation provided by CUSTODIAN as carrier hereunder pursuant to the terms of the Carmack Amendment, 49 U.S.C. §14706, or any similar successor statute, as if that statute were fully applicable as a matter of law to all of the transportation services provided by CUSTODIAN for BLUELINX. BLUELINX shall have two (2) years from the date of actual delivery of the freight or, in the case of lost freight, from the date delivery had been scheduled, to file a claim with CUSTODIAN in respect of the lost, damaged or delayed freight. CUSTODIAN shall handle all claims in accordance with the procedures set forth at 49 CFR Part 1005, or any rules governing the handling of claims that may be issued by DOT or any other applicable federal agency administering such rules, regardless of whether such rules are applicable by force of law to the particular claim. BLUELINX shall have until two (2) years from the date its claim is declined, in whole or in part, by CUSTODIAN to institute a legal action in an appropriate court of law with respect to its claim.

9.    Any claim by BLUELINX for refund of freight charges previously paid shall be made within 180 days of the date of CUSTODIAN's invoice for such charges. Any claim by CUSTODIAN for additional freight charges due under this Agreement shall be submitted in writing to BLUELINX within 180 days of the date of CUSTODIAN's original invoice. Any claim not raised within these time periods shall be deemed to be waived and may not be later asserted. The party receiving a written claim under this paragraph shall acknowledge receipt of same within ten (10) days of receipt and shall by writing transmitted to the other party by registered mail, return receipt requested, pay or decline such claim within sixty (60) days following its receipt of the claim. Either party may institute a legal action against the other for refund or payment of freight charges on or before eighteen (18) months from the date of delivery of the Materials in question.

10.    During the term of the Agreement, CUSTODIAN shall procure and maintain at its own expense: (a) Automobile Liability Insurance, covering owned, non-owned, hired and other vehicles, with a combined single limit of $1,000,000; and (b) Cargo Liability Insurance covering damage to or loss of the Materials transported on behalf of BLUELINX with limits of $50,000 per occurrence. If federal or state laws or regulations require more extensive liability coverage than the limits listed in this paragraph, CUSTODIAN shall procure and maintain such additional coverage at its expense. The insurance required by this paragraph shall be in addition to the insurance required by, and shall be subject to the requirements of, Sections 5d, 5e and 5f of the Agreement.

11.    CUSTODIAN may subcontract the transportation services to its owned or controlled affiliated entities. CUSTODIAN also may make trip lease arrangements, provided that any such trip leases move solely under CUSTODIAN's motor carrier operating authority. In all instances, BLUELINX will be contractually obligated to CUSTODIAN only, and CUSTODIAN will be responsible to the other parties in all respects. CUSTODIAN's insurance policies shall provide that such subcontractor and trip lease arrangements are covered by CUSTODIAN's insurance. CUSTODIAN will not broker any of BLUELINX's shipments without prior written consent from BLUELINX.

12486.DOC

# AMENDMENT NO. ONE
## TO
# CONSIGNMENT AGREEMENT

THIS AMENDMENT is attached to and made a part of the Consignment Agreement dated March 25, 2009 (the "Agreement") by and between BLUELINX CORPORATION ("Seller") and LYMAN LUMBER ("Buyer"). Except as defined herein or otherwise required by the context herein, all capitalized terms used in this Amendment No. One have the meaning set forth in the Agreement. The parties agree as follows:

1. Section 1. (a) Supply of Consignment Stock of the Agreement is modified by adding the following products:

   Metal Soffit and Installation Accessories

2. The Exhibit A attached to this Amendment is hereby added as Exhibit A to the Agreement.

Nothing contained herein alters or affects the provisions of the Agreement except as expressly provided herein. In the event of any conflict, inconsistency or incongruity between any provisions of this Amendment and the provisions of the Agreement, this Amendment shall govern and control in all respects.

ACCEPTED and AGREED TO this ___2nd___ day of February, 2010.


BLUELINX CORPORATION                          LYMAN LUMBER

By: _____               By: _____

Print Name: _____               Print Name: __Tim Liester__

Title: _____                Title: __Manager__

**EXHIBIT A**

 

# Lyman Lumber Metal Program

| PRODUCT | B/l # | CTN Size | Lyman |
|---|---|---|---|
| Quad 4 16" Solid Soffit | 636697 | 10 pcs | $10.10 |
| Quad 4 16" Center Vent | 636698 | 10 pcs | $10.10 |
| Comm ODE Long Neck | 636719 | 50 pcs | $3.41 |
| ½ F channel | 636705 | 25 pcs | $4.63 |
| ½ J channel | 636713 | 25 pcs | $2.31 |
| 6" Fascia Smooth Ribbed | 636703 | 25 pcs | $5.61 |
| 4" Fascia Smooth Ribbed | 636708 | 25 pcs | $5.29 |
| 8" Fascia Smooth Ribbed | 636704 | 25 pcs | $7.16 |
| Ptd Coil 24" | | Each | $48.50 |
| PVC Coil 24" | | Each | $53.50 |

Freight Policy     $ 5,500.00 Pre Paid   =    2,500 Lbs      11/01/09

# EXHIBIT D

## SUMMARY OF REAL PROPERTY MORTGAGES

<u>**EXHIBIT D**</u>

**SUMMARY OF REAL PROPERTY MORTGAGES**

**A.** <u>**Chanhassen, Minnesota**</u>

1.   Combination Mortgage, Security Agreement and Fixture Financing Statement dated March 1, 1999, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on April 2, 1999, as Document No. 7089556, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $1,875,000, which amount is evidenced by that certain Promissory Note dated March 1, 1999, in the original principal amount of up to $1,875,000, from Lyman Lumber Company to TCF National Bank Minnesota.

