# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 Case No. 11-45190 |
| Lyman Holding Company, et al., | (Jointly Administered) |
| Debtors.[1] | Judge Dennis D. O'Brien |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING PROCEDURES AND AUCTION; (IV) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (V) APPROVING FORM AND MANNER OF NOTICE; AND (VI) SCHEDULING FURTHER HEARING

To: The Debtors, and other entities entitled to service as specified in Local Rule 9013-(3)(b).

The Official Committee of Unsecured Creditors of Lyman Holding Company, et al. ("Committee"), by and through its undersigned counsel,[2] hereby files this Objection ("Objection") to the Debtors' Motion for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing ("Sale Motion").

---

[1] Jointly administered estates of the following Debtors: Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11-45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

[2] The Committee filed its application to employ Fafinski Mark & Johnson, P.A as the Committee's counsel on August 15, 2011. That application is pending.

1148599_5                                              1

All capitalized terms not otherwise defined herein have the meaning set forth in the Sale Motion. In support of its Objection, the Committee states and alleges as follows:

## **INTRODUCTION**

On August 5, 2011, one day after filing voluntary petitions for relief under Chapter 11, the Debtors filed the Sale Motion, seeking to sell substantially all of the Debtors' assets relating to business operations in Minnesota and Wisconsin ("Acquisition Assets") to SP Asset Management ("Stalking Horse"). The Committee was appointed four days later. In the Sale Motion, the Debtors seek to sell the vast majority of their assets for a sale price of $22 million cash, but that amount would be reduced by a working capital adjustment and further reduced by certain assumed obligations. The Sale Motion did not include a copy of the Asset Purchase Agreement ("APA"). The Debtors have since provided the Committee with only drafts of the APA. The most recent draft of the APA contains significant differences from the Term Sheet filed with the Sale Motion, including a purchase price decrease of $4,000,000, or about 18%.

The Committee objects to the Sale Motion for the following reasons: (1) the proposed break-up fee and expense reimbursement to be paid to the Stalking Horse is unreasonable relative to the purchase price and will not promote more competitive bidding or otherwise benefit the estate; (2) the APA unconscionably gives the Stalking Horse the power to prohibit the commencement of over $26 million worth of Avoidance Actions in exchange for no consideration; and (3) the proposed sales price is inadequate. If the Committee's objections are resolved, the process will promote the most competitive bidding at auction and potentially enhance the Debtors' recovery from the sale.

**ARGUMENT**

I.   **THE STANDARD FOR EVALUATING ASSET SALES UNDER § 363(B)(1)**

Under 11 U.S.C. § 363(b)(1), a debtor may sell property outside of the ordinary course of business after notice and a hearing. To approve a proposed sale, the court must find that a sufficient business reason exists for the sale and that the sale is in the best interest of the estate, *i.e.*, that the sale is fair and reasonable, that it has been adequately marketed, that it has been negotiated and proposed in good faith, and that it is an "arm's length" transaction. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991). In deciding whether a sale is in the best interest of the estate, the court must consider the diverse interests of the debtor, creditors and equity holders, alike. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

The debtor must demonstrate that all aspects of the sale are reasonable by showing that (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor provided adequate and reasonable notice to all necessary parties; and (4) the proposed purchaser acted in good faith. *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008); *In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D. W. Va. 2006). The court must make specific findings as to "whether the sale, public or private, is in the best interests of the debtor's estate when [the] consideration paid and all other relevant factors are taken into account." *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okl. 1983). Courts impose a heightened level of scrutiny on the proposed sale when a debtor desires to sell substantially all of its assets. *Wilde Horse*, 136 B.R. at 841.

The debtor's main responsibility—and the primary concern of the bankruptcy court—is to maximize the value of the asset being sold. *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995); *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *In re*

*Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992); *Wilde Horse*, 136 B.R. at 841. The debtor bears the burden to show that it obtained the best possible price for the asset. *Nicole Energy Servs.*, 385 B.R. at 233; *In re New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999); *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (stating that "in appropriate circumstances it is proper for a court to interfere with the trustee's judgment for the purpose of safeguarding the interest of parties concerned").

