UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Lyman Holding Company, et al.,

Debtors.[1]

Chapter 11 Case No. 11-45190

(Jointly Administered)

---

**UNSWORN DECLARATION OF SARAH M. GIBBS
IN SUPPORT OF DEBTORS' SALE MOTION [DOCKET #19]**

---

1.      I am one of the attorneys representing the Debtors in these cases.

2.      Attached as <u>Exhibit A</u> is the Asset Purchase Agreement as of August 30, 2011 ("08/30/11 APA"), which is still being negotiated with the proposed stalking horse bidder, SP Asset Management LLC ("SP Asset Management").  The 08/30/11 APA is the latest draft that SP Asset Management has proposed to Debtors but which contains terms remaining to be finalized.  Although neither completed nor executed, counsel for the Debtors have elected to file this draft so that the Court and parties in interest have the most current information.

Dated:  August 30, 2011                    */e/ Sarah M. Gibbs*
                                           Sarah M. Gibbs

4981424

---

[1] Jointly administered estates of the following Debtors:  Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11-45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

## Exhibit A

**(Asset Purchase Agreement)**

ASSET PURCHASE AGREEMENT

by and among

LYMAN HOLDING COMPANY, LYMAN LUMBER COMPANY, AUTOMATED
BUILDING COMPONENTS, INC., BUILDING MATERIAL WHOLESALERS, INC.,
LYMAN LUMBER OF WISCONSIN, INC., CARPENTRY CONTRACTORS CORP., as
Sellers

and

SP ASSET MANAGEMENT LLC, as Buyer

Dated as of August 30, 2011

# TABLE OF CONTENTS

Page

ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS ..................................... 2
    SECTION 1.1    Transfer of Acquired Assets. ...................................................... 2
    SECTION 1.2    Excluded Assets. ............................................................................ 4
    SECTION 1.3    Assumption of Liabilities............................................................. 6
    SECTION 1.4    Excluded Liabilities. ..................................................................... 6
    SECTION 1.5    Identification of Additional and Excluded Contracts; Cure Costs.............. 9

ARTICLE 2 PURCHASE PRICE ......................................................................................... 11
    SECTION 2.1    Purchase Price............................................................................... 11
    SECTION 2.2    Up-Front Reimbursement. .......................................................... 13
    SECTION 2.3    Proration....................................................................................... 13
    SECTION 2.4    Mortgage Liabilities .................................................................... 14

ARTICLE 3 CLOSING AND DELIVERIES........................................................................ 14
    SECTION 3.1    Closing. ......................................................................................... 14
    SECTION 3.2    Sellers' Deliveries........................................................................ 15
    SECTION 3.3    Buyer's Deliveries. ...................................................................... 15

ARTICLE 4 REPRESENTATIONS AND WARRANTIES.............................................. 16
    SECTION 4.1    Representations and Warranties of Sellers. .............................. 16
    SECTION 4.2    Representations and Warranties of Buyer................................. 25

ARTICLE 5 COVENANTS AND OTHER AGREEMENTS....................................................... 26
    SECTION 5.1    Pre-Closing Covenants of Sellers. ............................................. 26
    SECTION 5.2    Pre-Closing Covenants of Buyer. .............................................. 29
    SECTION 5.3    Other Covenants of Sellers and Buyer...................................... 30
    SECTION 5.4    Employment Covenants and Other Undertaking. ................... 30
    SECTION 5.5    Ownership of Lyman Lumber Names and
                     Acquired Intellectual Property.................................................... 31
    SECTION 5.6    Non-Assignment of Acquired Contracts.................................... 32
    SECTION 5.7    Bankruptcy Actions. .................................................................... 32
    SECTION 5.8    Post-Closing Covenant of Buyer. .............................................. 34

ARTICLE 6 TAXES.............................................................................................................. 34
    SECTION 6.1    Taxes Related to Purchase of Acquired Assets........................ 34
    SECTION 6.2    Cooperation on Tax Matters. ...................................................... 35
    SECTION 6.3    Allocation of Purchase Price....................................................... 35

ARTICLE 7 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................... 36
    SECTION 7.1    Conditions Precedent to Performance by Sellers..................... 36
    SECTION 7.2    Conditions Precedent to the Performance by Buyer................ 37

ARTICLE 8 TERMINATION .............................................................................................. 40
    SECTION 8.1    Conditions of Termination .......................................................... 40

SECTION 8.2     Effect of Termination.................................................................................. 42
SECTION 8.3     Break-Up Fee. ........................................................................................... 43

ARTICLE 9 SURVIVAL .......................................................................................................... 44
SECTION 9.1     Survival. .................................................................................................... 44
SECTION 9.2     Specific Performance. ............................................................................... 45
SECTION 9.3     Covenant Not to Sue. ................................................................................ 45

ARTICLE 10 MISCELLANEOUS ........................................................................................... 45
SECTION 10.1     Joint Drafting. .......................................................................................... 45
SECTION 10.2     Further Assurances. .................................................................................. 45
SECTION 10.3     Successors and Assigns. ........................................................................... 46
SECTION 10.4     Governing Law; Jurisdiction; Waiver of Trial by Jury. ........................... 46
SECTION 10.5     Expenses. .................................................................................................. 46
SECTION 10.6     Severability. ............................................................................................. 46
SECTION 10.7     Notices. .................................................................................................... 47
SECTION 10.8     Amendments; Waivers. ............................................................................. 48
SECTION 10.9     Public Announcements. ............................................................................ 48
SECTION 10.10    Entire Agreement. .................................................................................... 48
SECTION 10.11    No Third Party Beneficiaries. ................................................................... 49
SECTION 10.12    Headings. ................................................................................................. 49
SECTION 10.13    Counterparts. ............................................................................................ 49
SECTION 10.14    Construction. ............................................................................................ 49
SECTION 10.15    Tax Disclosure. ........................................................................................ 49
SECTION 10.16    Sellers' Representative. ............................................................................. 49

ARTICLE 11 DEFINITIONS .................................................................................................... 50

SCHEDULES

Schedule 1.1(a)          Real Property
Schedule 1.1(c)          Leased Property
Schedule 1.1(d)          Owned Machinery and Equipment
Schedule 1.1(e)          Acquired Contracts
Schedule 1.1(g)          Inventory and Inventory Locations
Schedule 1.1(h)          Acquired Intellectual Property
Schedule 1.1(n)          Insurance Policies
Schedule 1.2(b)          Excluded Contracts
Schedule 1.2(d)          Miscellaneous Excluded Assets
Schedule 1.2(g)          Excluded Causes of Action
Schedule 1.2(o)          Excluded Leases
Schedule 1.2(p)          Excluded Real Property
Schedule 1.2(s)          Miscellaneous Assets
Schedule 1.5(a)          Cure Costs
Schedule 2.4             Mortgage Liabilities
Schedule 4.1(e)          Sellers Consents and Approvals
Schedule 4.1(f)          Litigation
Schedule 4.1(g)          Title to Acquired Assets; Condition and Sufficiency of Assets
Schedule 4.1(h)(i)(a)    Valid use and ownership of Intellectual Property
Schedule 4.1(h)(i)(b)    Renewal and Maintenance Fees for Intellectual Property
Schedule 4.1(h)(i)(c)    Persons Holding Rights to Intellectual Property
Schedule 4.1(h)(ii)(a)   Compliance with Contractual Relationships Relating to Intellectual
                         Property
Schedule 4.1(h)(ii)(b)   Non-compliance and Unauthorized Use of Acquired IP
Schedule 4.1(h)(ii)(c)   Violations of Intellectual Property Agreements
Schedule 4.1(h)(ii)(d)   Litigation Relating to Intellectual Property
Schedule 4.1(h)(ii)(e)   Intellectual Property Violates Others Rights
Schedule 4.1(h)(iii)     Licenses Granted by Sellers
Schedule 4.1(i)          Information Technology
Schedule 4.1(j)          Permits
Schedule 4.1(k)          List of Environmental Matters
Schedule 4.1(l)          Insurance
Schedule 4.1(m)          Certain Matters Regarding Real Estate Leases
Schedule 4.1(p)          Contracts
Schedule 4.1(r)          Inventories
Schedule 4.1(s)          Accounts Receivables; Loan Receivables
Schedule 4.1(t)          Product Warranties
Schedule 4.1(u)          Employees; Employee Benefits
Schedule 4.1(v)          Financial Statements
Schedule 4.1(w)          Taxes
Schedule 4.1(x)          Prior Rights with Respect to Properties
Schedule 5.1(b)          Conduct of Business Pre-Closing
Schedule 5.1(e)          Subject Internet Domain Names
Schedule 7.2(f)          Consents
Schedule 11(a)           Lease Deposit Amounts

EXHIBITS

Exhibit A      Inventory Summary
Exhibit B      Accounts Receivable Summary
Exhibit C      Form of Instruments of Assignment of Intellectual Property
Exhibit D      Form of Assumption and Assignment Agreement
Exhibit E      Form of Instrument of Assignment of Leases
Exhibit F      Form of Bill of Sale
Exhibit G      Form of Sale Procedures Order
Exhibit H      Form of Sale Approval Order

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 30, 2011 (the "Execution Date"), is made by and among LYMAN HOLDING COMPANY, a Minnesota corporation ("LHC"), LYMAN LUMBER COMPANY, a Minnesota corporation ("Lyman Lumber"), AUTOMATED BUILDING COMPONENTS, INC., a Minnesota corporation ("ABC"), BUILDING MATERIAL WHOLESALERS, INC., a Minnesota corporation ("BMW"), LYMAN LUMBER OF WISCONSIN, INC., a Minnesota corporation ("LLW"), CARPENTRY CONTRACTORS CORP., a Minnesota corporation ("CCC" and, together with LHC, Lyman Lumber, ABC, BMW, LLW, and CCC, the "Sellers" and each, individually, a "Seller"), and SP ASSET MANAGEMENT, a Delaware limited liability company (together with such additional designees as may be designated by it, "Buyer"). Capitalized terms used in this Agreement are defined or cross-referenced in Article 11.

## RECITALS

WHEREAS, each of the Sellers other than LHC is a direct or indirect wholly-owned subsidiary of LHC;

WHEREAS, LHC and each of the other Sellers is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code") and each has filed a voluntary petition for relief (the "Petition for Relief," and the date on which such Petition for Relief is filed being referred to as the "Petition Date") under Chapter 11 of the Bankruptcy Code on August 4, 2011 in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court," the bankruptcy cases initiated by Sellers as described in this Recital, which are being jointly administered under Case No. 11-45190, shall collectively be referred to as the "Bankruptcy Case");

WHEREAS, Sellers are a lumber/building material distributor with panel and truss manufacturing capabilities and is a leading supplier of building materials and related services to the residential construction marketplace (collectively, the "Business");

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign and transfer to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and 1146 and other applicable provisions of the Bankruptcy Code; and

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Approval Order approving such sale, free and clear of all Liens (other than Permitted Liens), Claims, Interests, and Encumbrances, pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, to the full extent authorized by Section 363, which order will include the authorization for the assumption by Sellers and assignment to Buyer of the Acquired Contracts in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Approval Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of

Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Minnesota (together, the "<u>Bankruptcy Rules</u>").

STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer hereby agree as follows:

ARTICLE 1

PURCHASE AND SALE OF THE ACQUIRED ASSETS

SECTION 1.1 <u>Transfer of Acquired Assets</u>.

At the Closing, and upon the terms and subject to the conditions herein set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Liens), Claims, Interests, and Encumbrances, and Buyer shall acquire from Sellers, all right, title and interest of Sellers as of the Closing Date in, to and under the Acquired Assets. As used herein, the term "<u>Acquired Assets</u>" shall mean all of the properties, assets and rights, tangible and intangible, excluding the Excluded Assets, owned by Sellers as of the Closing Date of whatever kind and nature, including, without limitation:

(a)    each Seller's fee simple and ownership interest in that certain real property used in the operations of the Business and all Improvements located thereon and described on <u>Schedule 1.1(a)</u> (the "<u>Real Property</u>");

(b)    [Reserved];

(c)    each Seller's right, title and interest as lessee under (i) those real property leases relating to the Business and set forth on <u>Schedule 1.1(c)</u> (such real property leases being defined collectively herein as the "<u>Real Property Leases</u>", and the real property being leased pursuant to such Real Property Leases being defined collectively herein as the "<u>Leased Property</u>") plus all Lease Deposit Amounts, and (ii) those personal property leases relating to the Business and set forth on <u>Schedule 1.1(c)</u> (such personal property leases being defined collectively herein as the "<u>Personal Property Leases</u>", and the personal property being leased pursuant to such Personal Property Leases being defined collectively herein as the "<u>Leased Personal Property</u>").

(d)    all (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts owned by Sellers relating to the Business (the "<u>Owned Machinery and Equipment</u>"), including, without limitation, the Owned Machinery and Equipment listed on <u>Schedule 1.1(d)</u>, and (ii) rights of Sellers to the warranties and licenses received from manufacturers and sellers of the Owned Machinery and Equipment;

(e)    each Seller's right, title and interest as a party to those Contracts relating to the Business or the Properties listed on <u>Schedule 1.1(e)</u>, which <u>Schedule 1.1(e)</u> may be

2

amended by Buyer up to the day preceding Closing to add and remove Contracts (each, an "Acquired Contract" and, collectively, the "Acquired Contracts"), and all deposits made under any Acquired Contract;

(f)     all accounts receivable and notes receivable of Sellers with any Persons (the "Accounts Receivable");

(g)     all (i) Inventory of Sellers relating to the Business, including, without limitation, all (A) Inventory at the locations listed on Schedule 1.1(g), (B) Inventory held by third parties on a consignment basis, and (C) Inventory held by third-party suppliers or manufacturers that has been paid for by Sellers prior to the Closing Date, and (ii) rights of Sellers to the warranties received from suppliers with respect to such Inventory;

(h)     all Intellectual Property owned by Sellers or licensed to Sellers pursuant to an Acquired Contract (collectively, the "Acquired Intellectual Property"), including, without limitation, all rights to the name and mark "Lyman Lumber" (and all rights to any other trade names, trademarks and service marks owned by Sellers or licensed to Sellers, including without limitation, the Transferred Internet Domain Names to be transferred to Sellers in accordance with Section 5.1(e)), and the Intellectual Property listed on Schedule 1.1(h);

(i)     to the fullest extent permitted under applicable law, all permits, authorizations and licenses (collectively, the "Permits") issued to Sellers by any Government Authority and all pending applications therefor, including, without limitation, those Permits set forth on Schedule 4.1(j);

(j)     the originals of all books, files, documents and records owned by or in the control of Sellers and relating to the Business (in whatever format they exist, whether in hard copy or electronic format), including, without limitation: all Tax records and information ("Tax Records"), all corporate books and records, board minutes, organizational documents of Sellers, and all customer lists, historical customer files, accounting records, test results, product specifications, plans, data, studies, drawings, diagrams, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating and production records, inventory records, business plans, credit records of customers, and marketing materials (including, but not limited to all logos and artwork used in such marketing materials);

(k)     to the extent related to an Acquired Asset, all prepaid expenses, prepaid Taxes (real estate Taxes prorated through the Closing Date), deposits and advances made by or on behalf of Sellers and all credits due to Sellers;

(l)     all goodwill, payment intangibles and general intangible assets and rights of Sellers;

(m)     to the extent permitted by applicable law, all books, files and records owned by Sellers that relate to employees of Sellers who are hired by Buyer on the Closing Date, including, without limitation, books, files and records that arc related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of such employees;

(n)     all rights to proceeds under insurance policies set forth on <u>Schedule 1.1(n)</u> (except to the extent such proceeds relate to any Excluded Asset);

(o)     all Sellers' Causes of Action, other than the Causes of Action that are identified or described as Excluded Assets;

(p)     all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(q)     All Tax records and information ("<u>Tax Records</u>") and all corporate books and records, board minutes, organizational documents of Sellers; provided, however, that copies of corporate books and records, board minutes and organizational documents shall be provided to Sellers;

(r)     All of the assets of Keystone Report; and

(s)     all other or additional assets, properties, privileges, records, data, rights (including prepaid expenses), rebates, deposits and cash deposits (except as expressly excluded in Section 1.2 below), credits, equity interests and interests in the nature of equity interests (other than with respect to equity interests in Sellers or any Affiliates of Sellers to the extent they constitute an Excluded Asset hereunder), and interests of Sellers related to the Business whether or not specifically referred to in this Agreement;

*provided*, *however*, none of the parties hereto intends that Buyer, or any of its Affiliates, shall be deemed to be a successor to Sellers with respect to Acquired Assets.

SECTION 1.2 <u>Excluded Assets</u>.

Notwithstanding anything to the contrary in this Agreement, but without limitation of <u>Section 1.1</u>, Sellers shall retain all right, title and interest to, in and under only the properties, rights, interests and assets of Sellers set forth below (all such properties, rights, interests and assets not being acquired by Buyer being herein referred to as the "<u>Excluded Assets</u>"):

(a)     any inventory of a Seller that otherwise would constitute an Acquired Asset but for the fact that it is sold or otherwise disposed of, in the Ordinary Course of Business of the relevant Seller and consistent with <u>Section 5.1(b)</u> of this Agreement, during the time from the Execution Date until the Closing Date;

(b)     all Contracts listed on <u>Schedule 1.2(b)</u> and any other Contract that is not an Acquired Contract (collectively, the "<u>Excluded Contracts</u>");

(c)     all Employee Benefit Plans currently or previously sponsored or maintained by Sellers or any of Sellers' ERISA Affiliates (together with Sellers, the "<u>Seller Controlled Group</u>") or their respective predecessors or with respect to which the Seller Controlled Group or their respective predecessors has made or is required to make payments, transfers or contributions in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of Sellers or any of Sellers' ERISA Affiliates or their respective predecessors (collectively, the "<u>Seller Benefit Plans</u>"), and all

insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any Seller Benefit Plan;

(d)     all of the assets set forth on Schedule 1.2(d);

(e)     all rights of Sellers to Claims for refunds that do not constitute an Acquired Asset hereunder;

(f)     Reserved;

(g)     all Causes of Action identified on Schedule 1.2(g) and all proceeds thereof;

(h)     except as specified in Section 1.1(o), all Causes of Action against any holder of any Claim against any Sellers or any of their respective Affiliates that could be asserted as a defense, counterclaim, or a right of recoupment or setoff in response to any Cause of Action or Claim brought, commenced, filed or asserted by any Person against any of the Sellers or any of their respective Affiliates;

(i)     except as specified in Section 1.1(n), all of Sellers' rights under any insurance policy or contract of insurance or indemnity (or similar agreement) under which a Seller is an insured (including, without limitation, all rights to proceeds thereunder), named as an additional insured or is otherwise a beneficiary, and all proceeds realized in connection therewith;

(j)     all amounts due to Sellers from any Affiliate of Sellers;

(k)     all outstanding shares of capital stock or equity or other ownership interest held by a Seller in any other Seller;

(l)     all of Sellers' Cash and all of Sellers' right, title and interest in and to all deposit or similar accounts containing Sellers' Cash deposits, including Sellers' Health Funds;

(m)     all Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof;

(n)     all accounts receivable and notes receivable of Sellers owing by any Affiliate of any Seller;

(o)     all leases that are not Assumed Leases (the "Excluded Leases") relating to leased property of Sellers, including those listed on Schedule 1.2(o);

(p)     all real property that is not Real Property (the "Excluded Real Property") relating to real property of Sellers, including those listed on Schedule 1.2(p);

(q)     any and all information not relating to the Business that is stored on any Sellers' computer systems, data network or servers ("Non-Business Related Information");

(r)     all equity interests held by any Seller in any subsidiary;

(s)     any Sellers' assets which would be Acquired Assets but Buyer has elected (on or prior to the Closing Date) to reject and exclude the same from the Acquired Assets and deem the same Excluded Assets (such assets shall be set forth on Schedule 1.2(s) which schedule shall be delivered by Buyer on or before the Closing Date); and

(t)     all Avoidance Actions that Sellers or any of their Affiliates may have against any Person and all proceeds thereof.