2.   Combination Mortgage, Security Agreement and Fixture Financing Statement dated March 1, 1999, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on April 2, 1999, as Document No. 7089557, from Lyman Lumber Company, a Minnesota corporation, to City of Chanhassen, Minnesota, to secure the obligation to repay $1,725,000 pursuant to that certain Loan Agreement dated March 1, 1999, between the City of Chanhassen and Lyman Lumber Company (which mortgage was subsequently assigned to TCF National Bank, a national banking association, by Assignment of Mortgage dated April 30, 1999, and recorded in the office of the County Recorder of Hennepin County, Minnesota, as Document No. 7131133); as amended by that certain First Amendment to Combination Mortgage, Security Agreement and Fixture Financing Statement dated December 18, 2000, and recorded as Document No. 7402488, by Lyman Lumber Company and TCF National Bank.

3.   Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on June 27, 2008, as Document No. 9152668, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $5,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes: (i) Promissory Note dated October 20, 2004, in the original principal amount of $7,280,000 (executed by Mortgagor and Woodinville Lumber Company, Inc. as co-borrowers) (Woodinville, WA property); (ii) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (iii) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property); (iv) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (v) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

**B.**    **Eau Claire, Wisconsin**

1.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the Register of Deeds in and for Eau Claire County, Wisconsin, on November 19, 2004, as Document No. 915660, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $2,176,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of up to $2,176,000, from Lyman Lumber Company to TCF National Bank.

2.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the Register of Deeds in and for Eau Claire County, Wisconsin, on June 30, 2008, as Document No. 993560, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $6,700,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes: (i) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (ii) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (iii) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

**C.**    **Woodinville, Washington**

1.    Deed of Trust, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the County Recorder in and for King County, Washington, on November 10, 2004, as Document No. 20041110001436, from Woodinville Lumber, Inc., a Minnesota corporation, as Grantor, to Transnation Title Insurance Company, as Trustee, for the benefit of TCF National Bank, a national banking association, as Beneficiary, to secure the original principal amount of $7,280,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of up to $7,280,000 from Lyman Lumber Company and Woodinville Lumber, Inc., to TCF National Bank.

2.    Deed of Trust, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for King County, Washington, on July 2, 2008 as Document No. 20080702000562, from Woodinville Lumber, Inc., a Minnesota corporation, as Grantor, to Transnation Title Insurance Company, as Trustee, for the benefit of TCF National Bank, a national banking association, as Beneficiary, to secure a principal amount equal to the lesser of (a) $11,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes:  (i) Promissory Note dated March 1, 1999, in the original principal amount of $1,875,000 (Chanhassen, MN property); (ii) Promissory Note dated March 1, 1999, in the original principal amount of

$1,725,000 (originally in favor of the City of Chanhassen, subsequently assigned to TCF National Bank) (Chanhassen, MN property); (iii) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (iv) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property); (v) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (vi) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

### D.     Cottage Grove, Minnesota

1.     Combination Mortgage, Security Agreement and Fixture Financing Statement dated December 7, 2006, and recorded in the Office of the County Recorder in and for Washington County, Minnesota, on December 19, 2006, as Document No. 3621711, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of up to $9,280,000, which amount is evidenced by the following: (a) Promissory Note dated December 7, 2006, in the original principal amount of up to $4,300,000 from Lyman Lumber Company to TCF National Bank; (b) Promissory Note dated December 7, 2006, in the original principal amount of up to $1,100,000 from Lyman Lumber Company to TCF National Bank; (a) Promissory Note dated December 7, 2006, in the original principal amount of up to $3,880,000 from Lyman Lumber Company to TCF National Bank (Note – TCF National Bank's commitment to make the $3,880,000 advance was terminated, and the $3,880,000 promissory note was returned to Lyman Lumber Company, pursuant to that certain letter agreement dated June 26, 2008, between Lyman Lumber Company and TCF National Bank).

2.     Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder of Washington County, Minnesota, on June 27, 2008, as Document No. 3698361, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $2,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes: (i) Promissory Note dated March 1, 1999, in the original principal amount of $1,875,000 (Chanhassen, MN property); (ii) Promissory Note dated March 1, 1999, in the original principal amount of $1,725,000 (Chanhassen, MN property); (iii) Promissory Note dated October 20, 2004, in the original principal amount of $7,280,000 (Woodinville, WA property); (iv) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); and (v) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property).

### E.     Excelsior, Minnesota (ABC)

Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 25, 2008, and recorded in the Office of the County Recorder in and for

Hennepin County, Minnesota, on June 26, 2008, as Document No. A9151671, from Automated Building Components, Inc., a Minnesota corporation, to TCF National Bank, a national banking association, to secure the maximum principal amount of $500,000 of the indebtedness evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of $976,000 (Chetek, WI property), from Automated Building Components, Inc., to TCF National Bank.