## II. THE PROPOSED BREAK-UP FEE AND EXPENSE REIMBURSEMENT DO NOT BENEFIT THE ESTATE

The Debtors seek approval from the Court to pay the Stalking Horse Bidder a proposed "Break-up Fee" and an "Expense Reimbursement" in the total aggregate amount of up to $750,000. Sale Motion ¶¶ 38-39. The Committee objects to the proposed Break-up Fee because (1) there is no evidence that the Break-up Fee will promote more competitive bidding or otherwise benefit the estate and (2) the Break-up Fee is unreasonable relative to the purchase price.

In bankruptcy sales, a "break-up fee" is a fee paid by a seller to a prospective purchaser if the contemplated transaction is not consummated. *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 96 (8th Cir. B.A.P. 2003) ("*Tama I*"). For a break-up fee to be allowed, the claimant must prove that the break-up fee "benefitted the estate in some demonstrable way." *Id.* at 98. In considering whether to approve a break-up fee, the bankruptcy court considers nine factors:

> (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation;
>
> (2) whether the fee hampered, rather than encouraged bidding;
>
> (3) whether the amount of the fee is unreasonable relative to the proposed purchase price;

(4) whether the unsuccessful bidder placed the estate property in a sales configuration mode to attract other bidders to the auction;

(5) whether the request for a break-up fee served to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(6) whether the fee requested correlates with the maximization of value to the debtor's estate;

(7) whether the principal secured creditors and the official unsecured creditors committee supported the concession;

(8) whether there were safeguards beneficial to the debtor's estate; and

(9) whether there would be a substantial adverse impact on unsecured creditors from approval of the administrative expense.

*Id.*

### A. The Break-Up Fee Does Not Promote More Competitive Bidding and Will Not Benefit the Estate.

A break-up fee will only be allowed if the claimant shows that the "assurance of a break-up fee promoted more competitive bidding, such as inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.*; *In re Wintz Companies*, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999) (stating that break-up fees may be allowed if "the fees create an incentive for increased bidding in sales from bankruptcy assets."). Where a debtor's assets have been thoroughly marketed and the proposed break-up fee will not induce further bidding, or bidding generally, a break-up fee will be denied. *In re America West Airlines, Inc.*, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994).

There is no evidence that the Stalking Horse's actions will promote a more competitive bidding process or benefit the estate in any way. According to the Debtors and their financial advisor, Alliance Management, Inc. ("Alliance"), Alliance marketed the Debtors' assets

extensively before the bankruptcy filing. Alliance targeted and pursued 227 potential purchasers and distributed an Offering Memorandum to 36 interested parties, resulting in the Debtors negotiating "extensively with three of the five potential bidders." Sale Motion ¶¶ 11-13. Although Alliance intends to seek out additional competing bidders, it is clear that any competitive bidding environment is the result of Alliance's ongoing efforts and not as a result of the Break-up Fee or the Stalking Horse. *See .e.g., America West Airlines*, 166 B.R. at 913 (rejecting break-up fee because debtor had been thoroughly marketed and break-up fee did not induce further bidding). Additionally, Debtors have already paid Alliance a considerable amount for Alliance's services, and if Alliance's application for employment is approved, Debtors will pay considerably more, including an incentive fee to Alliance.[3] If Debtors are required to pay a break-up fee (which may be approved in the Eighth Circuit when the fee provides an "incentive for increased bidding"), Debtors are paying twice but not receiving any additional benefit.