SECTION 1.3  Assumption of Liabilities.

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities (the "Assumed Liabilities") and no others:

(a)     all Liabilities and obligations arising at and accruing after the Closing with respect to the Assigned Contracts, Real Property Leases, and Personal Property Leases, but expressly excluding any liability under any Assigned Contracts, Real Property Leases, and Personal Property Leases related to or arising from any pre-Closing breach of any one or more of these agreements or arising from or relating to any condition existing on or prior to the Closing Date;

(b)     Accrued Select Employee Vacation Time (but expressly excluding any other liability in respect of any Seller Benefit Plans); and

(c)     Mortgage Liabilities.

SECTION 1.4  Excluded Liabilities.

Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability, Encumbrance, Lien, or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities, Liability, Encumbrances, Liens, and obligations shall be retained by, and remain liabilities and obligations of, Sellers (all such liabilities are, collectively, the "Excluded Liabilities").  The Excluded Liabilities include, but are not limited to, the following liabilities and obligations:

(a)     all liabilities and obligations of Sellers relating to Excluded Assets;

(b)     all liabilities and obligations of Sellers or the Seller Controlled Group to all employees and former employees of Sellers (and their respective spouses and dependents);

(c)     all liabilities and obligations of Sellers for:  (i) payments made to or fees and expenses accrued with respect to professionals retained or employed by Sellers' Chapter 11 estate or any official committee of creditors appointed in the Sellers' Bankruptcy Case, (ii) reclamation Claims and (iii) any prepetition, priority or other tax Claims;

(d)        any liability of Sellers or their directors, officers, shareholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

(e)        other than as specifically identified as an Assumed Liability, any liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, and (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(f)        any liability to any Person at any time employed by Sellers or their predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers or their predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all Liabilities arising (i) under the Seller Benefit Plans, any other employment, change in control, termination, severance or similar agreement, (ii) under any employment, wage and hour law or restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, or any other applicable laws related to employment or termination thereof, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(g)        any liability of Sellers and the Seller Controlled Group under Title IV of ERISA, including any unfunded liability with respect to any Employee Benefit Plan, including any withdrawal liability under any such Employee Benefit Plan, and any other liability and/or claims arising out of or in connection with any Employee Benefit Plan including multiemployer plans (as defined in Section 4001(a)(3) of ERISA) whether due to termination, withdrawal, underfunding or otherwise;

(h)        except to the extent required by law (but subject to the terms and conditions of the Sale Approval Order), any liability of Sellers and the Seller Controlled Group under COBRA;

(i)        any incentive compensation, bonus, change in control, severance, pension or retirement liability of Sellers and the Seller Controlled Group to their current or former employees whether or not accrued as of the Closing Date, whether or not under any Seller Benefit Plan;

(j)        any liability or obligation of any Seller, or any member of any consolidated, affiliated, combined or unitary group of which any Seller is or has been a member, for Taxes;

(k)        any liability incurred by (i) Sellers or (ii) their respective directors, officers, shareholders, agents or employees after the Closing Date (except, with respect to any

Hired Employee, to the extent such liability arises with respect to services performed on behalf of Buyer or its Affiliates following the Closing Date );

(l)     any liability of Sellers to any Person on account of any Proceeding, including those Proceedings set forth on Schedule 4.1(f);

(m)    any liability relating to or arising out of the ownership or operation of an Excluded Asset;

(n)     any liability or obligation arising out of the conduct of the Business prior to the Closing Date, including, without limitation, (i) the liabilities relating to the employment by Sellers of any employees, other than the Accrued Select Employee Vacation Time, whether before or after the Closing Date and whether or not such employees become Hired Employees; and (ii) any liability under the WARN Act or similar foreign, state or local law;

(o)     fees or expenses of Sellers incurred with respect to the transactions contemplated herein;

(p)     any liability or obligation under any Acquired Contract or Assumed Lease arising on or after the Petition Date but prior to the Closing;

(q)     Liens, Encumbrances and Liabilities on or related to the Acquired Assets;

(r)     any and all Specified Obligations;

(s)     any and all Warranty Costs; and

(t)     any and all Cure Costs and Post-Petition Costs.

Neither the Buyer nor its Affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Agreement: (a) be a successor to the Sellers or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Sellers or their estates; or (c) be a continuation or substantial continuation of the Sellers or any enterprise of the Sellers. Except for the Assumed Liabilities, the transfer of the Acquired Assets to Buyer under the Agreement shall not result in (i) the Buyer, its Affiliates, members, or shareholders as such, or the Acquired Assets, having any liability or responsibility for any claim against the Sellers or against an insider of the Sellers, (ii) the Buyer, its Affiliates, members, or shareholders as such, or the Acquired Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) Buyer, its Affiliates, members, or shareholders as such, or the Acquired Assets, having any liability or responsibility to the Sellers except as is expressly set forth in the Agreement. Without limiting the effect or scope of the foregoing, as a result of the closing of the transaction contemplated by the Agreement, the Buyer shall have no successor liabilities of any kind or character, including, but not limited to, any theory of antitrust, Environmental Laws, successor or transferee liability, labor law, ERISA, tax law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Sellers or any obligations of the Sellers

arising prior to the Closing Date, including, but not limited to, liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Business and/or the Acquired Assets prior to the Closing, and any and all Excluded Liabilities.

The Sellers, jointly and severally, agree to defend, indemnify, protect and hold the Buyer (together with its Affiliates, and their respective members, officers, directors, employees, agents, successors and assigns, the "Indemnified Party"), harmless from and against any damages, losses, Liabilities, Claims, Interests, Taxes, Liens, Encumbrances, Post-Petition Costs, Cure Costs, Specified Obligations, interest or expenses (including, without limitation, reasonable attorneys' fees and expenses), suffered, incurred or paid, directly or indirectly, as a result of, arising out of, in any way related to, or in connection with any Excluded Liabilities (whether or not involving a third party claim or a claim by the Indemnified Party). For the avoidance of doubt, and except as provided elsewhere in this Agreement, the Buyer shall not be permitted to make a holdback against the Purchase Price pursuant to this paragraph.

SECTION 1.5 Identification of Additional and Excluded Contracts; Cure Costs.

(a)    Prior to the date hereof, Sellers have delivered Schedule 1.5(a) to Buyer, which schedule contains: (i) a list of Contracts and Real Property Leases, and Personal Property Leases, which Sellers have rejected pursuant to an order of the Bankruptcy Court prior to the date hereof (the "Rejected Contracts"); (ii) a list of Contracts and Real Property Leases, and Personal Property Leases which Sellers have assumed pursuant to an order of the Bankruptcy Court prior to the date hereof; and (iii) with respect to each Contracts that is listed as an Acquired Contract or an Excluded Contract and is listed, as of the date hereof, on Schedule 1.1(e) or Schedule 1.2(c), respectively, and each Real Property Lease and Personal Property Lease, (A) Sellers' good faith estimate of (x) the Cure Costs in respect of such Contract, Real Property Lease, or Personal Property Lease that arose prior to the Petition Date, and (y) the Cure Costs in respect of such Contract, Real Property Lease, or Personal Property Leases that arose on or after the Petition Date, and (B) whether such Contract, Real Property Lease, or Personal Property Lease was entered into on or following the Petition Date. No later than twenty (20) days prior to the Sale Approval Hearing, Buyer shall provide Sellers with an updated Schedule 1.1(c) listing the Real Property Leases and Personal Property Leases and Schedule 1.1(e) listing the Acquired Contracts, each to be assumed, if applicable, by Sellers and assigned by Sellers to Buyer (collectively, the "Assigned Contracts"). As promptly as practicable following the determination of the Assigned Contracts by Buyer and in any event no later than fourteen (14) days prior to the Sale Approval Hearing, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine Cure Costs with respect to any Assigned Contract entered into prior to the Petition Date. Notwithstanding the foregoing, prior to the Closing, Buyer may identify any Assigned Contract as one that Buyer no longer desires to have assigned to it and such Contract shall for all purposes of this Agreement be deemed to be an Excluded Asset. At the direction of Buyer, Sellers shall, or shall cause their Affiliates to, as the case may be, take all necessary actions and, if necessary, promptly commence appropriate proceedings before the Bankruptcy Court in order to effect the assumption of any Assigned Contract by Sellers, if applicable, and the assignment of such Contract to Buyer at the Closing pursuant to the Sale Motion.

(b)    (i)    Any motion, application or other court document filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to assume and assign or reject or terminate any Contracts shall be provided to Buyer in advance of filing (with a reasonable opportunity to review and comment on same).

(ii)    Sellers shall use their commercially reasonable efforts to make available to Buyer as promptly as practicable after the date hereof (or, in the case of Contracts entered into after the date hereof, as promptly thereafter as practicable) true and complete copies of each of the Contracts and of each of the Contracts listed, or required to be listed, in Schedule 1.1(e), and true and complete summaries of the terms of any such oral Contracts; it being understood that, in any event, such copies and summaries shall be made available in respect of the Contracts listed on the list delivered pursuant to the first sentence of Section 1.5(a) no later than twenty-five (25) days prior to the Sale Approval Hearing.

(c)    With respect to each Assigned Contract, Buyer shall provide adequate assurance of the future performance of such Assigned Contract by Buyer.

(d)    The Sellers shall (i) pay or make adequate provision for the payment of all Specified Obligations on or prior to the Closing Date, or (ii) provide Buyer with a credit against the Purchase Price at Closing, as shall be directed/elected by Buyer. For purposes of clarity, at the election of Buyer the Purchase Price and the Aggregate Cash Consideration provided in Section 2.1 below, shall be subject to setoffs, deductions or recoupments for the payment of Specified Obligations.  Two (2) days prior to the Closing, Sellers shall prepare and deliver to Buyer a statement of Specified Obligations as of the business day ended immediately prior to the Closing Date.

(e)    The Post-Petition Costs and Cure Costs in respect of all of the Assigned Contracts shall be paid by Sellers on or before Closing or as soon as practicable after the Post-Petition Costs and Cure Costs for an Assigned Contract has been determined by the Bankruptcy Court. In addition, Sellers shall also be responsible for and shall timely pay all direct and indirect costs and expenses associated with the Assigned Contracts arising or accruing between and including the Petition Date and the Closing Date (the "Post-Petition Costs"). All payments received from the counterparty to any Assigned Contract between and including the Petition Date and the Closing Date shall be applied by the Sellers to any Cure Costs and Post-Petition Costs relating to such Assigned Contract.  For purposes of clarity, at the election of Buyer the Purchase Price and the Aggregate Cash Consideration provided in Section 2.1 below, shall be subject to setoffs, deductions or recoupments for the payment of Cure Costs and Post-Petition Costs.  To the extent any specific Cure Costs and Post-Petition Costs have not been fully determined and paid by the Closing Date, then with respect to such specific undetermined and unpaid Cure Costs and Post-Petition Costs, a certain amount of the Purchase Price equal to the greater of the aggregate of each of the (i) Sellers' documented Cure Costs and Post-Petition Costs or (ii) the amount stated by the creditors with respect to each undetermined Cure Cost and Post-Petition Cost, as applicable, (the "Cure Costs Holdback") shall be held in escrow by the Escrow Agent.  After the full and final determination by the Bankruptcy Court of the amount of a specific unpaid Cure Costs and Post-Petition Costs such amount shall be released by the Escrow Agent to pay such Cure Costs and Post-Petition Costs as determined and directed by the Bankruptcy Court  After the determination and payment of all Cure Costs and Post-Petition

Payments, the balance of the Cure Costs Holdback, if any, shall be distributed by the Escrow Agent to the Sellers' Representative as directed by the Bankruptcy Court.

## ARTICLE 2

## PURCHASE PRICE

SECTION 2.1 <u>Purchase Price</u>.

(a)     (i) The aggregate consideration and purchase price (the "<u>Purchase Price</u>") for the sale, transfer, assignment and conveyance of the Acquired Assets will be Eighteen Million Dollars ($18,000,000.00), minus Mortgage Liabilities, plus or minus the Closing ARI Adjustment, as applicable; *provided*, *however*, that in accordance with <u>Sections 1.5(d) and (e)</u>, Specified Obligations, Cure Costs and Post-Petition Costs (if any) may be paid or set off from the Purchase Price, as applicable, to the extent that amounts necessary therefor are not otherwise available to the Seller (the "<u>Aggregate Cash Consideration</u>"), and (ii) the assumption by Buyer of the Assumed Liabilities.

(b)     At the Closing, Buyer shall pay to Sellers by wire transfer of immediately available funds to the account(s) designated by the Sellers in accordance with <u>Section 2.1(c)</u>, an amount in cash equal to the Aggregate Cash Consideration less (i) the Cure Costs Holdback, (ii) any adjustment in favor of Buyer in respect of Specified Obligations, (iii) the Warranty Adjustment, and (iv) the Proration Adjustment, (the "<u>Closing Date Payment</u>").

(c)     The Closing Date Payment shall be paid by Buyer to Sellers in accordance with the Sellers' Representative's written instructions, which shall be delivered to Buyer no less than two (2) Business Days prior to the Closing Date.

(d)     <u>Deposit</u>.  Not later than September 2, 2011 (the "<u>Deposit Date</u>"), Buyer shall deposit into an account at Zions Bank established by Sellers' counsel, denominating Zions Bank as escrow agent (the "<u>Escrow Agent</u>") hereunder, the sum of Five Hundred Thousand Dollars ($500,000.00) (such amount, together with any interest accrued thereon prior to the Closing Date, the "<u>Deposit</u>").  On or prior to the Deposit Date, the Sellers, Buyer and Escrow Agent shall enter into a mutually acceptable form of Escrow Agreement continuing such terms and provisions as are usual and customary for such matters and that are otherwise consistent with the terms and provisions of this Agreement. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Sellers. The Deposit shall be held by the Escrow Agent in trust and distributed as follows:

(i)     if the Closing shall occur, then the Deposit shall be applied towards the Purchase Price payable by Buyer to the Sellers under <u>Section 2.1</u>;

(ii)     if this Agreement is terminated by the Sellers pursuant to <u>Section 8.1(e)</u>, then the Deposit shall be delivered to the Sellers within five (5) days of such termination;

(iii)     if this Agreement is terminated (A) by Buyer pursuant to <u>Sections 8.1(b)</u>, <u>(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u>, or <u>(i)</u>, or (B) by the Sellers pursuant to <u>Sections 8.1(c)</u>, <u>(h)</u>, or <u>(i)</u>, or (C)

by each of the Parties pursuant to Section 8.1(a), then, in each case, the Deposit shall be delivered to the Buyer within two (2) days of such termination;

(iv)     if this Agreement is terminated by Buyer pursuant to Sections 8.1(d) as a result of a failure of the condition contained in Section 7.2(s), then the Diligence Deposit shall be delivered to the Buyer within two (2) days of such termination; and

(v)     in the event that the Diligence Deposit is not delivered to the Buyer pursuant to subsection (iv) above, but the Break-Up Fee is payable to the Buyer for any reason as provided in this Agreement, then the $150,000.00 held by the Escrow Agent as the Diligence Deposit shall be applied as the first dollars towards the Break-Up Fee.

(e)     Closing ARI.

(i)     Sellers and Buyer acknowledge and agree that a portion of the Purchase Price has been based on the total Accounts Receivable (as defined below) and Eligible Inventory (as defined below), as each of those terms has been historically reported on and calculated in borrowing base reports ("Accounts Receivable and Inventory") being valued collectively at Nineteen Million Seven Hundred Thousand Dollars ($19,700,00.00) as of the day prior to Closing (the "Benchmark"). The day prior to the Closing, Sellers shall prepare and deliver to Buyer a statement of Accounts Receivable and Inventory as of the business day ended immediately prior to the Closing Date (the "Closing Statement"), which shall be subject to approval by Buyer in its sole discretion, and such approval shall be a condition to Closing. In the event that the value of the Accounts Receivable and Inventory on the Closing Date as set forth in the Closing Statement (the "Closing ARI") is (A) less than the Benchmark (the amount by which such Closing ARI is less than the Benchmark, the "ARI Shortfall"), the Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the ARI Shortfall, or (B) is greater than the Benchmark (the amount by which such Closing ARI is greater than the Benchmark, the "Excess ARI"), the Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the Excess ARI (in the case of (A) or (B), the "Closing ARI Adjustment"). During the period between execution and delivery of this Agreement by the Parties, Sellers shall also provide Buyer with a weekly report, in the form of the Closing Statement contemplated by this Section 2.1(e)(i), as to the Accounts Receivable and Inventory as of the date of such weekly report.  As used herein, "Eligible Inventory" has the meaning set forth in the Sellers' Tenth Amended and Restated Credit Agreement dated as of January 27, 2011 as referenced and calculated in the example in Exhibit A.  As used herein, "Accounts Receivable" shall mean such of the "Receivables" owing to Sellers that meet the criteria outlined in sections (i)(a), (i)(b) and (i)(c) of the definition of Eligible Receivables in the Sellers' Tenth Amended and Restated Credit Agreement dated as of January 27, 2011, as referenced and calculated in the example in Exhibit B as "Total Accounts Receivable (aging)".