## F.   **Excelsior, Minnesota (Lyman)**

Mortgage and Security Agreement and Fixture Financing Statement dated May 13, 2004, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on May 17, 2004, as Document No. 8353720, and in the Office of the Registrar of Titles in and for Hennepin County, Minnesota, on May 17, 2004, as Document No. 3962960, from Lyman Lumber Company, a Minnesota corporation, to Union Central Mortgage Funding, Inc., an Ohio corporation, to secure the original principal amount of $1,800,000, which amount is evidenced by Promissory Note dated May 13, 2004, in the original principal amount of $1,800,000 from Lyman Lumber Company to Union Central Mortgage Funding, Inc. (which mortgage was subsequently assigned from Union Central Mortgage Funding, Inc., to LaSalle Bank National Association, as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2004-IQ8, pursuant to that certain Assignment of Loan Documents dated August 24, 2004, and recorded on September 15, 2004, as Document No. 8436547).

## G.   **Montrose, Minnesota**

1.   Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated May 1, 2001, and recorded in the Office of the County Recorder in and for Wright County, Minnesota, on June 6, 2001, as Document No. 744197, and in the Office of the County Recorder in and for Hennepin County, Minnesota, on June 5, 2001, as Document No. 7483243, from Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure an original principal amount of up to $4,371,000, or so much thereof as may be payable under that certain Reimbursement Agreement dated as of May 1, 2001, as amended, by and among Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Lumber, Inc., Carpentry Contractors Acquisition, Inc., Lyman Development Co., and U.S. Bank National Association; as amended by that certain First Amendment to Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 26, 2008, and recorded in the office of the County Recorder in and for Wright County, Minnesota, on April 14, 2008, as Document No. A1085423, and in the office of the County Recorder in and for Hennepin County, Minnesota, on April 14, 2008, as Document No. 9121509, from Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association.

2.  Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Wright County, Minnesota, on July 3, 2008, as Document No. A1092620, and in the Office of the County Recorder in and for Hennepin County, Minnesota, on July 2, 2008, as Document No. A9154272, from Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association, in its capacity as administrative agent for the Banks defined therein, to secure the maximum principal amount of $750,000 of the indebtedness evidenced by that certain Promissory Note dated October 16, 2007, in the original principal amount of $7,484,000, from Lyman Lumber Company to U.S. Bank National Association and by that certain Amended and Restated Loan Agreement dated as of March 26, 2008 (as amended by that certain First Amendment to Amended and Restated Loan Agreement dated as of June 26, 2008), by and among Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Lumber, Inc., Carpentry Contractors Corp., Lyman Development Co., Lyman Properties, L.L.C., Woodinville Construction Services, L.L.C., U.S. Bank National Association, and the Banks defined in and from time to time party to such Amended and Restated Loan Agreement, as amended.

## H.   Longview, Washington

1.  Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated October 16, 2007, and recorded in the Office of the County Recorder in and for Cowlitz County, Washington, on October 17, 2007, as Document No. 3350036, from Woodinville Lumber, Inc., a Minnesota corporation, in favor of U.S. Bank Trust Company, National Association, as trustee, for the benefit of U.S. Bank National Association, a national banking association, as beneficiary, in its capacity as administrative agent for the Banks defined therein, to secure, among other things, (i) payment of indebtedness in the total principal amount of $7,484,000, with interest thereon, evidenced by that certain Promissory Note dated October 16, 2007, by Woodinville Lumber, Inc., Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Construction Services, L.L.C., Carpentry Contractors Corp., Lyman Development Co., and Lyman Properties, L.L.C. (each a "**Maker**"); (b) payment of all other sums, with interest thereon, loaned to any of the Obligors, when evidenced by a promissory note reciting that it is secured by the Deed of Trust; and (c) payment of all debts, liabilities and obligations of the Makers under that certain Loan Agreement dated October 16, 2007, among Makers, U.S. Bank and the Banks; as such Deed of Trust was amended by that certain First Amendment to Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 26, 2008, and recorded in the office of the County Recorder in and for Cowlitz County, Washington, on April 14, 2008, as Document No. 3364404, from Wooodinville Lumber, Inc., a Minnesota corporation, for the benefit of U.S. Bank National Association, a national banking association.

2.  Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Cowlitz County, Washington, on July 3, 2008, as Document No. 3371509, from Woodinville Lumber, Inc., a Minnesota corporation, in favor of U.S. Bank Trust Company, National Association, as trustee, for the benefit of U.S. Bank National Association, a national banking association, as beneficiary, to secure, among other things, (a) an original principal amount of $4,371,000, or so much thereof as may be payable under that certain Second Amended and Restated Reimbursement Agreement dated as of March 26, 2008, by and among Woodinville Lumber, Inc., Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Construction Services, L.L.C., Carpentry Contractors Corp., Lyman Development Co., and Lyman Properties, L.L.C. (each an "**Obligor**"), and U.S. Bank National Association, as amended by that certain First Amendment to Second Amended and Restated Reimbursement Agreement dated as of June 26, 2008; and (b) payment of all other sums, with interest thereon, loaned to any Obligor, when evidenced by a promissory note reciting that it is secured by the Deed of Trust.

I.  **Chetek, Wisconsin**

Combination Mortgage, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the Register of Deeds in and for Barron County, Wisconsin, on November 12, 2004, as Document No. 701582, from Automated Building Components, Inc., a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $976,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of $976,000 from Automated Building Components, Inc., to TCF National Bank.

J.  **Matthews, North Carolina**

Deed of Trust, Absolute Assignment of Rents and Security Agreement and UCC Financing Statement dated June 26, 2008, and recorded in the Office of the Register of Deeds in and for Union County, North Carolina, on July 8, 2008, in Book 4932, Page 615, as Instrument No. 25683, from Mid-America Cedar, Inc., a Minnesota corporation, to Independent Trustees, Inc., as Trustee, for the benefit of U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of up to $52,000,000, or so much thereof as may be advanced under those certain revolving credit promissory notes dated March 6, 2008, pursuant to that certain Eighth Amended and Restated Credit Agreement dated as of March 6, 2008, as amended.