The Debtors are proposing to sell substantially all of their assets though the Sale Motion and other liquidation procedures. When considering the appropriateness of a break-up fee, courts have given significant weight to the Committee's objections on break-up fees in liquidating Chapter 11 cases. *See, e.g., In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Ill. 1995) ("In a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case 'because the principle [sic] underlying rationale for the 'business judgment rule', *i.e.,* that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances.'"). Here, there is no showing that the Break-Up Fee will promote competitive bidding or benefit the estate in any way, and the Break-Up Fee actually harms the estates by causing the Debtors to pay twice for the potential of

---

[3] Debtors' application to employ Alliance as its financial advisor discloses that since May 1, 2011, Alliance's was paid $748,919.34. Docket No. 37, ¶ 5. Additionally, Alliance is seeking a 2% incentive fee plus an hourly rate for its services. *Id*. ¶¶ 7-8.

bringing bidders to the table.[4] *See, e.g., In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Ill. 1995) (rejecting proposed break-up fee where bidder did not provide a benefit to the estate). The Break-up Fee should not be approved.

B. **The Break-Up Fee is Unreasonable.**

The Break-up Fee plus Expense Reimbursement (collectively, the "Fee") is far too high. It is appropriate to consider adjustments to the sale price when deciding if the break-up fee is a reasonable percentage of the sale price. *See, e.g., Matter of Tiara Motorcoach Corp.,* 212 B.R. 133, 137-38 (Bankr. N.D. Ind. 1997) (stating that the court had "no information concerning the value of the warranties or other liabilities that [buyer] agreed 'to pursue' to assume and thus cannot calculate a percentage of the breakup fee to the relative purchase price").

The $750,000 Fee is much higher than the 3.4% as alleged by the Debtors. The $750,000 cap could actually be $900,000, because the Debtors' gave the Stalking Horse Bidder a $150,000 deposit and despite the language the language of the Term Sheet, the Stalking Horse Bidder claims that it is entitled to the $150,000 deposit plus the $750,000 Fee. Sale Motion, at 12. Here is a chart showing the percentage of the Break-up Fee as a percentage of the sale price:

| Sale Price | Break-up plus Reimbursement Fees | Percentage of Sale Price |
|---|---|---|
| $18,000,000 | $750,000 | 4.16% |
| $18,000,000 | $900,000 | 5.0% |

Even if the Fee were closer to 3.4%, that percentage is too high under the circumstances in this case, given the significant adjustment downward to the cash price and Alliance's marketing efforts (see above). *In re Hupp Industries, Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992)

---

[4] If the Break-up Fee is approved, it would be appropriate for the Court to require the Stalking Horse Bidder to share its due diligence with all other potential bidders, because the estate is paying for that due diligence.

(court applied a seven-factor test, including whether unsecured creditors opposed the break-up fee, before rejecting a 2.1% break-up fee on the ground that the fee would be an unwarranted expense upon the debtor's estate). Additionally, Matrix anticipated that the net proceeds to unsecured creditors from the proposed sale would be $2,541,000, which makes $750,000 nearly 30% of the recovery for unsecured creditors. *See* Affidavit of Haas ¶ 5. It is unreasonable to pay nearly a 30% fee on that increase over liquidation value.

Second, allowing both the Break-up Fee and the Expense Reimbursement gives the Stalking Horse a windfall -- at the expense of creditors -- by allowing it to recover twice for any negative consequences it may suffer if it is not the Prevailing Bidder. The Eighth Circuit permits either a break-up fee or an expense reimbursement, but not both. *In re Tama Beef Packing, Inc.*, 321 B.R. 496, 497-98 (8th Cir. B.A.P. 2005) ("*Tama II*") ("[A]n unsuccessful stalking horse bidder may seek reimbursement of its actual expenses **or** it may seek a break-up fee which is designed to compensate the unsuccessful bidder for the risk and costs incurred in advancing the competitive bidding process." (emphasis added)). The Stalking Horse should not be able to use the bankruptcy sale process to profit from a failed transaction. As one court noted, "In a free market, no-one is forcing these bidders to play the game; they choose to enter the bidding arena presumably because a profit is to be made. Why should the estate, and ultimately the creditors, pay the entry fee?" *In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Ill. 1995). The Break-up Fee should not be approved.