(ii)     During the calculations and preparation of the Closing Statement the parties shall cooperate in good faith with each other and the parties respective accountants/representatives shall be permitted to have reasonable access to the books, records and work papers containing financial information of Sellers relevant to matters covered by the Closing Statement during the period in which the Closing Statement is being calculated in order

to assist them in verifying the accuracy and completeness thereof. During the period between execution and delivery of this Agreement by the Parties, Sellers shall also provide Buyer with weekly reporting as to cash usage and Accounts Receivable collections as compared to the assumptions appearing in (or serving as the basis for) any cash collateral or other financing budget then in effect in the Bankruptcy Case, which reporting shall include an explanation as to any material variances from budgeted projections. In connection with this Section 2.1(e)(i), the fees and expenses of Buyer's accountants/representatives shall be borne solely by Buyer, and the fees and expenses of the Sellers' accountants/representatives shall be borne solely by Sellers. The Closing Statement, once initially approved by Buyer in accordance with Section 2.1(e)(i) for the purposes of Closing, shall be conclusive and binding upon Buyer unless the Buyer's Representative objects in writing to any item or items shown on the Closing Statement within sixty (60) days after delivery of the Closing Statement. Such writing shall assert that the Closing Statement is in error specifying in reasonable detail the amount in dispute and the basis for such dispute. If the parties do not agree as to the amount in dispute within fifteen (15) days after Buyer's delivery of a written objection to the Closing Statement (which objection shall contain the information required by the immediately preceding sentence), such amount or amounts shall be submitted to the Bankruptcy Court for resolution and final determination.

(iii)    Upon final resolution of any downward adjustment to the Closing Statement and corresponding downward adjustment to the Purchase Price requested by Buyer, the amount of any overpayment made at Closing by Buyer shall be paid immediately by Seller to Buyer in cash. To the extent not so paid, the amount owed by Seller to Buyer shall be awarded an allowed administrative expense claim under Section 503(b) of the Bankruptcy Code payable prior to any payment to other administrative claimants, unsecured creditors, claim holders, equity holders and other parties in interest, which payment shall be free and clear of all liens, claims, interests, encumbrances and administrative expenses of any and all of the Sellers' Secured Lenders or other creditors. For purposes of clarity and the avoidance of doubt, no portion of the Purchase Price actually paid and delivered to Sellers' Secured Lenders shall be subject to disgorgement or refund as a result of a downward adjustment to the Purchase Price.

SECTION 2.2 Up-Front Reimbursement.

The parties acknowledge that Sellers have paid to the Buyer the sum of One Hundred Fifty Thousand Dollars ($150,000.00) as a reimbursement towards the payment of Buyer's costs and expenses incurred in connection with the transactions proposed under this Agreement (including, without limitation, all costs and expenses of auditors, inventory and real estate appraisers and legal counsel engaged by Buyer, as well as other out-of-pocket expenses).

SECTION 2.3 Proration.

All rent, utility payments, real property taxes, assessments, common area payments, leasing costs and commissions or other customarily incurred but unpaid real estate items, in each case, relating to an Acquired Asset ("Prorated Items") which have accrued, are unpaid, and are attributable to periods beginning before and ending on the Closing Date, shall be paid by and be the sole responsibility of the Sellers. If the Closing Date shall occur before the actual amount of Prorated Items for the month in which the Closing Date occurs are determined, the apportionment of such Prorated Items shall be upon the basis of an estimate by the Buyer of such

Prorated Items for such month based on the latest available bills, invoices, tax assessments and other reasonably detailed documentation, which shall be provided to, and reasonably satisfactory to, Buyer. Such Prorated Items to the extent not paid on or before the Closing Date may at the sole election of Buyer be deducted from the Purchase Price (the "Proration Adjustment"). In no event shall the Purchase Price be increased by, nor shall Buyer be otherwise obligated to refund to or pay over unto Sellers, any Prorated Items.

SECTION 2.4 Mortgage Liabilities. Attached hereto as Schedule 2.4 is list of the Real Property of Buyer used in the operation of its Business and sets forth the principal balances of the loan obligations secured by each such Real Property (copies of the mortgages, promissory notes, and related information and documents have been provided by the Sellers to the Buyer) as of the Execution Date. The Buyer shall in good faith negotiate with the holders of such mortgage obligations modifications to such mortgage obligations and agree to such modifications on terms substantially similar to the terms proposed by the Buyer to the holders of such mortgage obligations, pursuant to which Buyer shall assume the full principal amount of the outstanding mortgages as of the Closing Date. To the extent so modified, Buyer shall assume the principal balance only of such obligations (the "Mortgage Liabilities") in such amounts as shall be set forth on a revised Schedule 2.4 which shall be delivered at the Closing; *provided*, *however*, any Cure Costs and Post-Petition Costs which are not waived by the holder of such mortgage obligations shall be the sole responsibility of the Sellers. The mortgage obligation modifications contemplated by this Section 2.4 (the "Mortgage Modifications") and agreement between the parties as to the amount of the Mortgage Liabilities as of the Closing Date are a condition precedent to the Closing as set forth in Section 7.2(k).

ARTICLE 3

CLOSING AND DELIVERIES

SECTION 3.1 Closing.

The consummation of the transactions contemplated hereby (the "Closing") shall take place at the offices of Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402, at 10:00 a.m. CDT, no later than the first Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 7 or on such other date or at such other place and time as may be mutually agreed to by the parties (the "Closing Date"). The Closing Date shall be effective at 12:01 a.m. on the day of the Closing. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. Subject to the satisfaction or waiver of the conditions set forth in Article VII, the parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) calendar days after the Bankruptcy Court enters the Sale Approval Order approving the sale to Buyer provided that such order has become a Final Order.

SECTION 3.2 Sellers' Deliveries.

At or prior to the Closing, Sellers shall deliver to the Buyer:

(a)     the Bill of Sale and Assumption and Assignment Agreement and each other Ancillary Agreement to which any Seller is a party, duly executed by such Sellers;

(b)     instruments of assignment of all of the Acquired Intellectual Property (the "IP Assignments"), duly executed by Sellers, in form for recordation with the appropriate Government Authority, substantially in the form of Exhibit C hereto, and any other assignments or instruments with respect to the Acquired Intellectual Property for which an assignment or instrument is required to assign, transfer or convey such assets to Buyer;

(c)     evidence of receipt of Consents identified on Schedule 7.2(f) to the extent such consents are not provided for or satisfied by the Sale Approval Order;

(d)     a certified copy of the Sale Approval Order;

(e)     the officer's certificate required to be delivered pursuant to Section 7.2(a), (b) and (g);

(f)     instruments of assumption and assignment of the Assumed Leases substantially in the form of Exhibit E attached hereto (the "Assumption and Assignment of Leases"), duly executed by Sellers, in form for recordation with the appropriate public land records, if necessary;

(g)     all instruments and documents necessary to release any and all Liens (other than Permitted Liens), Claims, Interests, and Encumbrances;

(h)     all instruments and documents necessary to convey title to the Real Properties to Buyer and effect the Buyer's assumption of the Mortgage Liabilities;

(i)     an employment agreement in form and substance satisfactory to the Buyer executed and delivered by substantially all of those individuals as shall be designated by Buyer prior to the Closing Date (the "Employment Agreement(s)");

(j)     possession and control of the Acquired Assets, free and clear of all Liens pursuant to the Sale Order or otherwise; and

(k)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Acquired Assets.

SECTION 3.3 Buyer's Deliveries.

At the Closing, Buyer shall deliver to Sellers (i) the Closing Date Payment, and (ii) all of the following:

(a) the certificates required to be delivered by <u>Section 7.1(a)</u> and <u>(b)</u>;

(b) such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Buyer; and

(c) a transition services agreement, in form and substance reasonably acceptable to Buyer and Sellers, pursuant to which Buyer shall provide Sellers with limited transitional services thereunder during the one hundred eighty (180) day period after the Closing and Sellers shall reimburse Buyer for all costs and expenses of complying with and providing such services.

ARTICLE 4

<u>REPRESENTATIONS AND WARRANTIES</u>

SECTION 4.1 <u>Representations and Warranties of Sellers</u>.

Each Seller, jointly and severally, hereby represents to Buyer as set forth in this <u>Article 4</u>.

(a) <u>Organization</u>.  Each Seller is duly organized, validly existing and in good standing under the laws of the State of Minnesota.  Subject to the applicable provisions of bankruptcy law, each Seller has all requisite corporate or limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b) <u>Qualification to Conduct Business</u>.  Each Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the businesses conducted by it makes such qualification necessary.

(c) <u>Authorization and Validity</u>.  Each Seller has all requisite corporate or limited liability company power and authority to enter into this Agreement and any Ancillary Agreements to which each such Seller is or will become a party and, subject to the (i) Bankruptcy Court's entry of the Orders, and (ii) receipt of all Consents to perform each such Seller's obligations hereunder and thereunder, the execution and delivery of this Agreement and each Ancillary Agreement to which each such Seller is or will become a party and the performance of each such Seller's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary corporate or limited liability company action of each such Seller, and no other corporate or limited liability company proceedings on the part of any Seller are necessary to authorize such execution, delivery and performance.  This Agreement and each Ancillary Agreement to which each Seller is or will become a party have been, or on the Closing Date will be, duly executed by each such Seller, and, subject to the Bankruptcy Court's entry of the Orders, constitute, or will when executed and delivered constitute, each such Seller's valid and binding obligation, enforceable against each such Seller in accordance with their respective terms.  To the extent necessary, the boards of directors or boards of managers (as applicable) of each Seller have resolved to request that the Bankruptcy

Court approve this Agreement and the transactions contemplated hereby and each Ancillary Agreement to which each Seller is or will become a party.

(d)     No Conflict or Violation.  Subject to the (i) receipt of all Consents and (ii) the Bankruptcy Court's entry of the Orders, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement to which any of them is or will become a party does not and will not (A) violate or conflict with any provision of the organizational documents (i.e., certificate of incorporation, certificate of formation, bylaws, member control agreement or operating agreement) of any Seller, (B) violate any provision of law, or any order, judgment or decree of any Government Authority applicable to any Seller, (C) result in or require the creation or imposition of any Liens (other than Permitted Liens), Claims, Interests, and Encumbrances on any of the Acquired Assets or (D) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Acquired Contract entered into by any Seller or by which any of the Sellers is bound or to which the assets of Sellers are subject.

(e)     Consents and Approvals.  Schedule 4.1(e) sets forth a true and complete list of each consent, waiver, authorization or approval of any Person and each declaration to or filing or registration with any Government Authority that is required to be obtained by Sellers in connection with the execution and delivery by the Sellers of this Agreement and their respective Ancillary Agreements or the performance by them of their obligations hereunder or thereunder, including, without limitation, any and all material consents and approvals that are required to be obtained, or rights of first refusal, first offer or other similar preferential rights to purchase that are required to be complied with, in connection with the assignment or transfer of any Acquired Assets to Buyer in accordance with the terms of this Agreement (collectively, the "Consents").

(f)     Litigation.  Except as set forth on Schedule 4.1(f), there are no actions, Claims, suits, investigations, arbitrations or other proceedings pending, or, to the knowledge of Sellers, threatened, against any Seller or any of the Properties.  Except as set forth on Schedule 4.1(f), there are no outstanding violations of law or, to the Knowledge of Sellers, any outstanding order of any Governmental Authority with respect to any Seller or any of the Properties.  Except as set forth on Schedule 4.1 (f), there are no outstanding, nor to the Knowledge of Sellers any threatened, disputes or disagreements with respect to any agreements, contracts or other arrangements made in connection with the Business or the Properties.

(g)     Title to Acquired Assets; Condition and Sufficiency of Assets.

(i)     Sellers have good and valid title to, or, in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Acquired Assets.  On the Closing Date, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.2, and subject to the terms of the Sale Approval Order, Sellers will thereby transfer to Buyer all of Sellers' right, title and interest in and to all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens), Claims, Interests, and Encumbrances, except for the Assumed Liabilities.

(ii)     Except as set forth on <u>Schedule 4.1(g)</u>, all equipment, vehicles and other items of tangible property and assets which would be included in the Acquired Assets if the Closing took place on the date hereof are in good operating condition and repair, subject to normal wear and maintenance, are usable in the regular and ordinary course of business and conform in all material respects to all applicable laws, ordinances, codes, rules and regulations relating to their construction, use and operation.  The Acquired Assets together with such rights being granted by Sellers to Buyer pursuant to this Agreement include all rights and property necessary to the conduct of the Business by Buyer in substantially the same manner it is presently conducted by Sellers.

(h)     <u>Intellectual Property</u>.

(i)     Except as set forth on <u>Schedule 4.1(h)(i)(a)</u>, Sellers own all right, title and interest in and to, or have valid and enforceable licenses to use, all the Intellectual Property owned, used, issued to or held by them in connection with the conduct and operation of their respective businesses as now conducted, including all Intellectual Property set forth in <u>Schedule 1.1(h)</u>, which includes all registered Acquired Intellectual Property (including, without limitation, all websites and domain names) owned by any of the Sellers.  Except as set forth on <u>Schedule 4.1(h)(i)(b)</u>, no renewal and maintenance fees, annuities or other similar fees due and payable in respect of the Acquired Intellectual Property owned by any of the Sellers and required to have been limited on <u>Schedule 1.1(h)</u> are overdue.  Except as set forth on <u>Schedule 4.1(h)(i)(c)</u>, to the Knowledge of Sellers, no present or former employee, officer, director or other Affiliate of any of the Sellers, or agent or outside contractor of any of the Sellers, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Acquired Intellectual Property.

(ii)     Except as set forth on <u>Schedule 4.1(h)(ii)(a)</u>, Sellers are in compliance in all material respects with all contractual obligations relating to the Acquired Intellectual Property.  To the Knowledge of Sellers, except as set forth on <u>Schedule 4.1(h)(ii)(b)</u>, there is no unauthorized use, disclosure, infringement or misappropriation of any Acquired Intellectual Property owned by any of the Sellers by any third party, including by any employee or former employee of any of Sellers.  To the Knowledge of Sellers, except as set forth on <u>Schedule 4.1(h)(ii)(c)</u>, neither the Acquired Intellectual Property owned by any of the Sellers nor the use, development, manufacture, marketing, sale or the intended use of any product or service currently utilized, sold, provided or furnished by any Seller (including, without limitation, the transmission, reproduction, use, display or modification (including framing and linking of web site content) of any websites operated by any Seller (A) violates or conflicts with any license or other agreement between the Sellers, on the one hand, and any other Person, on the other hand, or (B) infringes, misappropriates or otherwise violates any proprietary right of any other Person, including the rights of privacy or publicity of any Person.  Except as set forth on <u>Schedule 4.1(h)(ii)(d)</u>, there is no pending or, to the Knowledge of Sellers, threatened, claim or litigation contesting the validity, enforceability or ownership of the Acquired Intellectual Property owned by any of the Sellers or the right of any of Sellers to exercise any rights in the Acquired Intellectual Property, nor, to the Knowledge of Sellers, is there any legitimate basis for any such claim.  Except as set forth on <u>Schedule 4.1(h)(ii)(e)</u>, no Seller has received any written notice asserting that any Acquired Intellectual Property, or the proposed use, sale, license or disposition

thereof, infringes, misappropriates or otherwise violates or will infringe, misappropriate or otherwise violate the rights of any other Person.

(iii)     Schedule 4.1(h)(iii) sets forth a complete list of (A) all licenses, sublicenses and other agreements pursuant to which any of the Sellers has granted to any Person the right to use any of the Acquired Intellectual Property owned by any of the Sellers; and (B) all consents, indemnifications, forbearances to sue, settlement agreements and material licensing or cross-licensing arrangements to which any Seller is a party relating to the Acquired Intellectual Property owned by any of the Sellers or the Intellectual Property or other proprietary rights of any third party.

(i)     Information Technology.  Schedule 4.1(i) includes a true and complete list of all Contracts to which any Seller is a party relating to the current use of hardware, software, databases, computer equipment and other information technology, owned, leased or licensed by any Seller (collectively, the "Information Technology").

(j)     Permits.  Schedule 4.1(j) sets forth a true, correct and complete list of all material permits in connection with the Real Properties, and all pending applications therefore held by Sellers.  Schedule 4.1(j) lists the current zoning/permitting status for each of the Real Properties.  Except as set forth on Schedule 4.1(j), each such Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Sellers, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect.

(k)     Environmental Matters.  Schedule 4.1(k) is a list of all environmental reports in possession of Sellers (collectively, the "Environmental Reports"), and true and correct copies of the Environmental Reports have been delivered to Buyer.  To the Knowledge of Sellers, except as set forth in the Environmental Reports, all operations or activities at, on, in, under or about, or use or occupancy of, the Properties, or any portion thereof, is, and at all times while owned or leased by Sellers has been, in compliance with all Environmental Laws and the requirements and recommendations set forth in the Environmental Reports, and, no Seller, nor to the Knowledge of any Seller, any prior owner or prior or current tenant or occupant of the Properties, or any portion thereof, engaged in or permitted any handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials on, under, in or about the Properties or any portion thereof, except in compliance with all Environmental Laws.  Except as disclosed in an Environmental Report, to the Knowledge of Sellers there is not present at, on, in or under any of the Properties, or any portion thereof, except in compliance with Environmental Laws, any Hazardous Materials, underground storage tanks, asbestos, or any structures, fixtures, equipment or other objects or materials containing Hazardous Materials, and to the Knowledge of Sellers there has been no violation of Environmental Laws relating to the Properties which remains uncured.  "Hazardous Materials" means any chemical, substance, pollutant, contaminant, materials or wastes, whether solid, liquid or gaseous in nature, which may pose a threat to human health or to the environment, including without implied limitation all "hazardous matter," "hazardous materials," "hazardous substances," "oil," "asbestos," "asbestos-containing materials," "polychlorinated biphenyls," "lead paint," "radon gas," "petroleum products," "urea-formaldehyde," "high-level radioactive waste," "low-level radioactive waste," "spent nuclear fuel," material which emits "radiation"

and/or is radioactive, and/or "solid waste" as defined or used in any applicable Environmental Laws.

(l)    <u>Insurance</u>.  <u>Schedule 4.1(l)</u> sets forth a correct and complete list of all current insurance policies covering Sellers.  Except as set forth on <u>Schedule 4.1(l)</u>, all premiums required to be paid under each insurance policy required to be set forth on <u>Schedule 4.1(l)</u> have been paid when due, and all such policies are in full force and effect.