K.  **Mortgages Encumbering Multiple Properties**

1.  Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Construction Mortgage Investors Co., a Minnesota corporation, to U.S. Bank National Association, a

national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the Office of the:

(a)     County Recorder for Carver County, Minnesota, on March 25, 2008, as Document No. A 480605;

(b)     County Recorder for Sherburne County, Minnesota, on March 28, 2008, as Document No. 669839; and Registrar of Titles for Sherburne County, Minnesota, on April 2, 2008, as Document No. 41628;

(c)     County Recorder for Wright County, Minnesota, on March 26, 2008, as Document No. A 1083729;

(d)     County Recorder for Stearns County, Minnesota, on March 26, 2008, as Document No. 1253807;

(e)     County Recorder for Dakota County, Minnesota, on March 27, 2008, as Document No. 2580860;

(f)     County Recorder for Anoka County, Minnesota, on March 26, 2008, as Document No. 1999596.001;

(g)     County Recorder for Washington County, Minnesota, on March 27, 2008, as Document No. 3685711;

(h)     County Recorder for Isanti County, Minnesota, on March 27, 2008, as Document No. 388141;

(i)     County Recorder for McLeod County, Minnesota, on March 25, 2008, as Document No. A-376008;

(j)     County Recorder for Hennepin County, Minnesota, on March 27, 2008, as Document No. 9114097; and Registrar of Titles for Hennepin County, Minnesota, on March 27, 2008, as Document No. 4481833;

(k)     County Recorder for Chisago County, Minnesota, on March 27, 2008, as Document No. A-496417;

(l)     County Recorder for Benton County, Minnesota, on March 26, 2008, as Document No. 356072;

(m)     County Recorder for Rice County, Minnesota, on March 27, 2008, as Document No. 599466; and

(n)   County Recorder for Scott County, Minnesota, on March 25, 2008, as Document No. A 796519.

[*__Note__* – This mortgage includes a mortgage of the mortgagor's interest in various third-party mortgages held by mortgagor.]

2.   Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Construction Mortgage Investors Co., a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of $70,000,000, which amount is evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the Office of the:

(a)   Register of Deeds for St. Croix County, Wisconsin, on March 26, 2008, as Document No. 871544;

(b)   Register of Deeds for Ozankee County, Wisconsin, on March 26, 2008, as Document No. 0880613;

(c)   Register of Deeds for Milwaukee County, Wisconsin, on March 28, 2008, as Document No. 09578547;

(d)   Register of Deeds for Racine County, Wisconsin, on April 7, 2008, as Document No. 2170117;

(e)   Register of Deeds for Washington County, Wisconsin, on March 26, 2008, as Document No. 1187019; and

(f)   Register of Deeds for Waukesha County, Wisconsin, on March 26, 2008, as Document No. 3557382.

[*__Note__* – This mortgage appears to be a mortgage of the mortgagor's interest in various third-party mortgages held by mortgagor.]

3.   Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, and recorded in the Office of the County Recorder in and for Scott County, Minnesota, on March 25, 2008, as Document No. A 796520, from Lyman Development Co., a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008.

4.    Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Lyman Properties, L.L.C., a Minnesota limited liability company, to U.S. Bank National Association, a national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the office of the:

(a)    County Recorder for Chisago County, Minnesota, on March 27, 2008, as Document No. A-496418; and

(b)    County Recorder for Carver County, Minnesota, on March 25, 2008, as Document No. A-480606.

5.    Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Lyman Properties, L.L.C., a Minnesota limited liability company, to U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of $70,000,000, which amount is evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, and recorded in the office of the:

(a)    Register of Deeds for Pierce County, Wisconsin, on March 26, 2008, as Document No. 501922; and

(b)    Register of Deeds for St. Croix County, Wisconsin, on March 26, 2008, as Document No. 871545.