### III. THE STALKING HORSE SHOULD NOT HAVE THE RIGHT TO PROHIBIT THE ESTATE FROM PURSUING AVOIDANCE ACTIONS.

It is unconscionable to give the Stalking Horse for zero consideration the power to prohibit the commencement of potential avoidance actions of over $26 million. The revised APA

provides the Stalking Horse with the sole power to prevent any avoidance actions against any customer, purchaser, vendor, supplier or distributor to or of the Debtors.[5]

The Debtors' Motion and the APA do not provide details regarding the Avoidance Actions. The Debtors schedules show that the Debtors made transfers within the 90-days before the bankruptcy filing in the amount of $26,758,815.42 to non-insiders.[6] Additionally, Debtors report that some transfers were made within days before the bankruptcy filings by wire transfer and those transfers are not contained in that total. The Committee does not have any additional information about the transfers or any potential defenses, so it is impossible to determine an accurate value of the Avoidance Actions.

To evaluate the Debtors' proposed sale of these actions, the bankruptcy court must apply the standards for approving compromises under 11 U.S.C. § 363(b)(1) and Feb. R. Bankr. P. *See Nicole Energy Servs.*, 385 B.R. at 237 (stating that, before approving a sale, the bankruptcy court also must determine whether the proposed compromise is fair and equitable). When deciding to approve a proposed settlement, the bankruptcy court must consider the following four factors: (1) the probability of success in the litigation; (2) the difficulties, if any, the trustee may encounter in collecting on a judgment; (3) the complexity of the litigation and the attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and a proper deference to their reasonable views concerning the litigation. *In re Flight Transportation Corp.*, 730 F.2d 1128, 1135 (8th Cir. 1984). The Debtors have the burden to show by a preponderance of the evidence that the proposed settlement is in the best interest of the estate. *In re Y-Knot*

---

[5] Section 5.3(d) of the most recent APA provides: "No Seller shall, without the prior written consent of Buyer, which may be given or withheld in its sole and absolute discretion, at any time before, on or after the Closing initiate or commence any Avoidance Action against any Person who was at any time prior to the Closing a customer, purchaser, vendor, supplier or distributor to or of any Seller, and each Seller shall use its best efforts to cause each Affiliate of such Seller not to initiate or commence any such Avoidance Action without such Buyer prior written consent."

[6] The total transfers to "insiders" totals $38,492,011.14.

*Construction, Inc.*, 369 B.R. 405, 408 (8th Cir. B.A.P. 2007); *In re Hanson Industries, Inc.*, 88 B.R. 942, 946 (Bankr. D. Minn. 1988). A court abuses its discretion in approving a proposed settlement without making findings of facts and conclusions of law that address these four factors. *Y-Knot Construction*, 369 B.R. at 408; *In re Racing Services, Inc.*, 332 B.R. 581, 586 (8th Cir. B.A.P. 2005). The bankruptcy court should not rely solely upon the Debtors' assertions that the settlement is in the best interests of the estate but instead "it must make an informed, *independent* judgment on the settlement after the parties have adequately developed the underlying facts and after the Court has thoroughly reviewed relevant parts of the record." *In re Meyer*, 105 B.R. 920, 923 (Bankr. D. Minn. 1989) (emphasis in original).

Based on the record currently before the Court, the only possible conclusion is that transfer of the power to control the avoidance actions is unconscionable and is not in the best interest of the estate. The Debtors' Motion and the APA do not provide any details regarding the avoidance actions being sold but the schedules show a potential value of $26 million. The proposed purchase price is nowhere near sufficient to account for this value. Accordingly, the APA which gives the Stalking Horse the power to prohibit brining the Avoidance Actions must be rejected.

## IV. THE PROPOSED SALE PRICE MAY BE INADEQUATE.

The proposed sale price has been a moving target, making analysis of the offer difficult. The latest version of the APA includes a sale price of $18,000,000 (a decrease of 18% from the Term Sheet), which is subject to adjustment for the assumption of certain liabilities and for working capital adjustments. The Sale Motion does not contain details regarding the proposed assumed obligations or the working capital adjustment and the Committee has not been provided with the schedules to the APA that would provide this information. The information available is incomplete and insufficient.