(m)    <u>Real Property Leases</u>. <u>Schedule 4.1(m)</u> sets forth a correct and complete list of each of the Real Property Leases, and the following information with respect to each of the Real Property Leases: the date of the lease and a list of all amendments thereto, the name and current address of the landlord, the commencement date, the term, current base rent and additional rent and amount of security deposit being held by the landlord (the "<u>Lease Schedule</u>"). Except for the Real Property Leases, there are no other leases, licenses or other agreements affecting Sellers' occupancy of the Leased Properties.  With respect to each Real Property Lease: (i) the Real Property Lease is in full force and effect, and constitutes the valid and binding legal obligation of the applicable Seller and the respective landlord, enforceable against each of them in accordance with its terms; (ii) there are no understandings, oral or written, between the parties to such Real Property Lease which in any manner vary the obligations or rights of either party; (iii) except as indicated on the Lease Schedule, no Seller is in default under such Real Property Lease, and, to the Knowledge of Seller, no controversy, claim, dispute or disagreement exists between the parties to any Real Property Lease and, to the Knowledge of Seller, no event has occurred which with the passage of time or giving of notice, or both, would constitute a default thereunder; and (iv) there are no unpaid tenant improvement allowances with respect to any of the Real Property Lease.  True, complete and accurate copies of each Real Property Lease have been delivered or made available to Buyer.  No Seller has assigned its interest under any Real Property Lease to which it is a party, or subleased, licensed, encumbered or pledged all or any portion of its leasehold interest in any Real Property Lease, to any third party.  No option has been exercised under any Real Property Lease, except options whose exercise has been evidenced by a written document delivered to Buyer.  All brokerage commissions and other similar compensation and fees payable in connection with the Real Property Leases have been paid in full and no additional brokerage commissions or other similar compensation and fees may be due in the future.

(n)    <u>Brokerage and Finder's Fees</u>.  No Seller, and none of Sellers' Affiliates or any of the officers or directors of any Seller or any Affiliate of any Seller, has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement, with the exception of Alliance Management.

(o)    <u>Limitation of Liability</u>.  Sellers shall not be liable in contract or in tort for any special, incidental, liquidated, punitive or consequential damages relating to any claim made by Buyer based upon, or arising from, this Agreement.  Buyer acknowledges and agrees that any consequences arising from Sellers' filing of the Bankruptcy Case in accordance with this Agreement shall not be deemed a breach of any of the representations or warranties set forth in this Agreement.

(p)    <u>Contracts</u>.

(i)     The Sellers have delivered or made available to the Buyer true, correct and complete copies of all Assigned Contracts which are in writing, and Schedule 4.1(p) contains an accurate summary of all Assigned Contracts which are oral contracts.  The Assigned Contracts are all of the Contracts necessary to operate the Business as currently conducted.

(ii)     The Sellers have provided to the Buyer a list containing the true and accurate amount due as of the Petition Date and Closing Date under all Assigned Contracts contemporaneously with the filing of its Summary of Schedules with the Bankruptcy Court.

(iii)     The Assigned Contracts are in full force and effect and are the valid and binding obligations of the Sellers and the other parties thereto, enforceable in accordance with their respective terms, subject only to bankruptcy, insolvency or similar laws affecting the rights of creditors generally and to general equitable principles.  Subject to entry of the Sale Order and if such Assigned Contract is an executory contract within the meaning of Section 365 of the Bankruptcy Code, each Assigned Contract is freely and fully assignable to the Buyer without penalty or other adverse consequences and no consent of any third party (the "Consents") is required in order to validly assign and transfer the Assigned Contracts to Buyer.  The Sellers have not received notice of default by any Seller under any of the Assigned Contracts and no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default by any Seller thereunder.  To the Knowledge of the Sellers, none of the other parties to any of the Assigned Contracts is in default thereunder, nor has an event occurred which, with the passage of time or the giving of notice or both would constitute a default by such other party thereunder.  The Sellers have not received notice of the cancellation, revocation or termination of any of the Assigned Contracts or disputes arising under the Assigned Contracts; *provided, however*, that to the extent an Assigned Contract is not an executory contract within the meaning of Section 365 of the Bankruptcy Code, such Assigned Contract is nevertheless transferable to the Buyer as an asset of the Sellers pursuant to Section 363 of the Bankruptcy Code.

(iv)     Subject to entry of the Sale Order, the continuation and validity of the Assigned Contracts under the current terms thereof will in no way be affected by the execution of this Agreement and the other Documents or the consummation of the transactions contemplated herein and therein.

(q)     Certain Practices.  Neither the Sellers, nor any of their respective directors, officers, employees or agents have, directly or indirectly, given or agreed to give any rebate, gift or similar benefit to any supplier, customer, governmental employee or other Person who was, is, or may be in a position to help or hinder the Sellers (or assist in connection with any actual or proposed transaction by the Sellers in relation to the Acquired Assets.)  Further, in relation to any of the Assigned Contracts, neither the Sellers nor any retained representative thereof have offered or given, and the Sellers have no Knowledge of any Person that has offered or given on its behalf, anything of value, in violation of applicable Law, to:  (i) any official of a Governmental Authority, any political party or official thereof or any candidate for political office; (ii) any customer or member of any Governmental Authority; or (iii) any other Person, in any such case while knowing or having reason to know that all or a portion of such money or thing of value may be offered, given or promised, directly or indirectly, to any customer or member of any Governmental Authority or any candidate for political office for the purpose of

the following: (A) influencing any action or decision of such Person in such Person's official capacity, including a decision to fail to perform such Person's official function; (B) inducing such Person to use such Person's influence with any Governmental Authority to affect or influence any act or decision of such Governmental Authority to assist the Sellers in obtaining or retaining business for, with, or directing business to, any Person; or (C) where such payment would constitute a bribe, kickback or illegal or improper payment to assist the Seller in obtaining or retaining business for, with, or directing business to, any Person, except for an immaterial political contribution (in an aggregate amount less than $1,000) by a political action committee which was fully disclosed to the appropriate Governmental Authority (without any resulting fine or penalty to the Seller or any of its directors, officers, employees or shareholders).

(r)     Inventories.

(i)     Schedule 4.1(r) sets forth a true, complete and correct list of Inventories of the Sellers. The Inventories consist only of items of a quality and quantity usable or saleable in the ordinary course of business, and within a reasonable period of time, as first quality goods. The Inventories do not consist of items that are obsolete, materially damaged or slow-moving. Except for the Liens set forth on Schedule 4.1(r), the Sellers have good and marketable title to the Inventories free and clear of all Liens. Except as set forth in Schedule 4.1(r), the Inventories do not include any items held on consignment. The Sellers are not under any obligation or liability with respect to accepting returns of items of Inventories or merchandise in the possession of its customers other than in the ordinary course of business consistent with past practice. Schedule 4.1(r) contains a complete list of the addresses of all warehouses and other facilities in which the Inventories are located.

(ii)     Except for Liens set forth on Schedule 4.1(r), the Inventories are in good and merchantable condition and are suitable and usable for the purposes for which it is intended.

(s)     Accounts Receivable. A true, complete and accurate list of all Accounts Receivable of the Sellers relating to the Business as of the date hereof are set forth on Schedule 4.1(s). The Accounts Receivable, other than as set forth in Schedule 4.1(s), are valid and enforceable claims and have arisen solely out of bona fide sales and deliveries of goods, performance of services, loan transactions (as applicable), and other arms-length business transactions in the ordinary course of the Business. The Accounts Receivable are subject to no valid defense, offsets, returns, allowances or credits of any kind, and will be collectible consistent with the Sellers' historical practices and in accordance with GAAP. Appropriate reserves have been made on the financial statements of the Sellers in connection Sellers' Accounts Receivable.

(t)     Product Warranties. Schedule 4.1(t) sets forth the product warranties made by the Sellers with respect to the products of the Business. All products manufactured and sold by Sellers with respect to the Business comply in all material respects with such warranties. Except as set forth on Schedule 4.1(t), Sellers have no liability for the replacement and/or repair of any such products or any damages in connection.

(u)     Employees; Employee Benefits.

(i)     The Sellers have delivered to the Buyer a list setting forth the names of all employees, consultants, and independent contractors (by classification or type) of the Business and their respective rates of compensation, including the portions thereof attributable to bonuses, and any other salary, bonus or other payment arrangement made with or promised to any of them.  The Sellers have also delivered to the Buyer a list setting forth any motor vehicle violations incurred by any drivers while working for the Business within the past three years.  Except as set forth on Schedule 4.1(u), the Sellers and/or the Business are not bound by any collective bargaining agreement, nor has the Business experienced any strikes, grievances, claims of unfair labor practices, or other labor disputes.  All amounts due in the form of cash for accrued vacation pay to employees of the Business on the Closing Date have been paid, to the extent payable by law, in full to such employees.

(ii)     Schedule 4.1(u) sets forth a complete and correct list of all Employee Benefit Plans currently contributed to or maintained by Sellers or any ERISA Affiliate in respect of or for the benefit of employees of Sellers or otherwise with respect to which any Seller or any ERISA Affiliate has any Liability.  All such Employee Plans are, and have been, maintained in substantial compliance with their terms and applicable Law.

(iii)     Other than as set forth on Schedule 4.1(u), no Seller or any ERISA Affiliate has maintained, contributed to or, has Liability with respect to any plan subject to Title IV of ERISA.

(iv)     Sellers have provided Buyer with (A) true and complete copies of each Employee Benefit Plan (or, if not written, a written summary of its terms), (B) any related trust agreement or other funding instrument; (C) the most recent IRS determination letter, if applicable; (D) any summary plan description and other material written communication (or a description of any material oral communications) by the Sellers to their employees concerning the benefits provided under the Employee Benefit Plans; and (E) the most recent financial statements and Form 5500 annual report (including attached schedules).

(v)     Except as set forth on Schedule 4.1(u), all contributions, premiums or other payments that are due have been paid on a timely basis with respect to each Employee Benefit Plan.  Except as set forth on Schedule 4.1(u), no unfunded Liability exists with respect to any Employee Benefit Plan.

(vi)     Except as set forth on Schedule 4.1(u), Sellers have no current or potential obligation to provide post-employment health, life or other welfare benefits other than as required under Section 4980B of the Code or any similar applicable law.

(vii)     There do not exist any pending or, to Sellers' Knowledge, threatened claims (other than routine undisputed claims for benefits), suits, actions, disputes, audits or investigations with respect to any Employee Benefit Plan.

(viii)     Except as set forth on Schedule 4.1(u), (A) there are no pending, or to the Knowledge of Seller threatened, labor or employment Legal Proceedings or controversies; (B) no Sellers are a party to any collective bargaining agreement or relationship; (C) to the Knowledge of Seller, no union organizing or decertification efforts are underway or threatened;

(D) there is no strike, slowdown, work stoppage, lockout or other material job action underway, or to the Knowledge of Sellers, threatened, and no such job action has occurred in the past five (5) years; (E) with respect to the Transactions, any notice required under any Law or Contract has been, or prior to the Closing will be, given, and any collective bargaining obligations have been, or prior to the Closing will be, satisfied; (F) within the past three (3) years, Sellers have not implemented any plant closing or layoff of employees that could implicate the WARN Act; and (G) to the Knowledge of Sellers, Sellers have complied in all material respects with all applicable laws relating to the employment or labor, including provisions thereof relating to wages, hours, equal opportunity, fair labor standards, nondiscrimination, workers compensation, collective bargaining and the payment of social security and other taxes.

(v)     Financial Statements and Related Matters.  Set forth on Schedule 4.1(v) are copies of Sellers' (i) unaudited consolidated and consolidating balance sheet as of July 31, 2011 (the "Latest Balance Sheet") and the related statements of income and cash flows for the seven-month period then ended and (ii) audited consolidated and consolidating balance sheets and statements of income and cash flows for the fiscal year ended December 31, 2010.  Each of the foregoing financial statements (including in all cases the notes thereto, if any) is accurate and complete, is consistent with the Sellers' books and records (which, in turn, are accurate and complete), presents fairly Sellers' financial condition and results of operations as of the times and for the periods referred to therein, and has been prepared in accordance with GAAP,  subject in the case of unaudited financial statements to changes resulting from normal year-end adjustments for recurring accruals (which shall not be material individually or in the aggregate) and to the absence of footnote disclosure.

(w)     Taxes.  Except as set forth on Schedule 4.1(w), to the Knowledge of  the Sellers, (i) each Seller has timely filed all Tax Returns required to be filed with the appropriate tax authorities, and all such Tax Returns are correct and complete in all respects; (ii) except as to Taxes the payment of which is prohibited or stayed by the Bankruptcy Code, each Seller has paid all Taxes due and payable by it (whether or not such Taxes are shown on any Tax Return); (iii) each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party; (iv) no Seller has received any written notice of deficiency or assessment from any tax authority with respect to liabilities for Taxes of such Seller which have not been fully paid or finally settled; (v) no Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency; (vi) no Tax audit, examination or other proceeding regarding Taxes is in progress or threatened in writing, with respect to any Seller; and (vii) no written claim has ever been made by a tax authority in a jurisdiction where any of the Sellers does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

(x)     Prior Rights with respect to Properties.  Except as disclosed on Schedule 4.1(x), there are no options or right of first refusal, or any other rights, to acquire any interest in the Real Properties, or any portion thereof.

(y)     Use and Operation of Properties/Restrictions & Easements.  Except as otherwise specifically set forth in this Agreement, Sellers do not know of any fact, nor has any Seller failed to disclose any fact which would prevent Buyer from using and operating the

Properties as currently operated by Sellers.  To the Knowledge of Sellers, the current use and occupancy of the Properties do not violate any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement or restriction affecting the Properties.

(z)     Eminent Domain.  There is no existing, nor, to the Knowledge of Sellers, any proposed or threatened, eminent domain or similar proceeding, or private purchase in lieu of such a proceeding, which would materially adversely affect the Properties.

(aa)     Disclosure.  No representation or warranty of the Seller contained in this Agreement and the other Documents, and no statement, report, or certificate furnished by or on behalf of the Seller to the Buyer or its agents pursuant to this Agreement or any of the other documents, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein, in the aggregate, not misleading or omits or will omit to state a material fact necessary in order to provide the Buyer with full and proper information as to the Acquired Assets.

SECTION 4.2 Representations and Warranties of Buyer.

Buyer hereby represents and warrants to Sellers as follows:

(a)     Corporate Organization.  Buyer is a Delaware limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b)     Authorization and Validity.  Buyer has all requisite limited liability company power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is or will become a party and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the Managing Director of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.  This Agreement and each Ancillary Agreement to which Buyer is or will become a party have been, or, in the case of those Ancillary Agreements to be executed at Closing, on the Closing Date will be, duly executed by Buyer and constitute, or will constitute, when executed and delivered, Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(c)     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is or will become a party do not and will not (i) violate or conflict with any provision of the certificate of formation or operating agreement of Buyer, (ii) violate any provision of law, or any order, judgment or decree of any court or Government Authority applicable to Buyer or (iii) violate or result in a breach of or constitute (with clue notice or lapse of time or both) a default under any Contract to which

Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(d)      <u>Consents and Approvals</u>.  No consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Government Authority is required in connection with the execution and delivery by Buyer of this Agreement and each Ancillary Agreement to which Buyer is or will become a party or the performance by Buyer of its obligations hereunder or thereunder.

(e)      <u>Brokerage and Finder's Fees</u>.  Neither Buyer, its Affiliates nor or any of their officers or directors will be responsible for any liability or obligation to pay any fees or commissions to any broker, finder or agent engaged by such parties with respect to the transactions contemplated by this Agreement.

(f)      <u>Buyer's Financing</u>.  Buyer (i) has sufficient cash to pay the Purchase Price and other amounts required by <u>Section 2.1</u> and other provisions of this Agreement, or (ii) will have at Closing an amount of cash sufficient to fund the Closing Date Payment and to pay costs or expenses payable by Buyer.

(g)      <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Section 4.2</u> or any document delivered in accordance with this Agreement, Buyer makes no representation or warranty, express or implied, at law or in equity, in respect of Buyer, its Affiliates, or their respective assets, liabilities or operations.  Buyer shall not be liable in contract or in tort for any special, incidental, liquidated, punitive or consequential damages relating to claim made by a Seller based upon, or arising from, this Agreement.

ARTICLE 5

<u>COVENANTS AND OTHER AGREEMENTS</u>

SECTION 5.1 <u>Pre-Closing Covenants of Sellers</u>.

Sellers covenant to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)      <u>General</u>.  Sellers will use reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in <u>Article 7</u> herein).

(b)      <u>Operation of Business</u>.  Subject to any restrictions and obligations imposed by the Bankruptcy Court and applicable law, Sellers will operate the Business in good faith, in the ordinary course of business, and in a manner intended to preserve relationships with customers, suppliers and employees of the Business.  In particular, except (i) with the express written approval of Buyer, (ii) as expressly provided in this Agreement, including in connection with the Auction, and (iii) as set forth on <u>Schedule 5.1(b)</u>, Sellers shall be prohibited from doing any of the following in respect of the Acquired Assets or the operation of the Business:  (A) disposing of, encumbering, pledging or allowing any Lien to be placed on, or transferring any

Acquired Asset, except for the sale of inventory in the Ordinary Course of Business, (B) amending, terminating or modifying any of the Acquired Contracts, (C) making any change in the compensation payable or to become payable to the employees of Sellers (except as may be required pursuant to any Acquired Contract or any Employee Benefit Plan in effect on the date hereof), (D) delay or postpone the payment of accounts payable and other liabilities outside the ordinary course of business, (E) permit the loss, lapse or abandonment of, or transfer, assign, enter into or grant any license or sublicense of any rights under or with respect to any Intellectual Property, (F) transfer or grant any rights under, or entered into any settlement regarding the breach or infringement of, any of the Intellectual Property of the Sellers, or modify any existing rights with respect thereto, (G) merge with, enter into a consolidation with or acquire an interest in any Person or acquire a substantial portion of the assets or business of any Person or any division or line of business thereof, or otherwise acquire any material assets, (H) enter into any employment contract, written or oral, or modify the terms of any existing such contract, (I) discontinue, close or dispose of any plant, facility or other business operation, or lay off any employees or implement any early retirement or separation program, or any program providing early retirement window benefits within the meaning of Section 1.401 (a)(4)-3(f)(4)(ii) of the Treasury Regulations or announce or plan any such action or program for the future, (J) hire employees with an annual salary of $75,000 or above, or terminate the employment of any employee other than for "cause", or (K) fail to maintain the material plant, property and equipment of Sellers in good repair and operating condition in all material respects, ordinary wear and tear excepted.

      (c)    <u>Access</u>.