**EXHIBIT E**

**CASH FLOW PROJECTIONS AND BUDGET**

# Exhibit E

**Lyman Lumber Company**
**Weekly Cash Flow Budget**

| | Prepetition | Postpetition | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning>>> | 8/1/2011 | 8/8/2011 | 8/15/2011 | 8/22/2011 | 8/29/2011 | 9/5/2011 | 9/12/2011 | 9/19/2011 | 9/26/2011 | 10/3/2011 | 10/10/2011 | 10/17/2011 | 10/24/2011 |
| **Beginning Cash** | | 3,000,000 | 2,546,769 | 1,870,297 | 2,107,917 | 1,069,418 | 1,253,943 | 1,263,304 | 1,743,008 | 19,496,230 | 328,942 | 2,527,090 | 2,657,802 |
| **Operational Sources of Cash** | | | | | | | | | | | | | |
| Accounts Receivable Sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,415,518 | 0 | 0 | 0 | 0 |
| Core Business Prepetition Collections | 0 | 1,739,163 | 1,739,163 | 1,739,163 | 278,266 | 278,266 | 278,266 | 278,266 | 278,266 | 0 | 0 | 0 | 0 |
| Core Business Postpetition Collections | 0 | 0 | 0 | 0 | 1,404,454 | 1,404,454 | 1,404,454 | 1,404,454 | 1,404,454 | 0 | 0 | 0 | 0 |
| Core Business Equipment Sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,316,608 | 0 | 0 | 0 | 0 |
| Core Business Inventory Liquidation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,912,420 | 0 | 0 | 0 | 0 |
| Non-Core Business Real Estate Sales | 0 | 0 | 0 | 300,000 | 0 | 0 | 0 | 0 | 1,775,000 | 0 | 0 | 0 | 0 |
| Non-Core Business Equipment Auction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 272,309 | 0 | 1,732,800 | 0 | 0 |
| Non-Core Business Inventory Liquidation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 580,027 | 0 | 314,638 | 0 | 0 |
| Non-Core Business Prepetition Collections | 0 | 935,547 | 935,547 | 935,547 | 148,288 | 148,288 | 148,288 | 148,288 | 148,288 | 84,907 | 84,907 | 84,907 | 84,907 |
| Non-Core Business Postpetition Collections | 0 | 0 | 0 | 0 | 437,923 | 437,923 | 437,923 | 437,923 | 437,923 | 65,805 | 65,805 | 65,805 | 65,805 |
| **Total Operational Sources of Cash** | 0 | 2,674,710 | 2,674,710 | 2,974,710 | 2,268,931 | 2,268,931 | 2,268,931 | 2,268,931 | 19,540,812 | 150,711 | 2,198,149 | 150,711 | 150,711 |
| **Operational Uses of Cash** | | | | | | | | | | | | | |
| Asset Sale Transaction Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees | 0 | 0 | 0 | 0 | 0 | 291,000 | 0 | 0 | 0 | 291,000 | 0 | 0 | 0 |
| US Trustee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,000 | 0 |
| Inventory Purchases | 0 | 1,852,190 | 1,852,190 | 1,605,231 | 1,030,717 | 1,030,717 | 1,030,717 | 1,030,717 | 1,030,717 | 0 | 0 | 0 | 0 |
| Employee Costs | 0 | 490,015 | 951,206 | 490,015 | 961,462 | 495,299 | 961,462 | 495,299 | 327,175 | 0 | 0 | 0 | 0 |
| Property and Sales Taxes | 0 | 0 | 0 | 0 | 753,320 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities | 0 | 29,256 | 29,256 | 146,279 | 21,899 | 21,899 | 21,899 | 21,899 | 21,899 | 0 | 0 | 0 | 0 |
| Insurance | 0 | 111,195 | 111,195 | 114,250 | 86,020 | 82,965 | 82,965 | 82,965 | 82,965 | 0 | 0 | 0 | 0 |
| Fees | 0 | 302,287 | 64,337 | 64,337 | 43,361 | 43,361 | 43,361 | 43,361 | 43,361 | 0 | 0 | 0 | 0 |
| Office & Yard | 0 | 77,494 | 77,494 | 67,162 | 40,673 | 40,673 | 40,673 | 40,673 | 40,673 | 0 | 0 | 0 | 0 |
| Travel & Entertainment | 0 | 11,486 | 11,486 | 11,486 | 7,068 | 7,068 | 7,068 | 7,068 | 7,068 | 0 | 0 | 0 | 0 |
| Other Operating | 0 | 11,347 | 11,347 | 11,347 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 0 | 0 | 0 | 0 |
| Vehicle and Property | 0 | 117,671 | 117,671 | 101,981 | 67,219 | 67,219 | 67,219 | 67,219 | 63,041 | 0 | 0 | 0 | 0 |
| **Total Operational Uses of Cash** | 0 | 3,002,942 | 3,226,182 | 2,612,089 | 3,015,944 | 2,084,406 | 2,259,569 | 1,789,227 | 1,621,104 | 291,000 | 0 | 20,000 | 0 |
| **CONTINGENCIES** | 0 | 125,000 | 125,000 | 125,000 | 125,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cumulative Use of Cash | 0 | 3,127,942 | 6,479,124 | 9,216,213 | 12,357,158 | 14,441,563 | 16,701,132 | 18,490,360 | 20,111,463 | 20,402,463 | 20,402,463 | 20,422,463 | 20,422,463 |
| **(1) Net Operating Cash Flow** | 0 | (453,231) | (676,472) | 237,621 | (872,013) | 184,525 | 9,362 | 479,704 | 17,919,708 | (140,289) | 2,198,149 | 130,711 | 150,711 |
| **Financing Cash Flow** | | | | | | | | | | | | | |
| Mortgage Principal & Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Line of Credit Interest | 0 | 0 | 0 | 0 | (166,486) | 0 | 0 | 0 | (166,486) | 0 | 0 | 0 | (165,544) |
| Line of Credit Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (19,027,000) | 0 | 0 | 0 |
| **(2) Net Financing Cash Flow** | 0 | 0 | 0 | 0 | (166,486) | 0 | 0 | 0 | (166,486) | (19,027,000) | 0 | 0 | (165,544) |
| **Weekly Net Cash Flow (1 + 2)** | 0 | (453,231) | (676,472) | 237,621 | (1,038,500) | 184,525 | 9,362 | 479,704 | 17,753,222 | (19,167,289) | 2,198,149 | 130,711 | (14,833) |
| **Ending Cash Balance** | 3,000,000 | 2,546,769 | 1,870,297 | 2,107,917 | 1,069,418 | 1,253,943 | 1,263,304 | 1,743,008 | 19,496,230 | 328,942 | 2,527,090 | 2,657,802 | 2,642,969 |