However, an analysis of the information available shows that the proposed sale price of $18,000,000 is inadequate because it will not provide a higher price than an orderly liquidation. Certainly, an amount higher than liquidation is necessary to justify the costs of the Stalking Horse (including the Break-up Fee). Matrix determined that the proposed sale to the Stalking Horse would result in less recovery to unsecured creditors than orderly liquidation of the same assets. Haas Aff. ¶ 5. For example, the sale price is insufficient because it deeply discounts the value of the accounts receivable and inventory. According to information provided by Alliance, the orderly liquidation value of accounts receivable is $7,147,000 and inventory is $12,789,000, for a total of $19,938,000, which is more than the proposed sale price of $18,000,000 even before taking into account the adjustments for assumed liabilities, holdbacks and expenses and the value of equipment and rolling stock. Haas Aff. ¶ 6. The Stalking Horse provided no reasonable justification to support these substantial discounts. The Committee is continuing to evaluate the adequacy of the proposed sale price because the APA has not yet been executed.

## VI. WITNESSES, VERIFICATION, AND RESERVATION OF RIGHTS.

The proposed APA was not filed with the Sale Motion and was not finalized before the filing of this Objection. The Committee reserves the right to assert further objections once the final APA is made available.

If an evidentiary hearing is required on the Sale Motion, the Committee intends to call Donald Hass as a witness. The Committee may also call any other witnesses that have been identified in the Sale Motion or objections to the Sale Motion.

To the extend disputed facts are asserted in this Sale Motion, the Committee files the Affidavit of Donald Haas to support those disputed facts. Facts not contained within that affidavit are not disputed and thus no verification is required for them.

**CONCLUSION**

The Sale Motion should not be approved until the sale and bid procedures have been modified to account for the Committee's objections set forth above. The estates must retain all rights to pursue avoidance actions to maximize recovery for the estates. If the Debtors proposal to proceed with a stalking horse is approved, at a minimum, the total Break-up Fee plus Reimbursement Fee should be capped at a percentage of the net proceeds of the sale (the Committee proposes 2.5%), the $150,000 deposit must be applied as part of that amount, the Stalking Horse should only be entitled to the Fees if it is outbid at the auction, and the Stalking Horse should be required to share its due diligence with other potential purchasers. These changes to the process will promote the most competitive bidding at auction, may potentially enhance the Debtors' recovery from the sale, and further the overriding goal of maximizing value to the estate.

Dated: August 24, 2011                FAFINSKI MARK & JOHNSON, P.A.


By:   /e/ Lorie A. Klein
    Connie A. Lahn, #0269219
    David E. Runck, #0289954
    Lorie A. Klein, #0311790
400 Flagship Corporate Center
775 Prairie Center Drive
Eden Prairie, Minnesota 55344
Telephone: (952) 995-9500
Facsimile: (952) 995-9577
Connie.Lahn@fmjlaw.com
David.Runck@fmjlaw.com
Lorie.Klein@fmjlaw.com
ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 Case No. 11-45190 |
| Lyman Holding Company, et al | (Jointly Administered) |
| Debtors[1]. | Judge Dennis D. O'Brien |

## UNSWORN DECLARATION OF DONALD HAAS

STATE OF MINNESOTA  )
                    ) ss.
COUNTY OF HENNEPIN  )

Donald Haas, being first duly sworn, states under oath as follows:

1. I am partner and senior consultant for Matrix Associates, Inc. ("Matrix"), proposed financial advisor for the Official Committee of Unsecured Creditors ("Committee") in the above-referenced cases.

2. I make this affidavit in support of the objection filed by the Committee to the Debtors' Motion for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break Up Fee and Expense Reimbursement; (V) Approving Form and Manner

---

[1] Jointly administered estates of the following Debtors: Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11-45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

of Notice; and (VI) Scheduling Further Hearing ("Sale Motion"). All capitalized terms not otherwise defined herein have the meaning set forth in the Sale Motion.