      (i)    Each Seller agrees that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees, consultants, financing sources, advisors and representatives, including its legal advisors and accountants (collectively, "<u>Purchaser's Representatives</u>"), to make such investigation and examination of the properties, business and operations (including customers, suppliers, employees and other business relations) of Sellers and such investigation and examination of the books and records of Sellers, the Acquired Assets, the Excluded Assets, the Contracts, the Assumed Liabilities and the Excluded Liabilities as it requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice and shall be subject to restrictions under applicable Law; provided that any Phase II environment investigation or other invasive testing shall be subject to Sellers' reasonable consent. Each Seller shall cause its respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in connection with such investigation and examination (including, if requested by Buyer, promptly arranging meetings or telephone calls with business relations of Sellers), and Buyer and Buyer's Representatives shall cooperate with each Seller and its representatives and shall use their reasonable efforts to minimize any disruption to such Seller's business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information prohibited from disclosure by Law.

      (ii)    In order to facilitate the resolution of any claims made by or against or incurred by the Buyer after the Closing or for any other reasonable purpose, for a period of up to one (1) year following the Closing Date, the Sellers shall (A) retain all books and

records of the Seller which are not transferred to the Buyer pursuant to this Agreement and which relate to the Seller, its operations or the Acquired Assets for periods prior to the Closing and which shall not otherwise have been delivered to the Buyer; and (B) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Buyer, reasonable access (including the right to make photocopies at the expense of the Buyer), during normal business hours, to such books and records. Upon and after the expiration of such 1-year period, Sellers shall, before destroying, discarding or otherwise disposing of any such books and records, notify Buyer in writing not less than twenty (20) days prior to taking any such action and, if Buyer elects in writing to Sellers at any time within such 20-day period to take title to and possession of any such books and records, Sellers shall assign, transfer and deliver same to Buyer at Buyer's expense.

(iii)     Should Seller fail to fulfill or comply with its obligations under this Section 5.1(c), Buyer shall be permitted to bring a proceeding before the Bankruptcy Court to compel such compliance.

(d)     Notice of Certain Events.  Sellers' Representative shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to Buyer's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled.  It is acknowledged and understood that no notice given pursuant to this Section 5.1(d) or that would cause any representations and warranties of Sellers to be incorrect or misleading shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

(e)     Assignment of Transferred Internet Domain Names.  Sellers shall cause their Affiliates who are the registered holders of the Transferred Internet Domain Names to assign and transfer to Buyer, at or prior to the Closing, all of such Transferred Internet Domain Names, other than those set forth on Schedule 5.1(e) (the "Subject Internet Domain Names"). The Transferred Internet Domain Names (other than the Subject Internet Domain Names), shall be transferred to Buyer at the Closing pursuant to Section 1.1 hereof.  The assignment and transfer to Sellers, at or prior to Closing, of the Transferred Internet Domain Names (other than the Subject Internet Domain Names) shall be a condition precedent to the Closing pursuant to Section 7.2(g).

(f)     Contact with Customers, Vendors and Employees.  Neither Buyer nor anyone acting on its behalf shall contact any employee, consultant, customer, supplier, vendor or distributor of the Business between the date hereof and the Closing Date for purposes of discussing (and neither Buyer nor anyone acting on its behalf shall discuss with any such Person) the Business, the Acquired Assets or the transactions contemplated hereby except (i) as expressly permitted by this Section 5.1(f) or (ii) with the Sellers' Representative's consent, such consent not to be unreasonably withheld, conditioned or delayed.  Subject to clause (ii) of the first sentence of this Section 5.1(f), prior to the Closing Date, Sellers shall use their commercially reasonable efforts to facilitate Buyer's (and all of its agents and representatives, and any of its employees, consultants, directors and officers) contact and communication with the employees, consultants, customers, suppliers, vendors and distributors of the Business, it being understood

that (i) Sellers shall be entitled to coordinate the timing of any such contact and communication (and to participate in any and all such contact and communication) and (ii) any inquiries made by Buyer with any of the foregoing Persons shall be made in such a manner as not to interfere unreasonably with the Business.

(g)    Third Party Consents.  Sellers shall, at their sole cost and expense, obtain the Consents set forth on Schedule 7.2(f) to the extent such consents are not provided for or satisfied by the Sale Approval Order.

(h)    Insurance.  Until the Closing, Sellers shall maintain (including necessary renewals thereof) insurance policies against risk and liabilities to the extent and in the manner and at the levels maintained by Sellers as of the date hereof with respect to the Business and the Acquired Assets. Prior to the Closing and as condition precedent to the Closing for the benefit of the Buyer, the Sellers shall obtain and prepay insurance coverage with respect to Sellers' operation of the Business prior to the Closing Date (commonly referred to as "tail insurance"); such insurance policies shall remain in full force and effect for three (3) years, be in such amounts and have such coverage and terms as the Buyer requests, and shall not be cancellable without the written consent of the Buyer.

SECTION 5.2 Pre-Closing Covenants of Buyer.

Buyer covenants to Sellers that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)    General.  Buyer will use reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in Article 7 herein).  Buyer shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Orders and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement. In that connection, Buyer will provide all reasonable assistance that may be requested by Sellers in order to obtain a determination by the Bankruptcy Court that Buyer has provided adequate assurance of future performance (as such term is used in Section 365 of the Bankruptcy Code) with respect to any Assigned Contracts and Real Property Leases and Personal Property Leases.

(b)    Permits.  Buyer shall use commercially reasonable efforts to promptly obtain or consummate the transfer to Buyer of any Permit required to own or operate the Business under applicable laws.

(c)    Notice of Certain Events.  Buyer shall promptly notify Sellers' Representative of, and furnish Sellers' Representative any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to Seller's obligations to consummate the transactions contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled. It is acknowledged and understood that no notice given pursuant to this Section 5.2(c) shall have

any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

SECTION 5.3 <u>Other Covenants of Sellers and Buyer</u>.

(a) <u>Filings</u>. During the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, Sellers and Buyer shall reasonably cooperate with one another in obtaining all authorizations, consents, and approvals of Government Authorities that may be or become necessary in connection with the consummation of the transactions contemplated by this Agreement, and to take all reasonable actions to avoid the entry of any order or decree by Government Authorities prohibiting the consummation of the transactions contemplated hereby, and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications to be filed by the other.

(b) <u>Improper Receipt of Payment</u>. From and after the Closing Date, (i) Sellers shall promptly forward to Buyer any and all payments received by Sellers from customers or any other Persons that constitute part of the Acquired Assets and (ii) Buyer shall promptly forward to Sellers any and all payments received by Buyer from customers or any other Persons that constitute part of the Excluded Assets.

(c) <u>Disclosure Schedule Supplements</u>. Sellers' Representative, on the one hand, shall notify Buyer of, and Buyer on the other hand, shall notify Sellers' Representative of, and shall supplement or amend the Schedules to this Agreement with respect to, any matter that (i) may arise after the delivery of the Schedules hereunder and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Sellers or Buyer, as applicable, that has been rendered inaccurate thereby. Each such notification and supplementation shall be made no later than three (3) days before the date set for the Closing by the parties, it being understood that, information contained in any supplement to the Schedules provided pursuant to this <u>Section 5.3</u> shall not be deemed to cure any breach for purposes of <u>Article 7</u> hereof.

(d) <u>No Avoidance Actions</u>. No Seller shall, without the prior written consent of Buyer, which may be given or withheld in its sole and absolute discretion, at any time before, on or after the Closing initiate or commence any Avoidance Action against any Person who was at any time prior to the Closing a customer, purchaser, vendor, supplier or distributor to or of any Seller, and each Seller shall use its best efforts to cause each Affiliate of such Seller not to initiate or commence any such Avoidance Action without such Buyer prior written consent.

SECTION 5.4 <u>Employment Covenants and Other Undertaking</u>.

(a) <u>Future Employment</u>. Not less than one calendar week prior to the Closing Date, Sellers shall have entered into new collective bargaining agreements with the unions with which the Sellers had collective bargaining agreements as of the date of this Agreement. Each such new collective bargaining agreement entered into by Sellers must (i) contain wage reduction provisions acceptable to the Buyer, in its reasonable sole discretion, (ii) contain

working terms and conditions acceptable to the Buyer, in its reasonable sole discretion, (iii) not contain any ongoing obligation under any multi-employer pension plan or any other pension plan after the Closing Date, (iv) contain other economic terms and conditions acceptable to the Buyer, in its reasonable sole discretion; and (v) be effective as of the Closing Date. Subject to the foregoing, prior to the Closing Date, Buyer shall provide offers of employment to those current employees and officers of Sellers and Affiliates of Sellers as identified by Buyer in its sole discretion. Such employees and/or officers who accept Buyer's offer of employment, and commence employment with Buyer on or following the Closing are referred to as "Hired Employees." Sellers will be solely responsible for obligations (including notice) under the WARN Act (and any similar state law or other applicable law) that arise based in any part on events that occur from or after the Closing with respect to any employees of Sellers that are not Hired Employees.

(b) Buyer shall recognize the service of Hired Employees with the Sellers prior to the Closing Date as service with the Buyer in connection with any qualified retirement plan and welfare benefit plan or policy (including vacations) maintained by Buyer that is made available following the Closing Date by Buyer for purposes of satisfying or determining any waiting period, vesting, eligibility or benefit entitlement (but excluding benefit accruals thereunder).

(c) With respect to any welfare benefit plan maintained by Buyer in which the Hired Employees are eligible to participate after the Closing Date, Buyer shall use commercially reasonable efforts, to the extent permitted by the third party providers of such plan, to use reasonable best efforts to, (i) waive all limitations to preexisting conditions, exclusions and waiting periods and actively-at-work requirements with respect to participation and coverage requirements applicable to the Hired Employees and their dependents and beneficiaries under such plan to the extent waived under the applicable corresponding Employee Benefit Plan immediately prior to the Closing Date, and (ii) provide each Hired Employee and his or her eligible dependents and beneficiaries with credit under such plan for any co-payments and deductibles paid under corresponding Employee Benefit Plans prior to the Closing Date in the calendar year in which the Closing Date occurs for purposes of satisfying any applicable deductible or out-of-pocket requirements (and any annual and lifetime maximums).

(d) [Reserved].

(e) No Right to Employment. Notwithstanding Section 5.4(a), nothing herein expressed or implied shall confer upon any of the employees of Sellers any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.

SECTION 5.5 Ownership of Lyman Lumber Names and Acquired Intellectual Property.

(a) Sellers covenant and agree that Sellers shall, and Sellers shall cause all of their Affiliates which use any of the Lyman Lumber Names, to pass all required resolutions and to amend their respective certificates of incorporation or formation or other organizational documents to change their corporate or company name to a name that does not include the word "Lyman Lumber" or any other Lyman Lumber Name, or any name intended or likely to be

confused or associated with any Lyman Lumber Name or product, no later than the Closing Date.

(b)    Sellers acknowledge that the Lyman Lumber Names and all other Acquired Intellectual Property shall be and remain, subsequent to the Closing, the sole and exclusive property of Buyer.  Prior to the Closing, Sellers shall terminate any Contract granting the right to use any Acquired Intellectual Property.

(c)    Subsequent to the Closing, subject to Section 5.5(d), none of Sellers or any of their Affiliates shall have any right, title or interest in or to, and Buyer is not granting Seller or any of its Affiliates, a license to use, the Lyman Lumber Name or any of the Acquired Intellectual Property.

(d)    The obligations in this Section 5.5 shall not apply (i) to the extent use of the Lyman Lumber Name is required by law or otherwise reasonably required pending the registration of the change of corporate names (as set out in this Section 5.5), (ii) to the extent use of the Lyman Lumber Name is reasonably required in order to enable collection or payment of invoices issued by Sellers or any of their Affiliates, or (iii) to the extent the Lyman Lumber Name is reasonably required to pursue a Claim.

SECTION 5.6 Non-Assignment of Acquired Contracts.

Sellers shall use their reasonable best efforts to obtain any consent, approval or amendment, if any, required to novate and/or assign any Acquired Contract to be assigned to Buyer hereunder which the Bankruptcy Court determines is not able to be assumed and assigned under section 365(c) of the Bankruptcy Code (a "Nonassignable Contract").  Sellers shall keep Buyer reasonably informed from time to time of the status of the foregoing and Buyer shall cooperate with Sellers in this regard.  To the extent that the rights of Sellers under any Nonassignable Contract, or under any other Acquired Asset, may not be assigned without the consent of a third party which has not been obtained prior to the scheduled Closing, this Agreement shall not constitute an agreement to assign the same. To the extent Buyer waives as a condition to closing set forth in Section 7.2 the assignment of any such specific Assigned Contracts and the parties close on the transaction, if any such consent has not been obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the instrument in question so that Buyer would not acquire the benefit of all such rights, then Sellers, to the maximum extent permitted by applicable law and the instrument, shall act as Buyer's agent in order to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable law and the instrument, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer (including, without limitation, by entering into an equivalent arrangement); *provided*, *however*, that after Closing, Buyer shall be responsible for all payment and other obligations under, and for all costs of obtaining such rights under such Non-Assignable Contract.

SECTION 5.7 Bankruptcy Actions.

(a)    Sale Motion.  Sellers have filed with the Bankruptcy Court a motion seeking approval of the Sale Procedures Order and the Sale Approval Order (the "Sale Motion").

(b)      Sale Procedures Order.  For purposes of this Agreement, "Sale Procedures Order" shall mean the order of the Bankruptcy Court substantially in the form attached as Exhibit G hereto (i) approving sale procedures and bidding protections in connection with the sale of substantially all of the debtors' assets pursuant to Sections 363 and 365 of the Bankruptcy Code; (ii) scheduling an auction and hearing to consider approval of the sale of substantially all of the debtors' assets (the "Auction"); and (iii) granting related relief.  Sellers shall use their reasonable efforts so that the Bankruptcy Court, as part of its Sale Procedures Order, (i) schedules a hearing to approve this Agreement, (ii) requires the payment of the Break-Up Fee in accordance with the terms of Section 8.3 hereof, and (iii) requires a deposit in the amount of $1,000,000.00.

(c)      Sale Approval Order.  For purposes of this Agreement, the term "Sale Approval Order" shall mean the order of the Bankruptcy Court entered pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form attached as Exhibit H hereof, in part, (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens, Claims, Encumbrances, and Interests to the full extent authorized by Section 363(f) of the Bankruptcy Code, (iii) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) confirming that Buyer is acquiring the Acquired Assets free and clear of the Excluded Assets and the Excluded Liabilities; (v) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; (vi) determining that Buyer will not be a successor to Sellers in any respect, and shall have no successorship liabilities of any kind or nature whatsoever post-Closing, including any liabilities under Title IV of ERISA with respect to any single employer or multi-employer pension plan (including withdrawal liabilities); and (vii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

(d)      Assignment Motion and Order.  Sellers shall use commercially reasonable efforts to file with the Bankruptcy Court, at least fourteen (14) days prior to the Sale Approval Hearing, a motion (which may be included in the Sale Motion) for an order (the "Assignment Order") authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts (the "Assignment Motion").  The Acquired Contracts have been, or shall be, identified on an exhibit to the Assignment Motion.  Such exhibit shall set forth the amounts necessary to cure defaults under each of such Acquired Contracts as determined by Sellers based on Sellers' books and records.  In situations in which Seller is unable to establish that a default exists based upon a review of its books and records, or other relevant information, the relevant cure amount shall be set at $0.00.  Buyer agrees to cooperate with Sellers in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance as required under Section 365(f)(2)(B) of the Bankruptcy Code.  Both the Assignment Motion and the Assignment Order shall be in form and substance satisfactory to the Buyer in its reasonable discretion.

(e)      Notice and Reasonable Efforts.  Sellers shall provide appropriate notice of the hearing(s) on the Sale Motion, the Assignment Motion, and, after approval by the Bankruptcy Court, the Auction, as is required by the Bankruptcy Code and the Bankruptcy Rules and other applicable law to all parties entitled to notice, including, but not limited to, all parties

to the Acquired Contracts and all taxing and environmental authorities in jurisdictions applicable to Sellers.  Thereafter, Sellers shall (i) take all actions as may be reasonably necessary to cause each of such orders to be issued, entered and become a Final Order in the form contemplated by this Agreement and (ii) consult with Buyer concerning such orders and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents to be filed by sellers relating to such orders (collectively, the "Bankruptcy Pleadings") prior to submission to the Bankruptcy Court (with a reasonable opportunity for Buyer to review and comment on same) and which Bankruptcy Pleadings shall be in form and substance satisfactory to Buyer in its reasonable discretion.

(f)     Excluded Assets.    Notwithstanding anything herein to the contrary, promptly after entry of the Sale Approval Order, Sellers shall have the right, in their sole discretion to reject any or all Excluded Assets, including any or all contracts other than the Acquired Contracts, and to take all actions necessary to effectuate any such rejection or rejections, including prosecuting a motion in the Bankruptcy Court seeking authorization, as necessary, to reject such Excluded Assets; provided in all events that  Buyer has been provided prior written notice and Buyer is provided with the opportunity to be appear and be heard by the Bankruptcy Court with respect to any proposed rejections.

(g)     Appeals of Bankruptcy Orders.   If, following the Closing, any of the Orders or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Sellers shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, at Sellers' sole cost and Buyer agrees to cooperate in such efforts, and each party hereto shall endeavor to obtain an expedited resolution of such appeal.

SECTION 5.8 POST-CLOSING COVENANT OF BUYER.

Buyer shall pay the Post-Closing Specified Obligations which have not been paid by the Sellers pursuant to Section 1.5(d) after the Closing Date as they become due and payable.

ARTICLE 6

TAXES

SECTION 6.1 Taxes Related to Purchase of Acquired Assets.

All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes") shall be paid by Sellers when due, and Sellers shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.  Buyer and Sellers shall cooperate in good faith to (a) determine the amount of Transfer Taxes payable

in connection with the transactions contemplated under this Agreement, (b) minimize the amount of Transfer Taxes that may be imposed or assessed as a result of the Transaction, (c) provide all requisite exemption certificates to minimize the amount of Transfer Taxes that may be imposed or assessed as a result of the transactions contemplated hereby and (d) prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate Government Authorities.

SECTION 6.2 <u>Cooperation on Tax Matters</u>.

(a) Buyer and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any Government Authority relating to Tax matters.