# EXHIBIT F

## COLLATERAL BALANCE PROJECTIONS

# Lyman Lumber Company
## Collateral Balance Projection

| | Prepetition | Postpetition | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning>>> | 8/1/2011 | 8/8/2011 | 8/15/2011 | 8/22/2011 | 8/29/2011 | 9/5/2011 | 9/12/2011 | 9/19/2011 | 9/26/2011 | 10/3/2011 | 10/10/2011 | 10/17/2011 | 10/24/2011 |
| **Collateral Balances (in 000s)** | | | | | | | | | | | | | |
| CASH | 3,000 | 2,547 | 1,870 | 2,108 | 1,069 | 1,254 | 1,263 | 1,743 | 19,496 | 329 | 2,527 | 2,658 | 2,643 |
| **LYMAN ACCOUNTS RECEIVABLE** | | | | | | | | | | | | | |
| LLC | 5,224 | 5,224 | 5,474 | 5,725 | 5,646 | 5,568 | 5,489 | 5,411 | 0 | 0 | 0 | 0 | 0 |
| WLI + WCS | 3,992 | 3,992 | 3,971 | 3,950 | 3,584 | 3,219 | 2,854 | 2,489 | 2,124 | 1,776 | 1,625 | 1,474 | 1,324 |
| CCC | 1,888 | 1,888 | 1,987 | 2,086 | 2,087 | 2,088 | 2,089 | 2,090 | 0 | 0 | 0 | 0 | 0 |
| MAC | 43 | 43 | 34 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 |
| Chetek / Millwork | 0 | 0 | 836 | 1,672 | 1,805 | 1,938 | 2,070 | 2,203 | 0 | 0 | 0 | 0 | 0 |
| Kitchens | 0 | 0 | 95 | 190 | 204 | 218 | 232 | 245 | 0 | 0 | 0 | 0 | 0 |
| LLW | 0 | 0 | 212 | 423 | 448 | 473 | 498 | 523 | 0 | 0 | 0 | 0 | 0 |
| Sisters | 4,897 | 4,897 | 4,147 | 3,396 | 3,276 | 3,156 | 3,036 | 2,916 | 0 | 0 | 0 | 0 | 0 |
| **Total Accounts** | 16,044 | 16,044 | 16,755 | 17,467 | 17,076 | 16,685 | 16,294 | 15,903 | 2,149 | 1,801 | 1,651 | 1,500 | 1,349 |
| **INVENTORY** | | | | | | | | | | | | | |
| LLC | 3,607 | 3,607 | 3,607 | 3,607 | 3,697 | 3,697 | 3,697 | 3,697 | 0 | 0 | 0 | 0 | 0 |
| CCC | 324 | 324 | 324 | 324 | 324 | 324 | 324 | 324 | 0 | 0 | 0 | 0 | 0 |
| MAC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WLI + WCS | 1,410 | 1,410 | 750 | 590 | 590 | 590 | 590 | 590 | 0 | 0 | 0 | 0 | 0 |
| Sisters | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chetek / Millwork | 2,150 | 2,150 | 2,150 | 2,150 | 2,203 | 2,203 | 2,203 | 2,203 | 0 | 0 | 0 | 0 | 0 |
| Kitchens | 77 | 77 | 77 | 77 | 79 | 79 | 79 | 79 | 0 | 0 | 0 | 0 | 0 |
| LLW | 823 | 823 | 823 | 823 | 844 | 844 | 844 | 844 | 0 | 0 | 0 | 0 | 0 |
| **Total Inventory** | 8,391 | 8,391 | 7,731 | 7,571 | 7,737 | 7,737 | 7,737 | 7,737 | 0 | 0 | 0 | 0 | 0 |
| **EQUIPMENT** | | | | | | | | | | | | | |
| NFLV of Equipment | 4,859 | 4,859 | 4,859 | 4,859 | 4,731 | 4,731 | 4,731 | 4,731 | 2,142 | 2,142 | 409 | 409 | 409 |
| **REAL ESTATE** | | | | | | | | | | | | | |
| Assessed Tax Value - Real Estate Collateral | 3,132 | 3,132 | 3,132 | 3,132 | 3,132 | 3,132 | 3,132 | 3,132 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL COLLATERAL** | 35,426 | 34,973 | 34,347 | 35,137 | 33,746 | 33,539 | 33,158 | 33,246 | 23,788 | 4,272 | 4,587 | 4,567 | 4,401 |
| **Line of Credit** | | | | | | | | | | | | | |
| Revolver Balance | 17,250 | 17,250 | 17,250 | 17,250 | 17,250 | 17,250 | 17,250 | 17,250 | 17,250 | 0 | 0 | 0 | 0 |
| Letters of Credit | 1,777 | 1,777 | 1,777 | 1,777 | 1,777 | 1,777 | 1,777 | 1,777 | 1,777 | 0 | 0 | 0 | 0 |
| **Total** | 19,027 | 19,027 | 19,027 | 19,027 | 19,027 | 19,027 | 19,027 | 19,027 | 19,027 | 0 | 0 | 0 | 0 |
| **Equity Cushion ($)** | 16,399 | 15,946 | 15,320 | 16,110 | 14,719 | 14,512 | 14,131 | 14,219 | 4,761 | N/A | N/A | N/A | N/A |
| **Equity Cushion (% of loan balance)** | 86% | 84% | 81% | 85% | 77% | 76% | 74% | 75% | 25% | N/A | N/A | N/A | N/A |