3. The Committee filed an application seeking approval of its retention of Matrix as the Committee's financial advisor ("Application"). Docket No. 71. That Application is pending. The United States Trustee supports the Application. *See* Docket entry on August 19, 2011. The affidavit filed in support of the Application contains a description of Matrix's qualifications and experience in providing financial advisory services.

4. In connection with the Committee's evaluation of the Sale Motion, the Debtors financial advisor, Alliance Management, Inc. ("Alliance") has been providing Matrix with information about the Debtors' assets, liabilities, other financial information, and the potential sale. As of noon on August 24, 2011, Debtors have not entered into an Asset Purchase Agreement ("APA") with the proposed stalking horse bidder, SP Asset Management, LLC ("Stalking Horse"). I understand that the Debtors are continuing to negotiate with the Stalking Horse. Matrix has examined drafts of the APA.

5. The proposed sale to the Stalking Horse would result in net proceeds of $2,541,000 to unsecured creditors. The orderly liquidation of the same assets would result in net proceeds of $7,803,000.

6. In information provided by Alliance, the orderly liquidation value of accounts receivable is $7,147,000 and inventory is $12,789,000, for a total of $19,938,000, which is more than the proposed sale price of $18,000,000 even before taking into account the adjustments for assumed liabilities, holdbacks and expenses and the value of equipment and rolling stock.

7. Alliance provided Matrix with a list of the potential purchasers of the Debtors' assets that Alliance contacted before the Debtors' bankruptcy filing. Attached as Exhibit A is a redacted copy of that list. That list shows that Alliance's pre-bankruptcy marketing targeted 227 potential purchasers but only four of those 227 were strategic buyers and the rest were financial buyers. The Committee's counsel has been contacted by two potential strategic buyers and I was informed of the identity of those two potential buyers. Those two potential strategic buyers are not contained on the non-redacted version of Exhibit A, so they were not solicited by Alliance.

8. I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

MATRIX ASSOCIATES, INC.

By: *[signature]*
Donald Haas

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                  Chapter 11 Case No. 11-45190

Lyman Holding Company, et al.,                          (Jointly Administered)

        Debtors.[1]

**UNSWORN CERTIFICATE OF SERVICE**

STATE OF MINNESOTA   )
                               ) ss.
COUNTY OF HENNEPIN   )

I, Lorie A. Klein, declare under penalty of perjury that on August 24, 2011, I caused the following:

1. Objection to the Debtors' Motion for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing.

to be served electronically with the Clerk of Court through ECF, and ECF will send an e-notice of the electronic filing to the following:

James L. Baillie jbaillie@fredlaw.com  scharter@fredlaw.com; landerson@fredlaw.com
Douglas W. Kassebaum dkassebaum@fredlaw.com, scharter@fredlaw.com;
       bankruptcy@fredlaw.com
Sarah M Gibbs sgibbs@fredlaw.com , jwitt@fredlaw.com
Cynthia A. Moyer cmoyer@fredlaw.com , cthomas@fredlaw.com
Colin F Dougherty cdougherty@faegre.com
Michael R. Stewart mstewart@faegre.com
Jeffrey W Jones jjones@fwhtlaw.com
Brett J. Nizzo bnizzo@riemerlaw.com

---

[1] Jointly administered estates of the following Debtors: Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11-45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

Debt Acquisition Group Loren aloren@debtacq.com, bschwab@debtacq.com; hweiss@debtacq.com
John R. McDonald jmcdonald@briggs.com, mjacobson@briggs.com
Marcus A Ploeger mploeger@briggs.com , mjacobson@briggs.com
Timothy J. Prindiville tim.prindiville@nilssonlaw.com
Paul L. Ratelle pratelle@fwhtlaw.com
Central States SE & SW Areas Pension Fund treuter@centralstatesfunds.org
Rebecca G. Sluss rsluss@oppenheimer.com
US Trustee  ustpregion12.mn.ecf@usdoj.gov
Sarah J Wencil Sarah.J.Wencil@usdoj.gov
Jon Chatalian chatalian.jon@pbgc.gov; efile@pbgc.gov

/e/ Lorie A. Klein