(b) Sellers shall retain possession of all Tax Records for a period of at least six (6) years from the Closing Date. Sellers shall give Buyer notice and an opportunity to retain any Tax Records in the event that Sellers determine to destroy or dispose of them after such period. In addition, from and after the Closing Date, Sellers shall provide access to Buyer and its representatives (after reasonable notice and during normal business hours and without charge), to the Tax Records as Buyer may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

(c) Buyer shall retain possession of all accounting, business and financial records and information (other than Tax Records) (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date. Buyer shall give Sellers notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer shall provide access to Sellers and their representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as Sellers may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer, (ii) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Sellers, or (iii) pursue any Claim. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

SECTION 6.3 <u>Allocation of Purchase Price</u>.

Following the closing, Buyer and Sellers' Representatives shall agree to an allocation of the Purchase Price among the Acquired Assets (the "<u>Allocation</u>") and sufficiently detailed to

satisfy applicable accounting and tax requirements. Such Allocation will be binding upon Buyer and Sellers and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation. Buyer and Sellers will report the purchase and sale of the Acquired Assets on all tax returns, including, without limitation, Form 8594 as provided for in Section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594. If Sellers and Buyer do not so agree within one hundred eighty (180) days of the Closing Date, each of Sellers and Buyer may prepare their own Allocation (provided that such Allocation is consistent with <u>Section 2.1</u>) and, for the avoidance of doubt each of Buyer and Sellers will have no liability to the other for any additional Taxes that may be imposed by any Government Authority as a result of inconsistencies between the respective allocations of Buyer and Sellers.

ARTICLE 7

<u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>

SECTION 7.1 <u>Conditions Precedent to Performance by Sellers</u>.

The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived in writing by Sellers' Representative, in its sole discretion:

(a) <u>Representations and Warranties of Buyer</u>. The representations and warranties of Buyer made in <u>Section 4.2</u> of this Agreement, in each case, shall be true and correct in all material respects as of the Closing Date (except for the representations and warranties of Buyer contained in <u>Section 4.2(g)</u>, which shall be true and correct in all respects as of the Closing Date) as though made by Buyer as of the Closing Date, except to the extent representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date and except for any breach that would not reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations hereunder, and Sellers shall have received a certificate signed by a duly authorized officer of Buyer to such effect.

(b) <u>Performance of the Obligations of Buyer</u>. Buyer shall have (i) performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party which are to be performed by it on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), (ii) delivered all certificates, instruments, and other documents required herein or otherwise in a form and substance reasonably satisfactory to Sellers required to effect the transactions contemplated hereby, and (iii) Sellers shall have received a certificate signed by a duly authorized officer of Buyer to such effect.

(c) <u>Governmental Consents and Approvals</u>. The Orders shall have been entered and shall not have been stayed. Notwithstanding the foregoing, nothing in this Agreement shall preclude Sellers from consummating the transactions contemplated herein if Sellers, in their sole discretion, waive the requirement that the Sale Approval Order shall have

become a Final Order. No notice of such waiver of this condition or any other condition to the Closing need be given except to Buyer, it being the intention of the parties that Sellers shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Approval Order becoming a Final Order.

(d)     No Violation of Orders. No preliminary or permanent injunction or other order of any court or Government Authority that declares this Agreement invalid or unenforceable in any material respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     Assignment and Assumption of Liabilities. Buyer shall have executed and delivered to Sellers an instrument of assignment and assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for Buyer and Sellers.

(f)     No Litigation. There shall not be pending by any Government Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

(g)     Sellers' Secured Lenders.     Sellers' Secured Lenders shall be paid in full at Closing, or shall have expressly consented to the Closing even though they may or will not be paid in full at Closing. In this regard, Sellers and Buyer all waive any right under Section 363(f) of the Bankruptcy Code or otherwise to seek to compel Sellers' Secured Lenders to accept less than payment in full at Closing.

SECTION 7.2 Conditions Precedent to the Performance by Buyer.

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by Buyer, in its sole discretion:

(a)     Representations and Warranties of Sellers. The representations and warranties of Sellers made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Closing Date (other than such representations and warranties that are qualified by materiality, which shall be true and correct as of the Closing Date) as though made by Sellers as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date, and Buyer shall have received a certificate signed by a duly authorized officer of Sellers to such effect.

(b)     Performance of the Obligations of Sellers. Sellers shall have (i) performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Sellers are party which are to be performed by Sellers on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), (ii) delivered all certificates, instruments, and other documents required herein or otherwise required to effect the transactions

contemplated hereby, including those set forth in <u>Section 3.2</u>, and (iii) Buyer shall have received a certificate signed by a duly authorized officer of Sellers to such effect.

(c) <u>Governmental Consents and Approvals</u>. The Orders shall have been entered and shall not have been stayed. Notwithstanding the foregoing, nothing in this Agreement shall preclude Buyer from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Approval Order shall have become a Final Order. No notice of such waiver of this condition or any other condition to the Closing need be given except to Sellers, it being the intention of the parties that Buyer shall he entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Approval Order becoming a Final Order.

(d) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Government Authority that declares this Agreement invalid in any material respect or prevents the consummation of the transactions contemplated hereby shall be in effect.

(e) <u>No Litigation</u>. There shall not be pending by any Government Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

(f) <u>Third Party Consents and Approvals</u>. Those Consents identified on <u>Schedule 7.2(f)</u> shall have been obtained.

(g) <u>Name Change</u>. Sellers shall have provided Buyer a certificate signed by a duly authorized officer of Sellers and acceptable to Buyer evidencing Sellers' compliance with <u>Section 5.5(a)</u>.

(h) <u>Sale Approval Order and Sale Procedures Order</u>. The Sale Procedures Order, the Sale Approval Order and the Assignment Order shall each have become a Final Order and each shall be in full force and effect and not stayed as of the Closing Date.

(i) <u>Sale Procedures</u>. The Sellers shall have adhered to the Sale Procedures without any modification thereof, unless approved by Buyer, such approval not to be unreasonably withheld.

(j) <u>Mortgage Modifications</u>. The Mortgage Modifications contemplated by <u>Section 2.4</u> have been made and the parties have agreed as to the aggregate amount of the Mortgage Liabilities as of the Closing Date. All assignment and assumption documents necessary to effect the assumption by Buyer of the mortgage documents shall be in form satisfactory to Buyer and shall be executed and delivered by applicable Sellers and lenders on the Closing Date.

(k) <u>Assigned Seller Contracts</u>. For all Assigned Contracts and Assumed Leases that are in fact to be assigned to the Buyer, (i) the Sale Approval Order or a separate assignment order of the Bankruptcy Court shall authorize the assumption and assignment thereof to Buyer, or (ii) Sellers shall have obtained all necessary consents from the non-debtor parties thereto to permit the assumption and assignment thereof to Buyer, and, with respect to (iii),

Buyer shall have been provided with written evidence of such consents in a form reasonably acceptable to Buyer.

(l)  No Reduction in Acquired Assets.  Sellers shall not have filed any motion with the Bankruptcy Court seeking the rejection of any Assigned Contract.  Seller shall not have abandoned or otherwise relinquished its or the Bankruptcy Estate's interest in any Acquired Asset, other than assets disposed of or abandoned in the ordinary course of business consistent with past practice, subject to and in accordance with Section 5.1(b).  Without the consent of Buyer, Seller shall not have taken any actions to dispose of or abandon any Acquired Assets or any Acquired Contract.

(m)  No Adverse Change.  No events or conditions shall have occurred which individually or in the aggregate, have had, or may reasonably be anticipated to give rise to any Material Adverse Effect.

(n)  Employees - Union.  With respect to the Sellers' employees that are covered by an existing collective bargaining agreement, not less than one calendar week prior to the Closing Date, the Sellers shall have entered into new collective bargaining agreements with the unions with which the Sellers had collective bargaining agreements as of the date of this Agreement.  Each such new collective bargaining agreement entered into by Sellers must, as a condition of closing:  (i) contain wage reduction provisions acceptable to the Buyer, in its reasonable sole discretion, (ii) contain working terms and conditions acceptable to the Buyer, in its reasonable sole discretion, (iii) not contain any ongoing obligation under any multi-employer pension plan after the Closing Date, (iv) contain other economic terms and conditions acceptable to the Buyer, in its reasonable sole discretion; and (v) be effective as of the Closing Date. Subject to the foregoing, prior to the Closing Date, substantially all employees covered by a collective bargaining agreement of the Sellers to whom Buyer has made offers of employment pursuant to Section 5.4, shall have accepted such employment and agreed to become Hired Employees as of the Closing Date.

(o)  Employees – Non-Union.  All manager level non-union employees of Seller which Buyer has made offers of employment to pursuant to Section 5.4 have accepted such employment and are Hired Employees as of the Closing Date.  Substantially all other non-union employees of Seller which Buyer has made offers of employment to pursuant to Section 5.4 have accepted such employment and are Hired Employees as of the Closing Date.

(p)  Title Insurance.  Buyer shall have obtained Owners' Policies of Title Insurance issued by a title company reasonably acceptable to Buyer for all of the Real Properties in form satisfactory to Buyer and insuring Buyer's or Buyer's nominee's record, marketable fee simple title to each of the Real Properties subject only to the Permitted Liens.

(q)  Closing Deliveries. Buyer shall have received copies of each of the Closing Documents required to be delivered by the Sellers pursuant to Section 3.2.

(r)  Environmental Reports. Buyer shall be satisfied in its sole and absolute discretion with all Environmental Reports.

(s)    Due Diligence. Buyer shall be satisfied in its sole and absolute discretion with all due diligence and other investigations conducted by it with respect to the Business and the Acquired Assets; provided, however, that (i) the Buyer's right to terminate this Agreement in accordance with Section 8.1(d) hereof as a result of a failure of the condition contained in this Section 7.2(s) shall expire on the "Bid Deadline" contained in the Sale Procedures Order, and (ii) anything in this Agreement to the contrary notwithstanding, in the event the Buyer terminates this Agreement in accordance with Section 8.1(d) hereof as a result of a failure of the condition contained in this Section 7.2(s), then in such event Buyer shall not be entitled to receive payment of the Break-Up Fee (provided that in such event Buyer shall be entitled (i) to retain the Upfront Deposit for its account and, (ii) in addition to the Upfront Deposit, otherwise be reimbursed by Sellers for any and all additional out-of pocket expenses up to a maximum amount of One Hundred Fifty Thousand Dollars ($150,000), including, without limitation, due diligence expenses and reasonable attorneys' fees, incurred by it in connection with this Agreement and the transactions contemplated hereby.   Upon entry of the Sales Procedures Order by the Bankruptcy Court, the Sellers shall deposit the sum of $150,000.00 ("Diligence Deposit") with the Escrow Agent in the event that the foregoing sum is required to be paid to the Buyer in accordance with the terms of this Section 7.2(s). In the event that (i) the Buyer elects to terminate this Agreement under Section 8.1(d) on account of a failure of the condition contained in this Section 7.2(s), or (ii) the Diligence Deposit is to be applied towards the Break-Up Fee as provided in Section 2.1(d)(v), then the Escrow Agent shall disburse the Diligence Deposit to Buyer.

(t)    Post-Petition Accounts Payable. Prior to the Closing Date Sellers shall have brought current and shall have paid all post-petition accounts payable attributable to the Business and the Acquired Assets.

The conditions set forth in this Section 7.2 are for the sole benefit of Buyer, and may be waived in whole or in part by Buyer by notice to the Seller in writing without prejudice to Buyer's rights under this Agreement or at law, if any, in the event of the non-fulfillment of any other condition or conditions.

# ARTICLE 8

# TERMINATION

SECTION 8.1 Conditions of Termination.  This Agreement may be terminated (with the effective date of any such termination under this Section 8.1 being defined as the "Termination Date") only in accordance with this Section 8.1.  This Agreement may be terminated at any time before the Closing, as follows:

(a)    by mutual written consent of Sellers' Representative (on behalf of Sellers) and Buyer;

(b)    by Buyer, by written notice to Sellers' Representative, on or after October 21, 2011 (the "Outside Closing Date") if the Closing has not occurred on or prior to the Outside Closing Date (subject to extension as set forth in subparagraph 8.1(f) below); provided that

Buyer shall not have the right to terminate this Agreement under this Section 8.1(b) if Buyer is then in material breach of this Agreement;

(c)  (i) by Sellers' Representative (on behalf of Sellers), by written notice to Buyer, on or after the Outside Closing Date if the Closing has not occurred on or prior to the Outside Closing Date (subject to extension as set forth in subparagraph 8.1(f) below); provided that Sellers' Representative shall not have the right to terminate this Agreement under this Section 8.1(c) if Sellers (A) are then in material breach of this Agreement or (B) are the proximate cause of any failure to close the transactions contemplated hereby on or prior to the Outside Closing Date;

(d)  by Buyer, by written notice to Sellers' Representative, if Buyer has previously provided Sellers' Representative with notice of: (i) any inaccuracy of any representation or warranty of Sellers contained in Section 4.1, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, the conditions in Section 7.2 not being satisfied (treating such time as if it were the Closing for purposes of this Section 8.1(e)), (ii) a material failure to perform any covenant of Sellers contained in this Agreement or any Ancillary Agreement to which a Seller is party, and Sellers have failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Sellers' ability to remedy such inaccuracy or perform such covenant, and/or (iii) the failure to be satisfied one or more conditions contained in Section 7.2 hereof; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(d) if Buyer is then in material breach of this Agreement;

(e)  by Sellers' Representative (on behalf of Sellers), by written notice to Buyer, if Sellers' Representative has previously provided Buyer with notice of any inaccuracy of any representation or warranty of Buyer contained in Section 4.2, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, the conditions set forth in Section 7.1(a) not being satisfied (treating such time as if it were the Closing for purposes of this Section 8.1(e)), or notice of a material failure to perform any covenant of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and Buyer has failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Sellers of Buyer's ability to remedy such inaccuracy or perform such covenant; provided, however, that Sellers' Representative (on behalf of Sellers) shall not have the right to terminate this Agreement under this Section 8.1(e) if Sellers are then in material breach of this Agreement;

(f)  by Buyer if (i) the Bankruptcy Court has not entered the Sale Procedures Order on or before August 31, 2011, (ii) the Auction is not held on or before October 3, 2011, (iii) the Sale Approval Hearing is not held on or before October 5, 2011, or (iv) the Sale Approval Order is not entered on or before October 7, 2011; provided, however, with respect to clauses (ii), (iii) and (iv) above, Sellers may extend such dates by not greater than fourteen (14) days if Sellers are reasonably certain that there is at least one other or additional Qualified Bidder(s) (as defined in the Bidding Procedures) prior to the Auction;

(g)     by Buyer, (i) if Sellers withdraw or seek authority to withdraw the Sale Motion, (ii) if Sellers or any other party authorized to file a plan of reorganization pursuant to Section 1121 of the Bankruptcy Code announces or files any standalone plan of reorganization or liquidation (or support any such plan filed by any other party whether or not authorized to be filed under Section 1121 of the Bankruptcy Code) other than in connection with the transactions contemplated by this Agreement, (iii) if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code pursuant to section 1112 of the Bankruptcy Code, or (iv) if a Trustee is appointed in the Bankruptcy Case pursuant to section 1104 of the Bankruptcy Code;

(h)     by Buyer or Sellers' Representative (on behalf of Sellers), if (i) Sellers have accepted or selected and the Bankruptcy Court shall have approved by Final Order, the bid or bids (including a credit bid) of any Person or Persons other than Buyer or any of its Affiliates to purchase all or a significant portion of the Acquired Assets and which bid(s) constitutes a Superior Proposal, or (ii) Buyer is not the successful bidder (or backup bidder, where applicable) at the Auction.  In the event Buyer is not determined by the Sellers to be the "Prevailing Bidder" (as defined in the Bidding Procedures) at the conclusion of the Auction, Buyer may select, in its sole and absolute discretion, whether it will agree to serve as a "Back-Up Bidder" (as defined in the Bidding Procedures); or

(i)     by either Buyer or Sellers' Representative (on behalf of Sellers), if a Government Authority issues a final and non-appealable ruling or order prohibiting the transactions contemplated by this Agreement.

SECTION 8.2 Effect of Termination.

In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than the provisions of Section 5.1(c), Article 8, Article 10 and Article 11, all of which shall expressly survive termination), none of Sellers or Buyer, or their respective Affiliates or respective representatives, shall have any liability whatsoever with respect to this Agreement or any Ancillary Agreement; *provided*, *however* that nothing herein shall relieve any party from liability for any breach of any representation, warranty, covenant or agreement contained in this Agreement which occurred prior to termination of this Agreement in accordance with its terms. In the event the Closing does not occur on or before the Outside Closing Date, for any reason other than (a) due to a material breach of Buyer or (b) termination of this Agreement and payment of an amount equal to the Break-Up Fee set forth in Section 8.3, and this Agreement is terminated by Buyer, Sellers shall pay Buyer the Break-Up Fee which, subject to Section 9.2 hereof, shall be Buyer's sole and exclusive remedy, at law in equity or otherwise, hereunder. In the event this Agreement is terminated as a result of a material breach of Buyer of its obligations hereunder, the maximum amount of Seller's damages shall be the amount of the Deposit, which shall be the Sellers' sole and exclusive remedy at law in equity or otherwise, hereunder. The parties acknowledge that this Section 8.2 shall survive termination of this Agreement.

SECTION 8.3 <u>Break-Up Fee</u>.