In re:

| Lyman Holding Company,<br>Debtor. | Case No. 11-45190<br>Chapter 11 Case |

| Lyman Lumber Company,<br>Debtor. | Case No. 11-45191<br>Chapter 11 Case |

| Automated Building Components, Inc.,<br>Debtor. | Case No. 11-45192<br>Chapter 11 Case |

| Building Materials Wholesalers, Inc.,<br>Debtor. | Case No. 11-45193<br>Chapter 11 Case |

| Carpentry Contractors Corp.,<br>Debtor. | Case No. 11-45194<br>Chapter 11 Case |

| Construction Mortgage Investors Co.,<br>Debtor. | Case No. 11-45196<br>Chapter 11 Case |

| Lyman Development Co.,<br>Debtor. | Case No. 11-45199<br>Chapter 11 Case |

| Lyman Lumber of Wisconsin, Inc.,<br>Debtor. | Case No. 11-45201<br>Chapter 11 Case |

| Lyman Properties, L.L.C.,<br>Debtor. | Case No. 11-45202<br>Chapter 11 Case |

| Mid-America Cedar, Inc.,<br>Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR (I) EXPEDITED RELIEF AND (II) INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL

The above-listed debtors ("Debtors"), as debtors-in-possession, move the Court for entry of an order (I) granting expedited relief, and (II) authorizing the Debtors to use cash collateral on an interim and final basis. The supporting facts are set forth in the verified Motion. All capitalized terms have the meaning subscribed to them in the Motion.

## ANALYSIS

### I. CAUSE EXISTS TO REDUCE NOTICE OF HEARING ON THE INTERIM MOTION.

Fed. R. Bankr. P. 4001(b) provides that the court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 15 days after service of the motion. The rule further provides that the court may conduct a preliminary hearing before such 15-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and reparable harm to the estate pending a final hearing. Local Rule 9006-1(b) provides that notice of hearing must be filed and served not later than fourteen days prior to the hearing date, except that subparagraph (e) provides that the court may reduce the notice of the hearing. Local instructions provide that the hearing will not normally be heard in less than 36 hours after notice.

In this case, there are grounds to reduce notice of the interim hearing and authorize use of cash collateral on a preliminary basis pending the final hearing. Debtors have an urgent need for use of cash collateral. Debtors must meet payroll and trade vendor obligations or they will be forced to cease operations. If that occurs, the value of the estates will be greatly diminished. Finally, the notice of the motion is more than 36 hours prior to the hearing and is consistent with the expedited relief contemplated in the local instructions.

## II.  THE COURT SHOULD AUTHORIZE DEBTORS' PROPOSED USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS.

The Bankruptcy Code provides that a debtor in possession may use cash collateral only with the secured creditor's consent or if the court, after notice and a hearing, authorizes such use. See 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that the Court must provide the secured creditor with adequate protection of its interest upon request of the creditor. The Eighth Circuit Court of Appeals has reasoned that:

> In any given case, the Bankruptcy Court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risk to the secured creditor's value resulting from the Debtor's request for use of cash collateral, and (3) determine whether the Debtor's adequate protection proposal protects values as nearly as possible against risk to that value consistent with the concept of indubitable equivalence.

In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

Pursuant to Martin, the first step is to establish the value of the secured creditor's interest. For purposes of this motion, and focusing on the cash collateral which is subject to the liens of the lender, the creditor's interest is determined by what the creditor could recover if the collateral were disposed of in the most commercially reasonable manner practicable. In re Boring, 91 B.R. 791, 795 (Bankr. S.D. Ohio 1988); United States v. Smithfield Estates, Inc., 48 B.R. 910, 912 (Bankr. D.R.I. 1985).

As of the Filing Date, Debtors' obligations to the Prepetition Lenders totaled $19,027,000 plus accrued and unpaid interest, fees, expenses, and other Obligations, if any (as defined in the Prepetition Credit Agreement). As of the commencement of this case, the value of the Prepetition Collateral exceeded $35 million. Hence, there is more than sufficient equity to protect the Bank's interest.

The second requirement of <u>Martin</u> requires the court to identify the risk to the secured creditor's value resulting from the debtor's request for use of cash collateral. In the instant case, such risk would be that the Debtors might fail to generate sufficient replacement cash collateral to compensate for use of existing cash collateral. In this case, that risk is minimal. Debtors project that the value of the collateral will decline modestly through October 31, 2011, but through a sale will still exceed the indebtedness by more than $14 million, an equity cushion of at least 74%. Debtors propose to use cash collateral to maintain their existing operations, to meet payroll and payroll taxes, and to meet other operating expenses, all of which maintain the going-concern value of the Debtors and inures to the benefit of the Prepetition Lenders. In the event that the Debtors are not authorized to use cash collateral, the only alternative is to shut down the Debtors' operations. Such a result would greatly impair the value of the Debtors' assets in which the Prepetition Lenders claim a security interest. Such a result would ensure that unsecured creditors receive, at best, a minimal distribution on account of their claims and would be disruptive to the Debtors' customers, employees, and other parties in interest.

The third requirement of <u>Martin</u> requires the Court to examine the debtor's adequate protection proposal to determine that the proposal protects the value of the lender's interest, if any, in the cash collateral relative to the risk to such value. <u>See Martin,</u> 761 F.2d at 477. Here, the Debtor proposes to grant the Prepetition Lenders a replacement lien on, and security interest

in, the same types and items of collateral as were subject to the Prepetition Lenders' liens as of the commencement of this case. Such replacement liens would extend to postpetition assets of the estate to the extent of cash collateral used by the Debtors. In addition, Debtors propose to make interest payments on the loan balances. The Debtors will provide to the Prepetition Lenders operating reports and other financial statements of the same type and kind as provided prepetition, and will provide to the Prepetition Lenders all reports filed with the Office of the United States Trustee. Finally, the Debtor's proposed Chapter 11 sale, which is funded by the use of cash collateral, will liquidate the Prepetition Collateral for the highest value and provide its own form of adequate protection. As demonstrated by the projections, the risk of loss from operations in the near term is minimal, and the Debtors project that they will be able to cover all operating expenses and administrative expenses in these chapter 11 cases.