(a)     The parties hereto acknowledge and agree that the terms and conditions set forth in this <u>Section 8.3</u> with respect to the payment of the Break-Up Fee shall only become operative if and to the extent that the Bankruptcy Court enters the Sale Procedures Order approving such terms and conditions, it being understood and agreed that the consummation of the transactions contemplated by this Agreement shall be conditioned upon the approval by the Bankruptcy Court of the provisions of the Sale Procedures Order and the entry of an order with respect thereto.  Notwithstanding <u>Section 8.2</u>, in the event that (i) the Sellers shall withdraw or fail to diligently pursue approval of the Sale Motion within the time periods provided for herein, (ii) the Sellers shall consummate a transaction including a sale (including, without limitation, with respect to a Superior Proposal), recapitalization, or securitization of a substantial part of the Acquired Assets to any person other than the Buyer, or confirm a plan of reorganization that does not transfer the Acquired Assets to the Buyer, (iii) the Secured Lenders (as defined in the Bid Procedures) shall have successfully opposed entry of the Sale Approval Order and the Buyer has elected to terminate this Agreement in accordance with Section 8.1 hereof, or (iv) the Bankruptcy Court shall have entered the Sale Approval Order and this Agreement shall thereafter be terminated by Buyer under <u>Section 8.1(b), (d), (f), (g), (h) and/or (i)</u> then Sellers shall (i) pay Buyer a break-up fee and (ii) reimburse Buyer for its actual, documented out-of-pocket expenses, including, but not limited to, due diligence expenses, environmental studies, and reasonable attorneys' fees, in an aggregate amount of $750,000 (which amount is in addition to, and exclusive of, the Up-Front Deposit) ((i) and (ii) being collectively defined as the "<u>Break-Up Fee</u>").  Payment of the Break-Up Fee pursuant to the previous sentence shall be paid within two (2) Business Days of the Termination Date and the payment of the Secured Lenders, except for payment of the Break-Up Fee, or any portion thereof, from the Diligence Deposit or from the proceeds of the Unencumbered Assets, which shall occur immediately in accordance with the terms of this Agreement and without regard for the payment of the Secured Lenders.  Except in the case of fraud or intentional misconduct by any Seller, or as otherwise provided in <u>Section 9.2</u> hereof, Buyer's right to receive payment of the Break-Up Fee from Sellers as herein provided shall be the sole and exclusive remedy available to Buyer against Sellers or any of their respective former, current or future shareholders, directors, officers, Affiliates or agents with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to the terms set forth herein, and upon payment of the Break-Up Fee in circumstances described herein, none of Sellers or any of their respective former, current or future shareholders, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

(b)     The Sale Procedures Order shall further provide that to the extent payable under this Agreement, the Sellers' obligation to pay the Break-Up Fee (i) shall survive termination of this Agreement, and, subject to Sections 8.3(c) and 8.3(d) below, (ii) shall be (x) secured by (1) a Lien and encumbrance on all of the Debtors' property and assets, real and personal, tangible and intangible, now existing and hereafter arising, which security interest shall be junior to all existing and non-avoidable, prior perfected pre-petition liens and encumbrances (including the liens and encumbrances held by the Sellers' Secured Lenders) ("<u>Encumbered Assets</u>") and (2) a first priority Lien and encumbrance upon all assets unencumbered as of the petition date (including without limitation, the Sellers' real estate known as the so-called "Old Excelsior

Yard" which is scheduled to be sold shortly after execution of this Agreement) ("Unencumbered Assets"), and (y) in the event the proceeds realized from the aforementioned liens are insufficient to pay Buyer the balance of the Break-Up Fee, then in addition to such liens the Buyer shall be awarded an allowed administrative expense claim under Section 503(b) of the Bankruptcy Code payable out of the Sellers' cash or other collateral securing Sellers' obligations to the Secured Lenders, but only after the claims of such Secured Lenders have been paid in full, but prior to any payment to other administrative claimants, unsecured creditors, claim holders, equity holders and other parties in interest, which payment shall be free and clear of all liens, claims, interests, encumbrances and administrative expenses of any and all of the Sellers' Secured Lenders or other creditors. The Sellers' obligation to pay all or any portion of the Break-Up Fee shall be joint and several, absolute, and unconditional, and any such payment shall be made in the amounts, and at the times provided for in this Agreement, including without limitation, the Diligence Deposit towards the Break-Up Fee as provided in Section 2.1(d)(v).

(c)     Upon the sale of any of the Debtors' Unencumbered Assets (including the "Old Excelsior Yard"), all proceeds of sale (net only of customary and usual closing costs) shall be deposited into the account maintained by the Escrow Agent up to the amount of the Break-Up Fee.

(d)     Upon the sale of any of the Debtors' Encumbered Assets, all proceeds of sale, if any, net only of (x) amounts secured by existing and non-avoidable, prior perfected pre-petition liens and encumbrances, and (y) customary and usual closing costs shall be deposited into the account maintained by the Escrow Agent up to the amount of the Break-Up Fee.

(e)     The foregoing Lien and encumbrance is intended to provide security for the payment of the Break-Up Fee, if due and owing by Sellers to Buyer in accordance with the terms and conditions of this Agreement.  However, (i) Buyer shall not be entitled to seek adequate protection for that Lien and encumbrance, (ii) other than with respect to proceeds of Unencumbered Assets, Buyer's consent shall not be required incidental to authorizing any cash collateral usage by Sellers, (iii) Buyer shall not enforce or foreclose that Lien or encumbrance, except through a proceeding authorized by the Bankruptcy Court, and (iv) Buyer shall be deemed to have automatically consented to and released that Lien and encumbrance on any Encumbered Asset that is to be sold, if the holder of the prior Lien has consented to such sale.

(f)     If the Bankruptcy Court shall enter the Sale Procedures Order approving the Break-Up Fee, then the Break-Up Fee shall be paid in accordance with the terms and conditions set forth herein and in such order and shall have such status as is specified herein and in such order.

ARTICLE 9

SURVIVAL

SECTION 9.1 Survival.

Each of the representations and warranties, covenants and agreements of Sellers and Buyer made in this Agreement shall not survive the Closing Date; *provided*, *however*, that any

covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

SECTION 9.2  Specific Performance.

Sellers and Buyer each acknowledges that in case of any breach of Sellers' covenants or other obligations under this Agreement, Buyer would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach Buyer shall be entitled to obtain specific performance and other equitable remedies (as an alternative to termination of this Agreement and receipt of the Break-Up Fee).

SECTION 9.3 Covenant Not to Sue.

(a)    On and after the Closing Date, Buyer on the one hand, and Sellers, on the other hand, each covenants and agrees not to sue or otherwise bring any action against the other and each of the current and former directors, officers, employees, agents, managers, advisors, attorneys and representatives (in their capacity as such and in no other capacity) of the other with respect to any and all Claims based in whole or in part upon any act, omission, transaction, event or other occurrence taking place at any time on or before the Closing Date, with the exception of acts, omissions, transactions, events or occurrences resulting from or involving the intentional misconduct, the intentional breach of any covenant set forth herein or fraud, in each case of any such Persons, as determined by a final order of the Bankruptcy Court or other court of competent jurisdiction.

(b)    Notwithstanding any other term in this Agreement to the contrary, the waivers, covenants and agreements contained in this Section 9.3 shall survive the Closing and shall bind and inure to the benefit of, as the case may be, the Buyer and its successors and assigns and the Sellers, their Affiliates, and their estate, creditors, successors and assigns, including, without limitation, any trustee in any case under Chapter 7 of the Bankruptcy Code.

ARTICLE 10

MISCELLANEOUS

SECTION 10.1      Joint Drafting.

The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

SECTION 10.2      Further Assurances.

From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or

assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby and thereby.

SECTION 10.3       Successors and Assigns.

This Agreement shall be binding on and inure to the benefit of Buyer and Sellers and their respective successors and permitted assigns, including, without limitation, any trustee appointed in the Bankruptcy Case or subsequent Chapter 7 case.  No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other party, except that all or any portion of the rights of Buyer hereunder may be designated to one or more Affiliates of Buyer or assigned, without the consent of Sellers, to one or more Affiliates of Buyer; provided that (a) the assignees shall assume in writing all of Buyer's obligations to Sellers hereunder, (b) Buyer shall not be released from any of its obligations hereunder by reason of such assignment and (c) such assignment shall not delay or otherwise impede in any respect the timing for the consummation of the transactions contemplated hereby.

SECTION 10.4       Governing Law; Jurisdiction; Waiver of Trial by Jury.

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having jurisdiction over Hennepin County, Minnesota.  To the fullest extent permitted by applicable law, the parties hereby irrevocably and expressly waive all right to trial by jury in any action, proceeding or counterclaim (whether based in contract, tort or otherwise) arising out of or relating to this Agreement, the Ancillary Agreements, or the actions of Sellers, Buyer or their respective representatives in the negotiation, preparation, performance or enforcement of this Agreement.

SECTION 10.5       Expenses.

Except as set forth in Section 8.3 and this Section 10.5, each of the parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

SECTION 10.6       Severability.

In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and

effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

SECTION 10.7        Notices.

(a)        All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to a Seller:

> Lyman Lumber Company
> 300 Morse Avenue
> Excelsior, Minnesota 55331
> Attn.:  Mr. James E. Hurd
> Fax:  (952) 470-3666

With copies (which shall not constitute notice) to:

> Fredrikson & Byron, P.A.
> 200 South Sixth Street, Suite 4000
> Minneapolis, Minnesota 55402
> Attn.:   James L. Baillie, Esq.
>                Thomas F. Steichen, Esq.
> Fax:  (612) 492-7077

> Alliance Management
> Carlson Towers, Suite 110
> 601 Carlson Parkway
> Minneapolis, MN 55305
> Attn:  James H. Cullen
> Fax: (952) 475-2224

If to Buyer:

> SP Asset Management LLC
> c/o Steel Partners LLC
> 590 Madison Avenue, 32nd Floor
> New York, New York 10022
> Attn: John McNamara, Managing Director
> Fax: (212) 230-2309

With copies (which shall not constitute notice) to:

>Riemer & Braunstein LLP
>3 Center Plaza
>Boston, Massachusetts 02108
>Attn: Donald E. Rothman, Esq.
>Fax: 617-692-3556

(b)     Any party may change its address or facsimile number for the purpose of this <u>Section 10.7</u> by giving the other parties written notice of its new address in the manner set forth above.

SECTION 10.8          <u>Amendments; Waivers</u>.

This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Buyer and Sellers' Representative, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

SECTION 10.9          <u>Public Announcements</u>.

Sellers, on the one hand, and Buyer, on the other hand, shall not make any press release or public announcement concerning the transactions contemplated by this Agreement (other than the filing of pleadings in the Bankruptcy Court) without the prior written agreement from Sellers' Representative (in the case of Sellers) or Buyer, as applicable, unless a press release or public announcement is required by law, the rules of any stock exchange or order of the Bankruptcy Court. If any such announcement or other disclosure is required by law, the rules of any stock exchange or order of the Bankruptcy Court, the form and content of any such announcing or other disclosure shall be subject to the prior written consent of Sellers' Representative (in the case of Sellers) or Buyer, as applicable, which consent shall not be unreasonably withheld.

SECTION 10.10          <u>Entire Agreement</u>.

This Agreement, the Ancillary Agreements and the Confidentiality Agreement contain the entire understanding among the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

SECTION 10.11        No Third Party Beneficiaries.

Except as set forth in <u>Sections 5.8</u> and <u>9.3</u>, nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligation or liability of any third Persons to Sellers or to Buyer.  Except as set forth in <u>Sections 5.8</u> and <u>9.3</u>, this Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Sellers or against Buyer.

SECTION 10.12        Headings.

The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

SECTION 10.13        Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

SECTION 10.14        Construction.

Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "<u>including</u>" shall mean including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa.

SECTION 10.15        Tax Disclosure.

Notwithstanding anything herein to the contrary, each party (and each Affiliate and Person acting on behalf of any such party) agrees that each party (and each employee, representative, and other agent of such party) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such party or such Person relating to such Tax treatment and Tax structure, but only to the extent necessary to comply with any applicable federal or state securities or tax laws.  This authorization is not intended to permit disclosure of any other information including (without limitation) (a) any portion of any materials to the extent not related to the Tax treatment or Tax structure of the transaction, (b) the identities of participants or potential participants in the transaction, (c) the existence or status of any negotiations, (d) any pricing or financial information (except to the extent such pricing or financial information is related to the Tax treatment or Tax structure of the transaction), or (e) any other term or detail not relevant to the Tax treatment or the Tax structure of the transaction.

SECTION 10.16        Sellers' Representative.

Each Seller hereby irrevocably appoints LHC to act as representative, agent, proxy and attorney-in-fact for all Sellers for all purposes under this Agreement (LHC, in such capacity, being "<u>Sellers' Representative</u>"), including, without limitation, the full power and authority on

each Seller's behalf to: (a) receive notices or service of process; (b) negotiate, determine, compromise, settle and take any other action permitted or called for by Sellers under this Agreement; (c) execute any and all intellectual property assignment agreements on behalf of Sellers; and (d) execute and deliver any termination of, amendment to or waiver under this Agreement. Each Seller agrees that such agency and proxy are coupled with an interest and are, therefore, irrevocable without the consent of Sellers' Representative and shall survive the bankruptcy, dissolution or liquidation of any Seller. All decisions and actions by Sellers' Representative shall be binding upon all Sellers, and no Seller shall have the right to object, dissent, protest or otherwise contest same. Sellers' Representative shall have no duties or obligations hereunder except those specifically set forth herein and such duties and obligations shall be determined solely by the express provisions of this Agreement. Each Seller agrees to indemnify and hold harmless Sellers' Representative from and against all expenses (including reasonable attorneys' fees), judgments, fines and amounts incurred by Sellers' Representative in connection with any action, suit or proceeding to which Sellers' Representative is made a party by reason of the fact it is or was acting as a Sellers' Representative under this Agreement. Neither Sellers' Representative nor any agent employed by Sellers' Representative shall incur any liability to any Seller relating to the performance of its duties hereunder except for actions or omissions constituting fraud or bad faith. Sellers' Representative shall have no liability in respect of any action, claim or proceeding brought against Sellers' Representative by any Seller if Sellers' Representative took or omitted taking any action in good faith.

## ARTICLE 11

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"Accrued Select Employee Vacation Time" means all vacation time accrued prior to Closing of such employees of any Seller whom Buyer elects to employ following the Closing (and only such employees), and as to which Buyer shall permit affected Hired Employees to use such accrued but previously unused vacation time post-Closing, but as for which Buyer shall not be liable or obligated to pay any amount in cash to any such Hired Employee upon termination of his/her employment with Buyer post-Closing.

"Accounts Receivable" has the meaning set forth in Section 1.1(f).

"Acquired Assets" has the meaning set forth in Section 1.1.

"Acquired Contracts" has the meaning set forth in Section 1.1(e).

"Acquired Intellectual Property" has the meaning set forth in Section 1.1(h).

"Affiliate" has the meaning given that term in Section 101(2) of the Bankruptcy Code.

"Aggregate Cash Consideration" has the meaning set forth in Section 2.1(a).

"Agreement" has the meaning set forth in the Preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Allowed Termination Claim</u>" means a claim (as such term is defined in section 101(5) of the Bankruptcy Code), which shall be an administrative expense of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

"<u>Ancillary Agreement</u>" means the Bill of Sale, Assumption and Assignment Agreement, IP Assignments, Assumption and Assignment of Leases and any other agreement that a Seller or Buyer, as applicable, may reasonably enter into in connection with the consummation of the transactions contemplated hereby.

"<u>Assigned Contracts</u>" has the meaning set forth in <u>Section 1.5(a)</u>.

"<u>Assignment Motion</u>" has the meaning set forth in <u>Section 5.7(d)</u>.

"<u>Assignment Order</u>" has the meaning set forth in <u>Section 5.7(d)</u>.

"<u>Assumed Leases</u>" shall mean collectively the Real Property Leases and the Personal Property Leases.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 1.3</u>.

"<u>Assumption and Assignment Agreement</u>" means the Assumption and Assignment Agreement in substantially the form of <u>Exhibit D</u>.

"<u>Assumption and Assignment of Leases</u>" means the Assumption and Assignment of Leases in substantially the form for <u>Exhibit E</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 5.7(b)</u>.

"<u>Avoidance Actions</u>" means all Claims, powers and remedies of a debtor assertable or arising under Chapter 5 of the Bankruptcy Code or any other applicable law, including, without limitation, all preference, fraudulent transfer, and other Claims to avoid a transfer.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Pleadings</u>" has the meaning set forth in <u>Section 5.7(e)</u>.

"<u>Bankruptcy Rules</u>" has the meaning set forth in the Recitals.

"<u>Benchmark</u>" has the meaning set forth in <u>Section 2.1(e)(i)</u>.

"<u>Bidding Procedures</u>" means the procedures, provisions and conditions set forth in the Sale Procedures Order.

"<u>Bill of Sale</u>" means the Bill of Sale substantially in the form of <u>Exhibit F</u>.

"<u>Break-Up Fee</u>" has the meaning set forth in <u>Section 8.3</u>.

"<u>Business</u>" has the meaning set forth in the Recitals.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Minneapolis, Minnesota are authorized by law or other governmental action to close.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>Cash</u>" means all cash and cash equivalents.

"<u>Causes of Action</u>" means all Claims and causes of action (of any kind or character and whether arising prior to, on or after the Petition Date).

"<u>Claim</u>" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing ARI Adjustment</u>" has the meaning set forth <u>in Section 2(e)(i)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Date Payment</u>" has the meaning set forth in <u>Section 2.1(b)</u>.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.1(e)(i)</u>.

"<u>COBRA</u>" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidential Information</u>" means any information concerning the operations and affairs of the Sellers, their Affiliates and/or the Business that is not already generally available to the public.

"<u>Confidentiality Agreement</u>" means that certain Confidentiality Agreement, dated as of November 29, 2010, by and between Alliance Management (on behalf of Lyman Holding Company) and Buyer or its Affiliate.

"<u>Consents</u>" has the meaning set forth in <u>Section 4.1(e)</u>.

"<u>Construction and Consultant Contracts</u>" has the meaning set forth in <u>Section 4.1(p)(vi)</u>.

"Contract" means any written contract, agreement, license or sublicense, instrument, indenture, commitment or undertaking (excluding, for all purposes hereof, purchase orders and sales orders).

"Cure Costs" means, with respect to any Contract, the costs and expenses payable under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of such contract.

"Cure Costs Holdback" has the meaning set forth in Section 1.5(d).

"Employee Benefit Plans" means all employee benefit plans as defined in Section 3(3) of ERISA, all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind and all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

"Encumbered Assets" has the meaning set forth in Section 8.3(b).

"Encumbrance" means any lien, pledge, charge, security interest, option, right of first refusal, mortgage, easement, right of way, lease, sublease, license, sublicense, adverse claim, title defect, encroachment, other survey defect, or other encumbrance of any kind, including, with respect to real property, any covenant or restriction relating thereto.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, orders, judgments, junctions, decrees, regulations and other provisions having the force of law, all judicial and administrative orders and determinations, or natural resources and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, exposure to or cleanup of any Hazardous Materials.

"Environmental Report" has the meaning set forth in Section 4.1(k).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with such Person or (ii) which together with such Person is treated as a single employer under Sections 414(b), (c), (m), (n) or (o) of the Code.

"Escrow Agent" has the meaning set forth in Section 2.1(d).

"Excluded Assets" has the meaning set forth in Section 1.2.

"Excluded Contracts" has the meaning set forth in Section 1.2(b).

"Excluded Leases" has the meaning set forth in Section 1.2(p).

"Excluded Liabilities" has the meaning set forth in Section 1.4.

"Execution Date" has the meaning set forth in the Preamble.

"Final Order" means an action taken or Order issued by the applicable Government Authority as to which:  (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Government Authority and the time for filing any such petition or protest is passed; (iii) the Government Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"GAAP" means generally accepted accounting principles in the United States.