## CONCLUSION

For all the foregoing reasons, Debtors respectfully request that the court grant the relief requested in the Motion.

Dated: August 4, 2011

 */e/ Douglas W. Kassebaum*
James L. Baillie (#3980)
Thomas F. Steichen (#279511)
Cynthia A. Moyer (#211229)
Douglas W. Kassebaum (#386802)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis MN 55402
(612) 492-7000
(612) 492-7077 fax
jbaillie@fredlaw.com
cmoyer@fredlaw.com
dkassebaum@fredlaw.com

PROPOSED ATTORNEYS FOR DEBTORS

4967355_2

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Lyman Holding Company,<br>               Debtor. | Case No. 11-45190<br>Chapter 11 Case |
| Lyman Lumber Company,<br>               Debtor. | Case No. 11-45191<br>Chapter 11 Case |
| Automated Building Components, Inc.,<br>               Debtor. | Case No. 11-45192<br>Chapter 11 Case |
| Building Materials Wholesalers, Inc.,<br>               Debtor. | Case No. 11-45193<br>Chapter 11 Case |
| Carpentry Contractors Corp.,<br>               Debtor. | Case No. 11-45194<br>Chapter 11 Case |
| Construction Mortgage Investors Co.,<br>               Debtor. | Case No. 11-45196<br>Chapter 11 Case |
| Lyman Development Co.,<br>               Debtor. | Case No. 11-45199<br>Chapter 11 Case |
| Lyman Lumber of Wisconsin, Inc.,<br>               Debtor. | Case No. 11-45201<br>Chapter 11 Case |
| Lyman Properties, L.L.C.,<br>               Debtor. | Case No. 11-45202<br>Chapter 11 Case |
| Mid-America Cedar, Inc.,<br>               Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

## ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL

This matter is before the Court on the Debtors' Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing the Use of Cash Collateral (the "Motion").

Appearances are noted on the record. Based on the Motion, all the files, records and proceedings herein, the Court having being advised in the premises, and the Court's findings of fact and conclusions of law, if any, having been stated orally and recorded in open court following the close of evidence,

IT IS HEREBY ORDERED:

1.      The Debtors' request for expedited relief is granted.

2.      The Debtors are authorized to cash, including cash collateral, that may be subject to liens in favor of U.S. Bank National Association, TCF National Bank, BMO Harris Bank, N.A., Bank of America, N.A., Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A., and Prudential Insurance Company of America (collectively, the "Prepetition Lenders"), consistent with the budget attached to the Motion through the end of the week beginning August 22, 2011.

3.      For purposes of adequate protection, and to the extent of the use of prepetition cash collateral in which the Prepetition Lenders have a security interest, the Debtors are authorized to grant to the Prepetition Lenders a replacement lien, pursuant to 11 U.S.C. § 552, in

the Debtors' postpetition assets of the same priority, dignity and effect as the prepetition lien, if

any, on the prepetition property of the Debtors.

Dated: _____        _____
                                       Dennis D. O'Brien
                                       United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Lyman Holding Company, | Case No. 11-45190 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber Company, | Case No. 11-45191 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Automated Building Components, Inc., | Case No. 11-45192 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Building Materials Wholesalers, Inc., | Case No. 11-45193 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Carpentry Contractors Corp., | Case No. 11-45194 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Construction Mortgage Investors Co., | Case No. 11-45196 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Development Co., | Case No. 11-45199 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc., | Case No. 11-45201 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Lyman Properties, L.L.C., | Case No. 11-45202 |
| Debtor. | Chapter 11 Case |

---

| | |
|---|---|
| Mid-America Cedar, Inc., | Case No. 11-45203 |
| Debtor. | Chapter 11 Case |

---

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

**ORDER AUTHORIZING FINAL USE OF CASH COLLATERAL**

This matter is before the Court on the Debtors' Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing the Use of Cash Collateral (the "Motion").

Appearances are noted on the record. Based on the Motion, all the files, records and proceedings herein, the Court having being advised in the premises, and the Court's findings of fact and conclusions of law, if any, having been stated orally and recorded in open court following the close of evidence,

IT IS HEREBY ORDERED:

1.      The Debtors are authorized to cash, including cash collateral, that may be subject to liens in favor of U.S. Bank National Association, TCF National Bank, BMO Harris Bank, N.A., Bank of America, N.A., Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A., and Prudential Insurance Company of America (collectively, the "Prepetition Lenders"), consistent with the budget attached to the Motion through October 31, 2011.

2.      For purposes of adequate protection, and to the extent of the use of prepetition cash collateral in which the Prepetition Lenders have a security interest, the Debtors are authorized to grant to the Prepetition Lenders a replacement lien, pursuant to 11 U.S.C. § 552, in the Debtors' postpetition assets of the same priority, dignity and effect as the prepetition lien, if

any, on the prepetition property of the Debtors.


Dated: _____

                                             Dennis D. O'Brien
                                             United States Bankruptcy Judge