"Government Authority" means any agency, division, subdivision or governmental or regulatory authority or any adjudicatory body thereof, of the United States, any state thereof or any foreign jurisdiction.

"Hazardous Materials" has the meaning set forth in Section 4.1(k).

"Hired Employees" has the meaning set forth in Section 5.4(a).

"Improvements" means the buildings, improvements and structures of Sellers now existing on Real Property or demised under any lease of, or other Contract for the use of, real property, and any and all fixtures appurtenant thereto.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business (other than the current liability portion of any indebtedness for borrowed money)); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); (vi) the liquidation value, accrued and unpaid dividends; prepayment or redemption premiums and penalties (if any), unpaid fees or expenses and other monetary obligations in respect of any redeemable preferred stock of such Person; (vii) all obligations with respect to any factoring programs of any Seller; (viii) all obligations of the type referred to in clauses (i) through (vii) of any Persons for the

payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (ix) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Information Technology" has the meaning set forth in Section 4.1(i).

"Intellectual Property" means any and all of the following used or useful in the Business: (i) any and all inventions, discoveries, ideas, processes, formulae, designs, models, industrial designs, know-how, trade secrets, confidential information and proprietary information, whether or not patented or patentable and including all improvements thereto, research and development, compositions, manufacturing and production processes and techniques, technical data, proprietary tools, designs, drawings, specifications, technology, systems, databases, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) all copyrightable works, all copyrights, and all applications, registrations and renewals in connection therewith; (iv) all mask works and all applications, registrations and renewals in connection therewith; (v) all Internet Web sites, including all Internet Web sites relating to the Transferred Internet Domain Names, including domain name registrations and content and software included therein; (vi) all rights to recover for past infringements of any of the foregoing; and (vii) all copies and tangible embodiments thereof (in whatever form or medium).

"Interests" means any claims to rights of ownership or otherwise.

"Inventory" means all the finished goods, raw materials, work in process and other supplies owned by Sellers on the Closing Date.

"IP Assignments" has the meaning set forth in Section 3.2(b).

"Knowledge" when referring to the Sellers means (i) the actual knowledge of James E. Hurd, Dale Carlson, Tim Liester, Bill Bye, Paul Swenson, Terry Elwood, Jason Cooper, Scott Gertjejansen and Brian Balcer, consisting of the individual officers, executive managers, and operating managers of each of the Sellers, have carefully reviewed the representations and warranties appearing in this Agreement and thereupon informed Sellers of any inaccuracies in or exceptions to the representations and warranties set forth in this Agreement and (ii) that knowledge which would have been obtained after due and diligent inquiry by such officers, executive managers, and operating managers.

"Lease Deposits Amount" means the aggregate amount of all lease deposits made by Sellers or any of their Affiliates pursuant to the Assumed Leases. Schedule 11(a) sets forth the aggregate amount, as of the date hereof, of all lease deposits made by Sellers or any of their Affiliates pursuant to the Assumed Leases.

"Lease Schedule" has the meaning set forth in Section 4.1(m).

"Leased Property" has the meaning set forth in Section 1.1(c).

"LHC" has the meaning set forth in the Preamble.

"Liability" means any debt, loss, claim (as defined in Section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" has the meaning given to that term in Section 101(37) of the Bankruptcy Code.

"Lyman Lumber Names" means any name including the word "Lyman Lumber" or any one or more other business or trade names set forth in the Preamble to this Agreement, and any other trade names, trademarks or service marks owned by Sellers or licensed to Sellers, or otherwise used by Sellers (including, without limitation, Keystone Report).

"Material Adverse Effect" means a material adverse change in the business, operations, assets, liabilities, properties, client base, rights, results of operations or condition (financial or otherwise) of any of the Sellers, or any occurrence, circumstance, or combination thereof that reasonably could be expected to result in any such material adverse change or would be reasonably likely to materially and adversely affect the ability of any Seller to consummate the transactions provided for in this Agreement.

"Mortgage Liabilities" has the meaning set forth in Section 2.4.

"Mortgage Documents" shall mean the mortgage loan documents encumbering the Real Property and set forth on Schedule 2.4.

"Nonassignable Contract" has the meaning set forth in Section 5.6.

"Non-Business Related Information" has the meaning set forth in Section 1.2(q).

"Orders" means the Sale Approval Order, the Sale Procedures Order, and the Assignment Order.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Business (including acts and omissions of Sellers in the ordinary and usual course) through the date hereof.

"Owned Machinery and Equipment" has the meaning set forth in Section 1.1(d).

"Permits" has the meaning set forth in Section 1.1(i).

"Permitted Liens" mean: (a) Liens for Taxes, assessments and Government Authority or other similar charges that are not yet due and payable, (b) easements, licenses, unrecorded real

estate agreements, restrictions and other matters of record which either (i) the title company has agreed to affirmatively insure against loss caused thereby in the applicable title policy, by way of ALTA coverage or other affirmative cover, reasonably acceptable to Buyer, or (ii) do not materially and adversely affect the operation of the Real Property in question as currently and previously used in the operation of the Business as determined by Buyer's in Buyer's reasonable discretion, (c) any state of facts a survey or other visual inspection would show that do not materially and adversely affect the operation of the Real Property in question as currently and previously used in the operation of the Business as determined by Buyer's in Buyer's reasonable discretion and (d) Liens arising from the Assumed Liabilities.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government Authority.

"Petition Date" has the meaning set forth in the Recitals.

"Petition for Relief" has the meaning set forth in the Recitals.

"Post-Closing Specified Obligations" means the Specified Obligations not paid by the Sellers prior to Closing pursuant to Section 1.5(d), relating to the following: employee bonuses and incentives; customer rebates; and employee commissions, and as specifically identified on a list of Specified Obligations as of the business day ended immediately prior to the Closing Date, as prepared and delivered by Seller to Buyer on the day prior to Closing.

"Post-Petition Costs" has the meaning set forth in Section 1.5(e).

Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Properties" shall mean collectively, the Real Property and the Leased Property.

"Prorated Items" has the meaning set forth in Section 2.3.

"Purchase Price" has the meaning set forth in Section 2.1(a).

"Real Property" has the meaning set forth in Section 1.1(a).

"Real Property Leases" has the meaning set forth in Section 4.1(m).

"Rejected Contracts" has the meaning set forth in Section 1.5(a).

"Sale Approval Order" has the meaning set forth in Section 5.7(c).

"Sale Approval Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a competing transaction.

"Sale Motion" has the meaning set forth in Section 5.7(a).

"Sale Procedures Order" has the meaning set forth in Section 5.7(b).

"Secured Lenders" means: (i) U.S. Bank National Association, a national banking association, as both a lender and administrative agent ("Agent") to the other lenders, and (ii) TCF National Bank, a national banking association, (iii) BMO Harris Bank N.A., successor-by-merger to M&I Marshall & Ilsley Bank, a Wisconsin state banking corporation, (iv) Bank of America, N.A., a national banking association, successor through merger to Bank of America National Trust & Savings Association, a national banking association, (v) Wells Fargo Bank, National Association, a national banking association, (vi) JPMorgan Chase Bank, N.A., a national banking association, and (vii) The Prudential Insurance Company of America, a New Jersey stock life insurance corporation.

"Seller Benefit Plans" has the meaning set forth in Section 1.2(c).

"Seller Controlled Group" has the meaning set forth in Section 1.2(c).

"Sellers" has the meaning set forth in the Preamble.

"Sellers' Representative" has the meaning set forth in Section 10.16.

"Specified Obligations" means all liabilities, accruals, and obligations of Sellers and any of them that relate to any period prior to the Closing in the nature of employee bonuses, consultant bonuses, sales commissions or other commissions, incentive pay, or other compensation (other than Accrued Select Employee Vacation Time), customer or purchaser rebates, sales, use, excise and similar taxes, and fees or other amounts in respect of any audit, tax benefit plan or other audit-related expenses.

"Subject Affiliates" has the meaning set forth in Section 5.8.

"Subject Internet Domain Names" has the meaning set forth in Section 5.1(e).

"Superior Proposal" means a bona fide written Alternative Proposal involving the direct or indirect acquisition of all or substantially all of the assets constituting the Business, that the Board of Directors of LHC determines in good faith (after consultation with outside legal counsel and the financial advisor to Sellers) is more favorable from a financial point of view to Sellers than the transactions contemplated by this Agreement, taking into account all relevant considerations, including the anticipated timing, conditions and prospects for completion of such Alternative Proposal.

"Tax Records" has the meaning set forth in Section 1.2(m).

"Tax Return" means any report, declaration, return, information return, filing, claim for refund or other information relating to Taxes, including any Schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government Authority, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Termination Date" has the meaning set forth in Section 8.1(b).

"Territory" has the meaning set forth in Section 5.8.

"Transfer Taxes" has the meaning set forth in Section 6.1.

"Transferred Internet Domain Names" means all internet domain names used in connection with the Business that are transferred to Buyer by Sellers following the assignment to Sellers by Sellers' Affiliates pursuant to Section 5.1(e).

"Unencumbered Assets" has the meaning set forth in Section 8.3(b).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1998.

"Warranty Adjustment" means $150,000.

"Warranty Costs" means any costs and expenses incurred in respect of any product or other warranty provided by Sellers to any purchaser or customer on or prior to the Closing Date and which is still in effect as of such date.

* * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

BUYER:

SP ASSET MANAGEMENT, LLC

By: _____
Its: _____

SELLERS:

LYMAN HOLDING COMPANY                    CARPENTRY CONTRACTORS CORP.

By: _____   By: _____
Its: _____  Its: _____


LYMAN LUMBER COMPANY

By: _____
Its: _____


AUTOMATED BUILDING
COMPONENTS, INC.

By: _____
Its: _____


BUILDING MATERIAL
WHOLESALERS, INC.

By: _____
Its: _____


LYMAN LUMBER OF WISCONSIN, INC.

By: _____
Its: _____

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

                                   Chapter 11 Case No. 11-45190

Lyman Holding Company, et al.,

                                       (Jointly Administered)

            Debtors.[1]

---

**CERTIFICATE OF SERVICE**

---

        Sarah M. Gibbs, under penalty of perjury, states that on August 30, 2011, she caused to be served the following:

            1.        Unsworn Declaration of Sarah M. Gibbs in Support of Debtors' Sale Motion [Docket #19]; and

            2.        Certificate of Service

by sending true and correct copies via ECF, e-mail, and US mail to the parties on the attached service list.

Dated: August 30, 2011                       */e/ Sarah M. Gibbs*
                                            Sarah M. Gibbs

---

[1] Jointly administered estates of the following Debtors: Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11- 45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

Lyman Holding Company and Related Debtors
Main Case: bky no. 11-45190
SERVICE LIST
Served via U.S. Mail except those parties whose contact information includes an e-mail address were served via ECF or e-mail.

| *US Trustee and Other Required Parties* |
| --- |
| *U.S. Trustee*<br>Sarah J. Wencil<br>U.S. Trustee's Office<br>1015 US Courthouse<br>300 South Fourth Street<br>Minneapolis, MN 55415<br>Sarah.J.Wencil@usdoj.gov |
| IRS District Counsel<br>380 Jackson St, Ste 650<br>St Paul MN 55101-4804 |
| Internal Revenue Service<br>Wells Fargo Place<br>30 E 7th St, Mail Stop 5700<br>St Paul MN 55101 |
| MN Department of Revenue<br>Collection Enforcement<br>551 Bky Section - PO Box 64447<br>St. Paul MN 55164-0000 |
| Internal Revenue Service<br>Special Procedures Branch<br>389 US Courthouse 316 N Robert<br>St. Paul MN 55101-0000 |
| US Attorney<br>600 US Courthouse<br>300 S Fourth St<br>Minneapolis MN 55415 |
| Minnesota Department of Economic Security<br>332 Minnesota St, Ste E200<br>St. Paul MN 55101-1351 |
| Eau Claire County Treasurer<br>721 Oxford Avenue<br>Eau Claire WI 54703 |
| Scott County Treasurer<br>200 Fourth Ave W<br>Shakopee MN 55379-0000 |
| Milwaukee County Treasurer<br>901 N 9th St Room 102<br>Milwaukee WI 53233-0000 |
| Isanti County Treasurer<br>555 - 18th Ave SW<br>Cambridge MN 55008-0000 |
| Wright County Treasurer<br>10 Second St NW<br>Buffalo MN 55313-0000 |
| WI Department of Revenue<br>5-77 Mail Stop<br>PO Box 8902<br>Madison WI 53708-0000 |

| |
| --- |
| Washington County Treasurer<br>PO Box 200<br>Stillwater MN 55082-0200 |
| ND Department of Revenue<br>600 E Boulevard Ave<br>Bismarck ND 58505-0000 |
| IA Department of Revenue<br>Hoover State Office Building<br>1305 E Walnut<br>Des Moines IA 50319-0000 |
| Hennepin County Treasurer<br>300 S Sixth St, A-600<br>Minneapolis MN 55487-0060 |
| Barron County Treasurer<br>330 E LaSalle Ave Rm 2412<br>Barron WI 54812-0000 |
| Washington County Treasurer<br>432 E Washington St<br>West Bend WI 53095-0000 |
| Stearns County Treasurer<br>705 Courthouse Square<br>Room 148<br>Saint Cloud MN 56303-0000 |
| *Debtors* |
| Lyman Holding Company<br>Lyman Lumber Company<br>Automated Building Components, Inc.<br>Building Materials Wholesalers, Inc.<br>Carpentry Contractors Corp.<br>Construction Mortgage Investors Co.<br>Lyman Development Co.<br>Lyman Lumber of Wisconsin, Inc.<br>Lyman Properties, L.L.C.<br>Mid-America Cedar, Inc.<br>Woodinville Lumber, Inc.<br>Woodinville Construction Services, L.L.C.<br>c/o Jim Hurd<br>300 Morse Avenue<br>Excelsior, MN 55331<br>jim_hurd@lymanlumber.com |

| *Official Committee of Unsecured Creditors* |
| --- |
| Connie A. Lahn, Esq.<br>Lorie A. Klein, Esq.<br>David E. Runck, Esq.<br>Fafinski Mark & Johnson, P.A.<br>400 Flagship Corporate Center<br>775 Prairie Center Drive<br>Eden Prairie, MN 55344<br>Connie.Lahn@fmjlaw.com<br>Lorie.Klein@fmjlaw.com<br>David.Runck@fmjlaw.com |
| *Major Secured Creditors* |
| Bluelinx Corporation<br>4300 Wildwood Pkwy<br>Atlanta GA 30339-0000 |
| Lumbermens Merchandising Corp.<br>c/o Lucian B. Murley<br>Saul Ewing LLP<br>222 Delaware Avenue, Suite 1200<br>Wilmington, DE 19899<br>lmurley@saul.com |
| TCF National Bank<br>c/o Steven W. Meyer, Esq.<br>Rebecca G. Sluss, Esq.<br>Oppenheimer, Wolff & Donnelly<br>Plaza VII, Suite 3300<br>45 South Seventh Street<br>Minneapolis, MN 55402<br>smeyer@oppenheimer.com<br>rsluss@oppenheimer.com |
| US Bank, N.A.<br>c/o John R. McDonald, Esq.<br>Marcus A. Ploeger, Esq.<br>Briggs and Morgan, P.A.<br>2200 IDS Center<br>80 South 8th St.<br>Minneapolis, MN 55402<br>jmcdonald@briggs.com<br>mploeger@briggs.com |
| Wells Fargo Bank, N.A.<br>c/o Michael R. Stewart, Esq.<br>Colin F. Dougherty, Esq.<br>Faegre & Benson LLP<br>2200 Wells Fargo Center<br>90 South Seventh Street<br>mstewart@faegre.com<br>cdougherty@faegre.com |

4982235_1.DOC

Lyman Holding Company and Related Debtors
Main Case: bky no. 11-45190
SERVICE LIST
Served via U.S. Mail except those parties whose contact information includes an e-mail address were served via ECF or e-mail.

| *__Interested Parties__* |
| --- |
| SP Asset Management<br>c/o Donald E. Rothman, Esq.<br>Steven E. Fox, Esq.<br>Brett J. Nizzo, Esq.<br>Riemer & Braunstein LLP<br>Seven Times Square, Suite 2506<br>New York, NY 10036<br>DRothman@riemerlaw.com<br>sfox@riemerlaw.com<br>bnizzo@riemerlaw.com<br><br>SP Asset Management<br>c/o Jeffrey W. Jones, Esq.<br>Paul L. Ratelle, Esq.<br>Fabyanske, Westra, Hart & Thomson, P.A.<br>800 LaSalle Plaza, Ste 1900<br>Minneapolis, MN 55402<br>jjones@fwhtlaw.com<br>pratelle@fwhtlaw.com |
| Western Conf of Teamsters<br>Pension Trust<br>2323 Eastlake Ave E<br>Seattle WA 98102-0000 |
| Debt Acquisition Group, LLC<br>Craig A. Loren<br>10 Rockefeller Plaza, Suite 601<br>N.Y., NY 10020<br>aloren@debtacq.com |
| Ronan Kennedy<br>Lee Hansen<br>Meriturn Partners, LLC<br>ronan@meriturn.com<br>lee@meriturn.com |

Bryan Tolles
BlackEagle Partners
btolles@blackeaglepartners.com

ITW Bldg. Components Group Inc
13389 Lakefront Dr.
Earth City, MO 63045
kruff@itwbcg.com

Guardian Building Products Distribution, Inc.
c/o Timothy J. Prindiville
Nilsson Law Offices, P.A.
900 Flour Exchange Building
310 Fourth Avenue South
Minneapolis, Minnesota 55415
tim.prindiville@nilssonlaw.com

Patrick M. Sneed
Davis, Pickren, Seydel & Sneed, LLP
285 Peachtree Center Avenue N.E.
2300 Marquis II Tower
Atlanta, GA 30303
psneed@dpsslegal.com

Pension Benefit Guaranty Corporation
c/o Jon Chatalian, Esq.
Office of the Chief Counsel
1200 K Street, N.W., Suite 340
Washington, DC 20005-4026
chatalian.jon@pbgc.gov
efile@pbgc.gov

Sierra Pacific Industries
c/o Gordon B. Conn, Jr.
Kalina, Wills, Gisvold & Clark
6160 Summit Drive, Suite 560
Minneapolis, MN 55430
conn@kwgc-law.com

Minnetonka Public Schools District 276
c/o Monica Clark
Dorsey & Whitney
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
clark.monica@dorsey.com

Central States, Southeast and
Southwest Areas Pension Fund
c/o David L. Mitchell
Robins, Kaplan, Miller & Ciresi
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
dlmitchell@rkmc.com